UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

06 CV 5853

| | |
|---|---|
| Michael Zuckerman, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SCOTTISH RE GROUP LTD., GLENN SCHAFER, SCOTT E. WILLKOMM, DEAN E. MILLER AND SETH VANCE,<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED**<br><br>"ECF CASE" |

RECEIVED
AUG 02 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Michael Zuckerman, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Scottish Re Group Ltd. ("Scottish Re" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of securities analysts' reports concerning Scottish Re; (c) review and analysis of press releases and media reports issued by and disseminated by Scottish Re; and (d) review of other publicly available information concerning Scottish Re.

1.      This is a class action against Scottish Re and certain of its officers and directors for violation of the federal securities laws. Plaintiff brings this action on behalf of himself and all other persons or entities, except for Defendants and certain of their related parties as

described below, who purchased Scottish Re securities (the "Class") during the period, December 16, 2005 through July 28, 2006, inclusive (the "Class Period").

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and 1367, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa).

3.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5). Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District. Scottish Re is the second-largest United States reinsurer, with about $1.02 trillion in contracts issued at the end of 2005. In addition, Scottish Re makes presentations at conferences and meeting in this District. For example, on June 21 and 22, 2006, Dale J. Mensik, Scottish Re's Vice President and Capital Markets Actuary gave a talk at the "Insurance and Risk Linked Securities Conference" at the Grand Hyatt Hotel in New York. On March 8 and 9, 2006, Scottish Re's subsidiary, Scottish Re Capital Markets, Inc. together with the law firm of LeBoeuf, Lamb, Greene & MacRae LLP sponsored the "Global Life Insurance Securitization Conference" in New York City. In addition, representatives of Scottish Re have given presentations at the Society of Actuaries annual meeting held in New York.

4.    In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Michael Zuckerman purchased Scottish Re common stock during the Class Period, as set forth in the certification attached hereto.   Mr. Zuckerman is a resident of New York.

7.      Scottish Re is a global life reinsurance specialist. The Company engages in the reinsurance of life insurance, annuities and annuity-type products.  These products are written by life insurance companies and other financial institutions located in the United States.  Scottish Re has operating companies in Bermuda, Charlotte, North Carolina, Dublin, Ireland, Grand Cayman, and Windsor, England. Its flagship operating subsidiaries include Scottish Annuity & Life Insurance Company (Cayman) Ltd. and Scottish Re (U.S.), Inc.  Scottish Re is licensed and/or accredited in all 50 states and the District of Columbia.  Scottish Re has executive offices located at Crown House, Third Floor, 4 Par-la-Ville Road, Hamilton HM08, Bermuda, Cayman Islands; 13840 Ballantyne Corporate Place Suite 500 Charlotte, NC 28277, USA; and 1290 Broadway Suite 1600 Denver, CO 80203.

8.      On December 31, 2004, the Company acquired the in-force individual life reinsurance business of ING.  Pursuant to this transaction, Security Life of Denver Insurance Company and Security Life of Denver International Limited, both subsidiaries of ING, reinsured their in-force individual life reinsurance business to Scottish Re (U.S.), Inc. and Scottish Re Life (Bermuda) Limited on a 100% indemnity reinsurance basis. Scottish Re common stock is traded in an efficient market on the New York Stock Exchange under the symbol "SCT".

9.      Defendant Glenn Schafer has been Chairman of the Board of Directors since May 4, 2006.  He previously served on the Board from December 2001 through February 2005.

3

10.    Defendant Scott E. Willkomm was the Company's Chief Executive Officer from January 1, 2005 until his resignation on July 31, 2006. He was also a director of the Company. He served as a director since June 2000, and as President from March 2000. He also served as the Company's Chief Financial Officer from September 2000 to April 2002.

11.    Defendant Dean E. Miller has served as Executive Vice President and Chief Financial Officer since August 2005. He is responsible for the day-to-day financial operations of the Company and its subsidiaries. From May 2003 to July 2005, Mr. Miller was Chief Executive Officer of Swiss Re's Admin Re (SM) business in the United Kingdom. During that same time, he was also Chief Executive Officer of Swiss Re Services Limited, with responsibility for shared service activities in Swiss Re's UK operations. From 2001 to 2003, Mr. Miller was Chief Financial Officer of Swiss Re's Life and Health Business Group, and was a member of its Life Executive Board. Mr. Miller joined Swiss Re in 2000 as Senior Vice President — Finance, North American Life and Health. From 1997 to 2000, he was a partner with Ernst & Young in the New York office. Mr. Miller commenced his professional career in 1985 with Ernst & Young in Columbus, Ohio. Mr. Miller is a graduate of Miami University, Oxford, Ohio and is a Certified Public Accountant.

12.    Defendant Seth Vance, President and Chief Executive Officer, Scottish Holdings, Inc., has served as President and Chief Executive Officer since April 2004. He is responsible for the day-to-day activities of Scottish Re's North American life reinsurance operations.

13.    Defendants Glenn Schafer, Scott E. Willkomm, Dean E. Miller and Seth Vance are herein collectively referred to as the "Individual Defendants".

14.    The Individual Defendants, who were the Company's principal officers, controlled Scottish Re and its public disclosures. Each of them made false and misleading

4

statements and/or failed to disclose material adverse information concerning the Company's business and operations during the Class Period, as detailed herein. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

15.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, were the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers and/or directors of Scottish Re, by virtue of their high level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or deliberately disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

16.     As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Scottish Re, each of the Individual Defendants had access to the adverse, undisclosed information about the Company's operations, the financial condition and performance of the Company as particularized herein and knew (or deliberately disregarded) that these adverse facts rendered the positive representations made by or about Scottish Re and its business issued or adopted by the Company materially false and misleading.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the

6

Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

19.     Each of the Defendants is liable as a participant in a wrongful scheme and course of business that operated as a fraud or deceit on those who purchased or otherwise acquired Scottish Re common stock during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Scottish Re's business, operations, and the intrinsic value of the Company's common stock, and caused plaintiff and other members of the Class to purchase Scottish Re common stock at artificially inflated prices.

### CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased Scottish Re securities during the Class Period. Excluded from the Class are Defendants, officers and directors of the Company, members of the immediate families of the Individual Defendants and each of their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or has had a controlling interest.

21.     This action is properly maintainable as a class action because:

a.     the members of the proposed Class in this action are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the thousands. Millions of Scottish Re shares were traded publicly on the New York Stock Exchange ("NYSE") under the symbol "SCT". As of March 9, 2006, Scottish Re had 53,486,106 ordinary shares outstanding.

b.      Plaintiff's claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws as alleged herein;

c.      Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

d.      A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

e.      Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

f.      the questions of law and fact common to the members of the Class predominates over any questions affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

i.      whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

8

ii.    whether the Company's Class Period public statements and filings misrepresented and/or omitted material facts;

iii.   whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

iv.    whether Defendants participated in and pursued the common course of conduct complained of herein;

v.     whether the market price of Scottish Re securities was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period; and

vi.    to what extent the members of the Class have sustained damages and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

22.    Reinsurance is best thought of as "insurance for insurance companies," a way for a primary insurer to protect against unforeseen or extraordinary losses. Reinsurance limits liability on specific risks and lets front-line insurers increase their own capacity. It also helps share liability when losses overwhelm a primary insurer, which helps the entire industry retain more stability in the face of wide swings in profit and loss margins that are inherent in the insurance business. "For example, reinsurance plays a critically necessary, though behind-the-scenes, role in the financial management of natural disaster losses," according to the Reinsurance Association of America. A reinsurer issues contracts and charges a premium to indemnify another insurance company against all or part of its potential losses. Scottish Re is the second-largest reinsurer in the United States, with about $1.02 trillion in contracts issued at the end of 2005, according to Fitch.

9

23.     Scottish Re derives revenue primarily from premiums from reinsurance assumed on life business from existing treaties and from premiums on new treaties; investment income; realized gains and losses from its investment portfolio and fees from its financial solutions and wealth management businesses. Defendants knew that Scottish Re's success depends on its ability to accurately assess and manage the risks associated with the business that it reinsures. During the Class Period, defendants knew or were reckless in not knowing and failed to disclosed, *inter alia*, that Scottish Re: (1) failed to assess and price adequately for the risks it assumed; (2) failed to manage its assets and liabilities to manage investment and liquidity risk; and (3) failed to control expenses.

24.     On January 3, 2005, Scottish Re has closed on its acquisition of ING Re's individual life reinsurance business in the United States. ING's individual-life reinsurance business in the United States. Scottish Re and ING have agreed that ING will transfer the assets and reinsure the liabilities of all of its U.S. individual life reinsurance business to Scottish Re through a co-insurance transaction. Pursuant to the reinsurance agreement, ING will transfer to Scottish Re assets equal to reserves of approximately $800 million and pay Scottish Re a ceding commission of $560 million. This acquisition expanded Scottish Re's North American platform. At this time it made Scottish Re the 3rd largest life reinsurer by volume of U.S. life reinsurance in-force.

25.     Simultaneous with the closing of the ING acquisition, Scottish Re closed on $180 million in new capital provided by The Cypress Group ("Cypress"), a New York private equity firm, to support the acquired business. Under this purchase agreement, Cypress received ordinary shares equal to 9.9% of the aggregate number of ordinary shares issued and outstanding on the closing date at $19.375 per share, Class C warrants to purchase ordinary shares

10

representing the difference between 19.9% ownership, and an approximately $41 million aggregate principal amount of 7.00% convertible junior subordinated notes. As of the closing, Cypress is Scottish Re's largest shareholder. Cypress appointed one director and one non-voting observer to the Board of Directors, effective as of the closing. To further support this acquisition, Scottish Re raised an additional $50 million in preferred trust securities.

26.     On December 16, 2005, Scottish Re announced the pricing of a public offering of its ordinary shares. The press release stated:

> The Company offered 6,250,000 newly issued ordinary shares at $24.00 per share. In addition, approximately 3,150,000 ordinary shares were borrowed and offered in connection with forward sale agreements. The Company has also granted the underwriters a 30-day option to purchase up to an additional 1,410,000 ordinary shares at the public offering price less the underwriting discount, to cover over-allotments.
>
> Bear, Stearns & Co. Inc., Lehman Brothers Inc., Banc of America Securities LLC, Goldman, Sachs & Co., Wachovia Capital Markets, LLC, A.G. Edwards & Sons, Inc., Fox-Pitt, Kelton Incorporated, Keefe, Bruyette & Woods, Inc. and Oppenheimer & Co. Inc. are the underwriters for the offering. Bear, Stearns & Co. Inc. and Lehman Brothers Inc. are joint book running managers for the offering.
>
> The offering will be made under the Company's existing shelf registration statement filed with the Securities and Exchange Commission. In connection with the offering, the Company entered into forward sale agreements with affiliates of Bear, Stearns & Co. Inc. and Lehman Brothers Inc. (the "forward purchasers") and the forward purchasers borrowed and sold an aggregate of approximately 3,150,000 ordinary shares as their initial hedge of the forward sale agreements. Pursuant to the forward sale agreements, the forward purchasers agree to pay the Company an aggregate of approximately $75 million in approximately nine months and an aggregate of approximately $75 million in approximately twelve months, subject to the Company's right to receive a portion of such payment prior to the settlement dates. In exchange, on each of such dates the Company will deliver to the forward purchasers a variable number of ordinary shares based on the average market price of the ordinary shares, subject to a floor price of $22.80 and a cap price of $28.80. The Company also has the right to net share settle or cash settle the forward sale agreements.

27.     On December 16, 2005, Scottish Re stock closed at $24.02.

28.      On December 21, 2005, Scottish Re announced that it closed an offering of $455 million of 30-year maturity securities by its wholly-owned subsidiary Orkney Re II plc. Proceeds from the issuance will be used to fund certain statutory reserves associated with level-premium term life insurance policies (commonly referred to as Regulation XXX reserves) reinsured by Scottish Re (U.S.), Inc. between January 1, 2004 and December 31, 2004. Orkney Re II plc is a newly-formed, public limited company incorporated under the laws of Ireland that was established for the sole purpose of reinsuring the defined business.

29.      In connection with this announcement defendant Willkomm was quoted as stating:

> This transaction marks another important milestone for Scottish Re's capital market's strategy. Scottish Re has, once again, blazed a new path in the evolving world of life insurance securitization by successfully completing an innovative transaction in an expedited time frame. We have built on the foundation developed in the first Orkney transaction, while adding structural enhancements that make the Orkney Re II structure more capital and cost efficient.

30.      On December 23, 2005, Scottish Re announced that it completed two transactions that together provide approximately $2 billion in collateral to fund certain statutory reserves associated with level-premium term life insurance policies (commonly referred to as Regulation XXX reserves) that were assumed by Scottish Re in connection with its acquisition of ING Re's individual life reinsurance business. The press release further stated:

> We are pleased to announce that within one year from the date Scottish Re acquired ING Re's individual life reinsurance business, we have succeeded in locking in long-term, cost-effective financing for approximately forty percent of the Triple-X reserves associated with that block, said Scott E. Willkomm, President and Chief Executive Officer of Scottish Re Group Limited.
>
> One of these transactions is a 20-year collateral finance facility with HSBC Bank USA that provides approximately $1 billion of Triple-X collateral support. The structure is an enhanced version of the original Scottish Re/HSBC collateral finance facility that was completed in 2004. The second transaction is a long-term

reinsurance facility with a third party reinsurer that provides up to $1 billion of Triple-X collateral support.

31.     According to the 2005 Form 10-K filed with the SEC on March 16, 2006 the Company completed the public offering of 7,660,000 ordinary shares (which included an over allotment option of 1,410,000 shares) in which it raised aggregate net proceeds of $174.1 million. In connection with the offering, the Forward Purchasers agreed to pay an aggregate of approximately $75.0 million on September 29, 2006 and an aggregate of approximately $75.0 million on December 29, 2006.

32.     On February 16, 2006, Scottish Re net income available to ordinary shareholders for the quarter ended December 31, 2005 was $58.5 million, or $1.18 per diluted ordinary share, as compared to $21.0 million, or $0.56 per diluted ordinary share for the prior year period. Net income available to ordinary shareholders for the year ended December 31, 2005 was $125.4 million or $2.64 per diluted ordinary share, as compared to $71.4 million, or $1.90 per diluted ordinary share for the prior year period.  In this same release defendant Willkomm was quoted as stating:

> We are very pleased with the results for the quarter ended December 31, 2005. With this strong performance, we have met our earnings guidance for both the quarter and full year and significantly enhanced the return on equity to our shareholders. These quality earnings were driven by the excellent contribution made from our traditional reinsurance business in North America but performance from all areas of the business was solid for the period. In addition, I am particularly pleased with the successful completion of the integration of the ING business and the migration of our administration operations from Charlotte to Denver. Finally, the capital market transactions completed in December capped an excellent year for our Company and I look forward to carrying this momentum into 2006.

33.     According to the Company's 2005 Form 10-K the Company has six principal types of expenses: claims and policy benefits under our reinsurance contracts; interest credited to

interest sensitive contract liabilities; acquisition costs and other insurance expenses; operating expenses; collateral finance facilities expense; and interest expense. The Form 10-K further states that:

> A portion of the costs of acquiring new business, such as commissions, certain internal expenses related to our policy issuance and underwriting departments and other variable selling expenses are capitalized. The resulting deferred acquisition costs asset is amortized over future periods based on our expectations as to the emergence of future gross profits from the underlying contracts. These costs are dependent on the structure, size and type of business written.

34.     On May 2, 2006, Scottish Re completed an offering by Ballantyne Re, a $2.1 billion Regulation Triple-X securitization. Ballantyne Re was formed as a public limited company in Ireland and established for the sole purpose of reinsuring the defined block of business from Scottish Re (U.S.). Proceeds from Class A Notes will be held in a credit-for-reinsurance trust and used to fund regulatory reserves associated with level premium term life insurance policies (commonly referred to as Regulation XXX reserves). This was the largest life insurance-linked securitization ever completed.

35.     With the completion of this transaction, Scottish Re said that it had refinanced all of the Regulation Triple-X business acquired in connection with the ING Re transaction in late 2004. In addition, the Company said that it permanently lowered the cost of financing the Triple-X reserves from the cost assumed in the pricing of the transaction. Upon closing, Scottish Re received a $6.2 million rebate fee from ING that would be reported in the Company's results of operations for the second quarter ending June 30, 2006.

36.     In connection with this announcement Defendant Willkomm stated that the success of Ballantyne Re further solidifies Scottish Re's position as a market leader in life securitizations. We have now securitized over $3 billion in XXX reserves in three term

14

transactions and have financed an additional $2 billion in Triple-X reserves in two synthetic transactions."

37.     Mr. Goldean was also quoted as stating "Our ability to develop and execute innovative structures provides significant value to our clients and shareholders." Ballantyne Re is our second securitization vehicle domiciled in Ireland, a jurisdiction Scottish Re has been operating in since 2000.

38.     On May 4, 2006, Scottish Re issued a press release announcing it financial results for its first quarter ended March 31, 2006. The Company reported that that net income available to ordinary shareholders for the quarter ended March 31, 2006 was $11.6 million, or $0.20 per diluted ordinary share, as compared to $33.4 million, or $0.74 per diluted ordinary share for the prior year period. Net operating earnings available to ordinary shareholders were $14.3 million, or $0.25 per diluted ordinary share for the quarter ended March 31, 2006 as compared to $26.9 million or $0.60 per diluted ordinary share for the prior year period. The press release further stated:

UK New Business Success

We are focused on capitalizing on the success we are enjoying in our UK business and regional expansion," Mr. Willkomm said. "We have written five protection treaties that are expected to generate approximately $10 million of premium during the course of 2006 and $50 million in 2007. In addition, we closed a $600 million fixed annuity transaction in the UK in early April that will generate attractive long-term returns on capital.

Total revenues for the quarter increased to $578.3 million from $556.6 million for the prior year period, an increase of 3.9%. Excluding realized gains and losses and the change in value of the embedded derivatives, total revenues for the quarter increased to $581.8 million from $547.8 million for the prior year period, an increase of 6.2%.

Total benefits and expenses increased to $571.8 million for the quarter from $523.1 million for the prior year period, an increase of 9.3%. The increases in

revenues and expenses were principally driven by growth in the Company's reinsurance business in North America.

US Market Share Leadership Continues

In 2005, Scottish Re originated $131 billion of traditional life reinsurance in the United States. As a result, the Company was the number two life reinsurer with a 15.5% recurring new business market share according to the annual Society of Actuaries survey. In the first quarter, the Company originated $15.5 billion of new traditional life reinsurance business, which was in line with production expectations.

In the first quarter, Scottish Re's North American Segment's pre-tax operating income was slightly better than expected. On an assumed basis, actual-to-expected mortality experience in the United States was in line with expectations. However, net claims expense was approximately $5 million greater than expected due to a lower level of claim recoveries from retrocessionaires in the quarter. During the quarter, fewer claims were reported in excess of the Company's per life retention that would have benefited from retrocession.

Consolidated Operating Expenses in Line

The Company's operating expense ratio (which is the ratio of operating expenses to total revenue excluding realized gains and losses and the change in value of embedded derivatives) for the last twelve months ended March 31, 2006 was 5.2%, as compared to an operating expense ratio of 5.0% for the year ended December 31, 2005, resulting principally in lower operating revenues during the first quarter 2006. On an absolute dollar basis, 2006 operating expenses are on track to be level with 2005 reflecting the increased scale in our operations in North America and the successful integration of the ING Re acquisition.

The Company's effective tax rate was higher in the first quarter than prior quarters principally due to the operating losses incurred in the international segment.

The Company's total assets were $12.3 billion as of March 31, 2006. The core investment portfolio, comprising fixed maturity investments, preferred stock and most of the cash and cash equivalents, totaled $6.8 billion, and had an average quality rating of "AA", an effective duration of 3.0 years and a weighted average book yield of 5.1%. This compares with a portfolio balance of $6.7 billion, an average quality rating of "AA", effective duration of 2.9 years and an average book yield of 4.9% as of December 31, 2005.

39.    During the conference call announcing the Company's first quarter results

Defendant Willkomm stated:

16

While we're disappointed with the results we reported to the market last night we should not lose sight of the many significant accomplishments of the first quarter. The success of the ING acquisition, *our demonstrated ability to manage capital and mitigate risks through direct access to the capital markets*, combined with the continued execution of our business strategy positions us well for future profitable growth. And as a result we are bullish about our prospects for 2006 and beyond.

40.    Also, on May 4, 2006, Scottish Re announced today that its wholly owned subsidiary Scottish Annuity & Life Insurance Company (Cayman) Ltd. has entered into a transaction with the special purpose vehicle, Tartan Capital Limited to receive up to $155 million of payments in the event of severe population mortality. In connection with this announcement Defendant Willkomm was quoted as stating:

Once again, we at Scottish Re have demonstrated our ability to efficiently utilize the capital markets to fund life insurance risks, this time by transferring extreme mortality risk to investors as an alternative to traditional sources of retrocession

41.    On May 20, 2006, Scottish Re filed its Form 10-Q with the SEC for its first quarter ended March 31, 2006. In connection with such report, the Company submitted to the Securities and Exchange Commission the certifications of the principal executive officer and the principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Defendants Willkomm and Miller signed the certifications for the March 31, 2006 Form 10-Q.

42.    On July 31, 2006, Scottish Re announced that Defendant Willkomm resigned his position as President and Chief Executive Officer. The Board of Directors appointed Paul Goldean, Executive Vice President and General Counsel, to the position of interim Chief Executive Officer, effective immediately. Glenn Schafer, Chairman of the Board of Directors, said the Board has appointed a special committee, The Office of the Chairman, to assist executive management in directing the company in the near term. The committee will include

17

two longtime insurance industry executives, Bill Caulfeild-Browne and Mr. Schafer, as well as Mr. Goldean. It became immediately clear why Defendant Willkomm was resigning.

43.     Scottish Re also announced on July 31, 2006, that, based on preliminary estimates available, it expects to report a net operating loss available to ordinary shareholders of approximately $130 million for the second quarter ended June 30, 2006. The Company claimed that the loss for the quarter related to a valuation allowance on deferred tax assets of approximately $112 million combined with the following factors:

-- Reduction in estimated premium accruals

-- Increased retrocession costs

-- Write-down of deferred acquisition costs due to higher than expected lapse rates on certain fixed annuity treaties

-- Severance and retirement costs and other non-recurring operating expenses.

44.     On this news the price of Scottish Re stock dropped from $16.00 to $3.99 or approximately 72% on volume of 32 million shares, compared with average daily volume of 1 million shares. The decline in Scottish Re's stock price is a direct result of the nature and extent of defendants' false statements being revealed to investors and the market.

45.     Following Scottish Re July 31, 2006 announcement, Moody's Investors Service has downgraded to Ba2 from Baa2 the senior unsecured debt rating of Scottish Re; the rating agency also downgraded to Baa2 from A3 the insurance financial strength (IFS) ratings of the company's core insurance subsidiaries, Scottish Annuity & Life Insurance Company (Cayman) Ltd. and Scottish Re (U.S.), Inc. All debt and IFS ratings of Scottish Re remain on negative outlook.

18

46.     Contrary to defendants' repeated statements throughout the Class Period that the Company was poised from future profitable growth because of its demonstrated ability to manage capital and mitigate risks through direct access to the capital markets defendants knew or were reckless in not knowing that the Company was not generating enough new business through the collection of premiums from front-line insurance companies and was paying out more to its own reinsurers, whom they use to spread their own risk.   In addition, defendants knew or were reckless in not knowing that the "protection treaties" and "fixed annuity transactions" entered into to generate premium during the course of 2006 and 2007 would not be sufficient to cover its present and future losses.

47.     Defendants knew that Scottish Re had  (1) failed to assess and price adequately for the risks it assumed; (2) failed to manage its assets and liabilities to manage investment and liquidity risk; and (3) failed to control expenses.  Defendant knew that the failure to manage and mitigate the Company's risk would have an adverse affect on its ability to be profitable.

48.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Scottish Re their control over, and/or receipt and/or modification of Scottish Re allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Scottish Re, participated in the fraudulent scheme alleged herein.

## Applicability Of Presumption Of
## Reliance:  Fraud-On-The-Market Doctrine

49.     The market for Scottish Re's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Scottish Re's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Scottish Re securities relying upon the integrity of the market price of Scottish Re's securities and market information relating to Scottish Re, and have been damaged thereby.

50.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Scottish Re's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Scottish Re's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Scottish Re and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members

of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein

52.    At all relevant times, the market for Scottish Re's securities was an efficient market for the following reasons, among others:

(a)    Scottish Re's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Scottish Re filed periodic public reports with the SEC and the NYSE;

(c)    Scottish Re regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Scottish Re was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

53.    As a result of the foregoing, the market for Scottish Re's securities promptly digested current information regarding Scottish Re from all publicly available sources and reflected such information in Scottish Re's stock price. Under these circumstances, all purchasers of Scottish Re's securities during the Class Period suffered similar injury through their purchase of Scottish Re's securities at artificially inflated prices and a presumption of reliance applies.

21

## COUNT I

### For Violations of Sections 10(b) of
### The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder

54.    Plaintiff repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

55.    In connection with the sale of Scottish Re securities throughout the Class Period, Defendants participated, directly or by acquiescence, despite a duty to act, in the preparation and/or issuance of materially false and misleading statements and omissions.

56.    Defendants knew, or were reckless in not knowing, that the statements contained in Scottish Re public filings were materially false and misleading. Plaintiff and the Class relied, directly or indirectly by reliance on the integrity of the market, on Defendants' misstatements and/or omissions and were damaged as a result. But for Defendants' misrepresentations and/or omissions, Plaintiff and the Class would not have purchased Scottish Re securities or would have purchased them at non-artificially inflated prices.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act

57.    Plaintiff repeats and realleges each of the preceding paragraphs 1 through 56 as if fully set forth herein.

58.    This claim is brought against the Individual Defendants.

59.    The Individual Defendants were control persons within the meaning of the Exchange Act.

60.    As set forth above, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this complaint. By virtue of their positions as control persons, the Individual Defendants, each of whom violated Section 10(b) and Rule 10b-5, are liable pursuant to Section 20(a) of the Exchange Act.

61.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## NO SAFE HARBOR

62.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Scottish Re who knew that the statement was false when made.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all other Class members, prays for judgment as follows:

A.      A determination that this action is a proper class action and a certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.      An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants for damages sustained as a result of Defendants' wrongdoing, including interest thereon;

C.      An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other disbursements; and

D.      A grant of such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 2, 2006

Respectfully submitted,

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**

By: _____
       Arthur N. Abbey (AA-8074)
       Nancy Kaboolian (NK - 6346)
212 East 39th Street
New York, New York 10016
Tele:    (212) 889-3700
Fax:     (212) 684-5191

**PASKOWITZ & ASSOICATES**
Laurence D. Paskowitz, Esq.
Roy L. Jacobs, Esq
60 East 42nd Street, 46th Floor
New York, New York 10016
Tel: (212) 685-0969
Fax: (212) 685-2306

**Attorneys for Plaintiff**

24

## PLAINTIFF'S CERTIFICATE

     Michael Zuckerman    ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

       1.    Plaintiff has reviewed the complaint of Scottish Re Group LTD. and certain other defendants.

       2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

       3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

       4.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

       5.    Plaintiff made the following transactions during the Class Period (December 16, 2005 through July 31, 2006) in the common shares of Scottish Re:

| Purchases | | | | Sales | | |
|-----------|--|--|--|-------|--|--|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 07/26/2006 | 1200 | 15.717 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

       6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

       7.    I declare under penalty of perjury, this  1st  day of August, 2006 that the information above is accurate.

                                     MICHAEL ZUCKERMAN
                                              E-Sign