UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF CASE

|  |  |  |
|---|---|---|

In re SCOTTISH RE GROUP         :
SECURITIES LITIGATION           :

Master File No.
06-CV-05853 (SAS)

JURY TRIAL DEMANDED

## CONSOLIDATED CLASS ACTION COMPLAINT

Lead Plaintiff, the State Teachers Retirement System of Ohio, and Plaintiff Richard Allen

Baehr as trustee of the Richard Allen Baehr Living Trust (collectively "Plaintiffs") make the

following allegations upon information and belief based upon all of the facts set forth below

which were obtained through an investigation made by and through Plaintiffs' Lead Counsel.

Lead Counsel's investigation has included, among other things, a review of filings by

Defendants with the United States Securities and Exchange Commission ("SEC"), press releases

and other public statements issued by Defendants and the other sources set forth below.

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set

forth below after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this federal securities class action on behalf of themselves and all

other persons and entities other than Defendants and their affiliates as specified below, who

purchased or acquired Scottish Re Group Limited ("Scottish Re" or the "Company") Ordinary

Shares, Non-Cumulative Perpetual Preferred Shares ("Preferred Shares") and/or convertible

preferred shares of Hybrid Capital Units ("HyCUs") during the time period between February

17, 2005 and July 31, 2006 (the "Class Period") and were injured thereby.

2.      In this complaint, Plaintiffs assert two different sets of claims. The first set of

claims (Counts One through Eight) assert strict liability and negligence claims based on the

Securities Act of 1933 (the "Securities Act"). These claims are asserted against those Defendants who are statutorily responsible for material misstatements of facts and omissions in the prospectuses and registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered to the public in July and December 2005, respectively (the "Offerings"). Plaintiffs specifically disclaim any allegations of fraud in connection with these non-fraud claims.

3.    In the second set of claims (Counts Nine through Ten), Plaintiffs assert fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act") against those Defendants who are alleged to have directly participated in a fraudulent scheme throughout the Class Period and who acted with knowledge or reckless disregard of the true facts.

4.    Through its operating subsidiaries, Scottish Re is engaged in the reinsurance of life insurance, annuities and annuity-type products. Reinsurance is an arrangement under which a reinsurance company agrees in a treaty to assume risks of another insurance company referred to as a ceding company. Since its formation in 1998, the Company grew rapidly to become one of the three largest life reinsurance companies in the United States by the start of the Class Period.

5.    Throughout the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with Generally Accepted Accounting Principles ("GAAP"). The Company's senior executive officers also repeatedly signed sworn certifications regarding Scottish Re's financial statements and the adequacy of the Company's internal controls which were materially misstated as they failed to reveal Scottish Re's violations of GAAP and material deficiencies in the Company's administrative and claims processing systems and other internal controls.

6.    As set forth in detail below, the Company's violations of GAAP arose out of its failure, at all relevant times during the Class Period, to properly account for deferred tax assets. Despite the fact that the Company's financial statements repeatedly referred to the relevant and controlling GAAP standards, the Company's financial statements failed to comply with those same standards. During the Class Period and at the time of the Offerings, the Company reported material deferred tax assets notwithstanding the fact that long-planned securitization transactions (critical for Scottish Re to raise required insurance reserves) rendered the ability of the Company to benefit from those assets unlikely. Scottish Re failed to account for its securitization plans as required by GAAP until the end of the Class Period, when it suddenly announced a large tax valuation allowance which, inter alia, triggered reductions in the Company's credit ratings and threatened its ability to continue as a going concern.

7.    In addition to these violations of GAAP, throughout the Class Period, the Company suffered from numerous, undisclosed internal control deficiencies including the ability of senior executive officers to cause over $2 million of 2005 expenses to be deferred improperly and in violation of GAAP into 2006, in order to improve the Company's reported year-end 2005 results and earnings per share. The Company also suffered from other undisclosed internal control deficiencies set forth in detail below, including serious weaknesses in processing and tracking insurance claims, an area which should have been a core expertise for Scottish Re as one of the third largest reinsurance companies in the United States. These weaknesses which stemmed from poor administrative systems which were incapable of handling Scottish Re's rapid growth as well as a lack of trained employees and managers to process reinsurance claims, made it difficult for the Company to close its books at the end of each month and to properly state claims reserves and premiums in its financial statements.

8.    When the true facts were revealed, including a material valuation allowance on deferred tax assets and numerous other required financial adjustments (revealing the Company's poor internal controls), the price of Scottish Re securities declined precipitously. On the last day of the Class Period, the price of Scottish Re Ordinary Shares declined in one trading day by approximately 75%, following the Company's adverse disclosures.  Similarly, the price of Scottish Re HyCUs and Preferred Shares declined by approximately 72% and 50%, respectively, on heavy trading on the last day of the Class Period.

## JURISDICTION AND VENUE

9.    Certain non-fraud related claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Certain other claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

11.    Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## PARTIES

13.   On October 12, 2006, the Honorable Shira A. Scheindlin appointed the State Teachers Retirement System of Ohio ("Ohio Teachers") to serve as Lead Plaintiff in this consolidated class action.  Ohio Teachers is a public pension fund serving more than 439,000 active, inactive and retired Ohio public educators.  With invested assets of over $59 billion (as of June 30, 2005), Lead Plaintiff is one of the largest public pension funds in the country.  As set forth in the previously-filed certification attached hereto as Exhibit A, Ohio Teachers purchased Scottish Re Ordinary Shares during the Class Period, including Ordinary Shares purchased from the Company's public offering of Ordinary Shares in December 2005.

14.   Plaintiff Richard Allen Baehr as trustee of the Richard Allen Baehr Living Trust (the "Richard Baehr Trust"), as set forth in the previously-filed certification attached hereto as Exhibit B, purchased Scottish Re Preferred Shares from the Company's public offering of Preferred Shares in July 2005.

15.   Defendant Scottish Re Group Limited describes itself as a holding company incorporated under the laws of the Cayman Islands with its principal executive offices in Bermuda.  Scottish Re's Ordinary Shares, Preferred Shares and HyCUs are traded over the New York Stock Exchange and, during the Class Period, the Company held its annual investor day meeting in New York City.  In connection with the Offerings, Scottish Re irrevocably agreed that it may be served with process in New York, NY with respect to actions arising out of or in connection with violations of U.S. Federal securities laws.

16.   Defendant Scott Willkomm ("Willkomm") served as Chief Executive Officer of Scottish Re from January 1, 2005 until his resignation from the Company on July 31, 2006, the

last day of the Class Period.  Willkomm also served as President of Scottish Re and a member

of its Board of Directors from 2000 until July 31, 2006.  Prior to joining Scottish Re,

Willkomm was an investment banker specializing in insurance, banking and financial services.

Willkomm was a Managing Director with Prudential Securities Incorporated ("Prudential

Securities") and was responsible for that firm's insurance investment banking activities.

During his tenure with Prudential Securities, Willkomm represented insurance and reinsurance

companies in connection with public and private offerings of equity and debt securities,

mergers and acquisitions and other transactions.  In addition, he advised a number of

Prudential Securities clients in establishing reinsurance companies in both life and property

and casualty, including lead-managing Scottish Re's initial public offering in November 1998.

Prior to Prudential Securities, Willkomm worked as Senior Vice President with Oppenheimer

& Co. in that firm's Financial Institutions Group.

17.    Defendant Elizabeth Murphy ("Murphy") served as Chief Financial Officer of

Scottish Re from April 2002 until August 10, 2005.  Murphy served as Executive Vice

President of Finance and as a member of the Scottish Re senior management team reporting to

Defendant Willkomm from August 11, 2005 until her resignation from the Company on March

31, 2006.  Prior to joining Scottish Re, Murphy was Treasurer of ACE Limited and Chief

Financial Officer of ACE Tempest Re and was previously associated with

PricewaterhouseCoopers LLP.  Defendant Murphy is not being sued in this action for

statements made by Scottish Re or other Defendants for the first time after her resignation from

the Company on March 31, 2006.

18.    Defendant Dean E. Miller ("Miller") served as Executive Vice President and

Chief Financial Officer of the Company from August 10, 2005 through the end of the Class

Period.  Prior to joining the Company, Miller had over 20 years of insurance and reinsurance experience, including as a senior executive officer with Swiss Re.  Miller served as Chief Executive Officer of Swiss Re's Admin Re business in the United Kingdom and Chief Executive Officer of Swiss Re Services Limited from 2003 until when he joined Scottish Re. From 2001 to 2003, Miller served as Chief Financial Officer of Swiss Re's Life and Health Business Group and was a member of its Life Executive Board.  From 1997 to 2000, Miller was a partner with Ernst & Young LLP ("E&Y") and he began his career with E&Y in 1985. Defendant Miller is not being sued in this action for statements made by Scottish Re or other Defendants prior to his joining the Company on August 10, 2005, except for any statements that were repeated after that date in connection with new SEC filings or other public disclosures after August 10, 2005.

19.    Defendant Michael C. French ("French") served as Chairman of the Board of Directors of Scottish Re from March 2000 to May 3, 2006.  French served as a director of the Company from the time he founded the Company through the end of the Class Period.  French served as Chief Executive Officer of Scottish Re from the Company's incorporation in May 1998 until December 31, 2004.  As set forth below, Defendant French signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

20.    Defendants Scottish Re, Willkomm, Murphy, Miller and French are referred to herein collectively as the "Scottish Re Defendants."  Because of their senior executive positions with the Company, they each had access at the time they held their positions to the adverse undisclosed information about Scottish Re's financial statements and internal controls as set forth below.  It is appropriate to treat these individuals as a "group" for pleading

- 7 -

purposes and to presume the materially misstated information conveyed in the Company's press releases, SEC filings and other public statements quoted below were the collective actions of this narrowly defined group of individuals. Each of these individuals, by virtue of his or her high-level positions with the Company, directly participated in the management of the Company, including its financial reporting. These individuals were each involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case during his or her tenure with the Company.

21.    As officers and directors of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the Federal securities laws, these individual defendants each had a duty to disseminate promptly, accurate information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously-issued statements that had become materially misstated or untrue, so that the market price of the Company's publicly-traded securities would be based upon accurate information. Defendants Willkomm, Murphy, Miller and French each violated these requirements and obligations during the Class Period.

22.    These four individuals, because of their positions of control and authority as senior officers and directors of Scottish Re, were able to and did control the content of the various press releases, SEC filings and other public statements issued by Scottish Re during the Class Period. Each of these individuals, during his or her tenure with the Company, were provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly,

each of these individuals is responsible for the accuracy of the public statements detailed herein.

23.    Defendant Michael Austin ("Austin") served as a director of the Company from October 1998 through the end of the Class Period.  Austin retired in 1992 as the Managing Partner of the Cayman Islands office of KPMG Peat Marwick, an international accounting and consulting firm.  Austin served as director of the Cayman Islands Monetary Authority from 1997 to 2003, and as its Chairman until July 2004.  He has also served on a variety of other Cayman Islands government committees and government related boards.  As set forth below, Defendant Austin signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

24.    Defendant William Caulfeild-Browne ("Caulfeild-Browne") served as a director of Scottish Re from June 1999 through the end of the Class Period.  Caulfeild-Browne was the Chief Operating Officer (U.S.) for Swiss Re Life and Health of America from 1996 to 1998. He was Chief Operating Officer and a director of The Mercantile and General Reinsurance Company, from 1990 to 1996, Senior Vice President of that company from 1986 to 1990, and Vice President, Marketing of that company from 1981 to 1986.  Caulfeild-Browne was Chairman of the Research Council of the Life Office Management Association from 1993 to 1997.  As set forth below, Defendant Caulfeild-Browne signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

25.    Defendant Robert Chmely ("Chmely") served as a director of Scottish Re from October 1998 through the end of the Class Period.  From December 1995 to November 1997, Chmely was President of Prudential Asset Management Group, the corporate pension business

of The Prudential Insurance Company of America ("Prudential") and from December 1994 to December 1995, he was CFO of that group.  From December 1990 to December 1994, Chmely served as Senior Managing Director of Portfolio Management at Prudential.  As set forth below, Defendant Chmely signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

26.    Defendant Lord Norman Lamont ("Lamont") served as a director of Scottish Re from December 2001 through the end of the Class Period.  As set forth below, Defendant Lamont signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

27.    Defendant Hazel O'Leary ("O'Leary") served as a director of the Company from February 2001 through the end of the Class Period.  As set forth below, Defendant O'Leary signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

28.    Defendant Glenn Schafer ("Schafer") served as a director of the Company from 2001 through 2005, and from February 2006 through the end of the Class Period.  From January 1995 until December 2005, Schafer was President of Pacific Life Insurance Company.  As set forth below, Defendant Schafer signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period.

29.    Defendant Ernst & Young LLP served as the Company's outside auditor at all relevant times, from its initial public offering through the end of the Class Period.  E&Y provided audit, tax and due diligence services to the Company prior to and throughout the

Class Period, which included the issuance of clean and unqualified audit opinion letters on the Company's financial statements for the years ended December 31, 2004 and December 31, 2005. E&Y consented to the incorporation by reference in the registration statement for the Offerings of its clean and unqualified audit opinion letter on the Company's financial statements and its opinion letter on management's assessment of internal controls for the year ended December 31, 2004. For the years ended December 31, 2004 and December 31, 2005, E&Y was paid: (a) fees for audit services of approximately $2,498,000 and $1,800,000, respectively; (b) fees for tax services and tax planning of approximately $1,004,000 and $1,675,000, respectively; and (c) fees for audit related services, including due diligence services related to mergers and acquisitions, of approximately $1,184,000 and $710,000, respectively. E&Y maintains its national headquarters at Five Times Square, New York, NY.

30. Defendant Lehman Brothers Inc. ("Lehman Brothers") is an investment bank and acted as the Sole Book Running Manager of the public offering of Scottish Re securities in July 2005 and the Joint Book Running Manager of the public offering of Scottish Re securities in December 2005. As discussed below, Lehman Brothers also served as the Sole Structuring Agent and Lead Book-Runner for the Company's $2.1 billion Ballantyne Re securitization. Lehman's world headquarters are located at 745 Seventh Avenue, New York, NY.

31. Defendant Bear Stearns & Co. Inc. ("Bear Stearns") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in July 2005 and the Joint Book Running Manager of the public offerings of Scottish Re securities in December 2005. Bear Stearns's worldwide headquarters are located at 383 Madison Avenue, New York, NY.

- 11 -

32.   Defendant Banc of America Securities LLC ("Banc of America") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in July 2005 and December 2005.  Banc of America also served as a Co-Manager for the Company's $2.1 billion Ballantyne Re securitization.

33.   Defendant Keefe Bruyette & Woods ("Keefe Bruyette") is an investment bank and acted as one of the underwriters with respect to the public offerings of Scottish Re securities in July 2005 and December 2005.  Keefe Bruyette's headquarters are located at 787 Seventh Avenue, New York, NY.

34.   Defendant Oppenheimer & Co. ("Oppenheimer") is an investment bank and acted as one of the underwriters with respect to the public offerings of Scottish Re securities in July 2005 and December 2005.  Oppenheimer's principal offices are located at 125 Broad Street, New York, NY.

35.   Defendant Advest, Inc. ("Advest") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in July 2005.

36.   Defendant RBC Dain Rauscher Inc. ("RBC Dain Rauscher") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in July 2005.

37.   Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in July 2005.

38.   Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in December 2005.  Goldman Sachs also served as a Co-Manager for the Company's $2.1 billion

Ballantyne Re securitization. Goldman Sachs's principal executive offices are located at 85 Broad Street, New York, NY.

39.     Defendant Wachovia Capital Markets, LLC ("Wachovia") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in December 2005.

40.     Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in December 2005.

41.     Defendant Fox-Pitt Kelton Incorporated ("Fox-Pitt") is an investment bank and acted as one of the underwriters with respect to the public offering of Scottish Re securities in December 2005. Fox-Pitt's corporate headquarters are located at 55 East 52nd Street, New York, NY.

42.     Defendant Bear Stearns International Limited is an affiliate of Defendant Bear Stearns.  Bear Stearns International Limited acted as a forward purchaser of Scottish Re Ordinary Shares in connection with the public offering of Scottish Re Ordinary Shares in December 2005.  Together with Defendant Lehman Brothers OTC Derivatives Inc. (collectively the "Forward Purchaser Defendants"), the Forward Purchaser Defendants borrowed and sold an aggregate of approximately 3,150,000 Ordinary Shares in the December 2005 offering in exchange for the agreement by the Company to issue Ordinary Shares to the Forward Purchaser Defendants on settlement dates nine and twelve months after the offering.

43.     Defendant Lehman Brothers OTC Derivatives Inc. is an affiliate of Defendant Lehman Brothers.  Lehman Brothers OTC Derivatives Inc. acted as a forward purchaser of Scottish Re Ordinary Shares in connection with the public offering of Scottish Re Ordinary

Shares in December 2005. Together with Defendant Bear Stearns International Limited, Lehman Brothers OTC Derivatives Inc. borrowed and sold an aggregate of approximately 3,150,000 Ordinary Shares in the December 2005 offering in exchange for the agreement by the Company to issue Ordinary Shares to the Forward Purchaser Defendants on settlement dates nine and twelve months after the offering.

## CLASS ACTION ALLEGATIONS

44.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired Scottish Re Ordinary Shares, Preferred Shares and/or HyCUs during the Class Period, February 17, 2005 through July 31, 2006, either in the Offerings, pursuant to a registration statement, or in the market, and, who, upon disclosure of certain facts alleged herein, were injured thereby. Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the individual Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director, or controlling person of Scottish Re (including any of its subsidiaries or affiliates) or any other Defendant; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

45.    The members of the Class are so numerous that joinder of all members is impracticable. As of May 5, 2006, Scottish Re had 53,719,156 Ordinary Shares issued and outstanding. Throughout the Class Period, Scottish Re securities were actively traded on the New York Stock Exchange. While the exact number of purchasers of Scottish Re securities is

unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the thousands.

46.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and the other members of the Class acquired Scottish Re securities in the Offerings, pursuant to a registration statement, or in the market, and sustained damages as a result of Defendants' conduct complained of herein.

47.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

48.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

49.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.    whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

    b.    whether the registration statements and prospectuses for the Company's securities Offerings contained material misstatements or omitted to state material information;

    c.    whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

d.      whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

e.      whether and to what extent Defendant E&Y's audits of the Company's financial statements and management's assessments of internal controls during the Class Period failed to be conducted in accordance with Generally Accepted Auditing Standards ("GAAS");

f.      whether and to what extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

g.      whether, with respect to Plaintiffs' claims under the Securities Act, Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

h.      whether, with respect to Plaintiffs' claims under the Exchange Act, Defendants named in those claims acted with scienter;

i.      whether, with respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, Defendants named in those claims are controlling persons of Scottish Re;

j.      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

k.      whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

50.    The names and addresses of those persons and entities who purchased Scottish Re securities during the Class Period are available from the Company's transfer agent(s) and/or from the underwriter Defendants. Notice may be provided to such purchasers and/or record owners via first class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## FACTUAL ALLEGATIONS PERTINENT TO
## CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

**The Company's Formation and Explosive Growth**

51.    Scottish Re is a holding company incorporated under the laws of the Cayman Islands, with principal executive offices located in Bermuda.  Through its operating subsidiaries, the Company is engaged in the reinsurance of life insurance, annuities and annuity-type products.

52.    Although Scottish Re is a relatively young company, it has grown at an explosive pace by acquiring numerous insurance companies around the world.  The Company's roots date back to 1994, when brothers Sam and Charles J. Wyly, Jr. (the "Wyly Brothers") and Defendant French co-founded an offshore holding company known as Scottish Holdings Ltd., and established its wholly-owned subsidiary, The Scottish Annuity Company (Cayman) Ltd. ("Scottish Annuity"), a privately held Cayman Islands company which issued tax deferred annuities to sophisticated investors.

53.    On May 12, 1998, the management and shareholders of Scottish Annuity incorporated Scottish Annuity & Life Holdings, Ltd. ("Scottish Holdings") under the laws of the Cayman Islands.  Scottish Holdings was organized to provide customized variable life insurance policies to high net worth individuals and families and reinsurance of in-force blocks of fixed annuities through its wholly-owned subsidiary, Scottish Annuity & Life Insurance Company (Cayman) Ltd. ("Scottish Annuity & Life").

54.    On November 30, 1998, Scottish Holdings completed an initial public offering ("IPO"), issuing approximately 16.75 million Ordinary Shares at an offering price of $15.00 per share.  Following the completion of the IPO, Defendant French served as CEO and President, Sam Wyly served as Chairman of the Board, and Charles Wyly served as a Director.

55.   On October 15, 1999, Scottish Holdings paid approximately $25 million in cash to acquire Harbourton Reassurance, Inc. ("Harbourton"), a U.S.-based reinsurance company licensed in fourteen states and the District of Columbia, and an authorized reinsurer in thirty-eight states.  As of March 31, 1999, Harbourton had a closed-block of business, with reserves of about $90 million, statutory assets of about $136 million and capital of about $38 million. By acquiring Harbourton, Scottish Holdings obtained a platform to begin writing insurance policies in the United States.  Shortly after the acquisition was completed, the Company changed Harbourton's name to Scottish Re (U.S.).

56.   On December 31, 2001, the Company expanded its business outside of North America by acquiring World-Wide Holdings Limited and its wholly-owned subsidiary, World-Wide Reassurance Limited, a U.K.-based reinsurer of group life insurance, individual life insurance and aircrew loss of license insurance in Asia, Europe, Latin America and the Middle East, in exchange for 4,532,380 newly issued Scottish Holdings Ordinary Shares.  As of March 31, 2001, World-Wide Reassurance had total assets of approximately $166 million.  Following the completion of these acquisitions, the Company changed the names of World-Wide Holdings Limited and World-Wide Reassurance Limited to Scottish Re Holdings Limited and Scottish Re Limited, respectively.

57.   On September 2, 2003, Scottish Holdings issued a press release announcing that it received shareholder approval to change its name to Scottish Re Group Limited, noting that "[t]he Company intends to unify its corporate identity under the Scottish Re banner to more accurately reflect the Company's mission by emphasizing its life reinsurance business and provide a strong and consistent brand for its operating companies."

58.   On December 22, 2003, the Company paid $151 million to acquire 95% of the outstanding capital stock of ERC Life Reinsurance Corporation ("ERC"), a subsidiary of GE Employers Reinsurance Corp., whose business consisted primarily of a closed block of traditional life reinsurance business.  At the time of the acquisition, ERC had approximately $800 million in total assets and approximately $100 million of statutory capital and surplus. Shortly thereafter, the Company changed ERC's name to Scottish Re Life Corporation.

59.   On December 31, 2004, the Company, through Scottish Re (U.S.) and Scottish Re Life (Bermuda) Limited, acquired the in-force individual life reinsurance business of ING.  By completing this acquisition, the Company increased its policy count in North America from approximately 7.5 million to 15 million and increased its gross face amount of in-force business in North America from approximately $305 billion to approximately $1 trillion.  As a result, by the start of the Class Period on February 17, 2005, Scottish Re purported to be the third largest U.S. life reinsurer based on life reinsurance in-force.

**Background Regarding Scottish Re's Material Financial Misstatements and Second Quarter 2006 Loss and Valuation Allowance on Deferred Tax Assets**

60.   In a complete surprise to investors, on July 31, 2006, the last day of the Class Period, the Scottish Re Defendants issued a press release announcing that the Company expected to report a net loss of approximately $130 million for the second quarter ended June 30, 2006.  The Company's press release stated that the loss for the quarter was "principally related to a valuation allowance on deferred tax assets of approximately $112 million."

61.   As explained by Defendant Miller during a conference call held on August 4, 2006, the Company's valuation allowance followed the closing on May 2, 2006, of a $2.1 billion securitization used to fund the Company's statutory Regulation XXX insurance reserve requirements, by Ballantyne Re plc ("Ballantyne Re"), an offshore special purpose vehicle

formed in Ireland on November 8, 2005.  According to Miller, the Ballantyne Re securitization

"eliminated a large cushion that greatly reduced flexibility in [Scottish Re's] tax planning

strategies and increased pressure on [the Company's] remaining strategies."  During the

conference call, Miller further stated:

> What Ballantyne did was – we had various tax planning strategies that we felt
> very comfortable with.  We also had other blocks of business that we could apply
> tax planning strategies to that gave us some extra cushion.  <u>All Ballantyne did was
> it put profitable business into a securitized vehicle that limited some flexibility on
> what you could do with that block of business</u>.  So in other words, it kind of took
> some of the cushion away and then put more pressure on the existing tax planning
> strategies that we were relying on.  [Emphasis added.]

62.  As set forth herein, public statements by the Scottish Re Defendants in early 2005

demonstrate that the Ballantyne Re transaction was one that the Company had planned and

anticipated from the very start of the Class Period, following the Company's acquisition of a

large block of reinsurance business from ING.  Because these securitization plans, at all

relevant times, rendered a substantial portion of the Company's deferred tax assets unlikely to

benefit the Company, in accordance with GAAP as set forth below, the Company should have

recorded a valuation allowance and recognized material losses related to its deferred tax assets

by no later than the start of the Class Period, on February 17, 2005.  Scottish Re's failure to

record these losses throughout the Class Period violated GAAP and caused the Company's

financial statements and other disclosures to be materially misstated at the time of the

Offerings and throughout the Class Period.  Scottish Re's financial misstatements were not

corrected until the Company's surprise disclosures on the last day of the Class Period.

63.  After the end of the Class Period, on November 9, 2006, Scottish Re reported yet

another valuation allowance and loss for the 2006 third quarter ended September 30, 2006.  In

explaining that valuation allowance, Scottish Re once again noted in the Form 10-Q filed for

the quarter ended September 30, 2006:  "as previously indicated, the Company can no longer recognize tax benefits for certain legal entities."

**Regulation XXX Reserve Requirements**

64.   As a life reinsurance company operating within the United States, Scottish Re is required by U.S. insurance regulations to maintain certain minimum levels of reserves. Reserves represent the amount of money that must be set aside by the Company to pay for future insurance or reinsurance obligations.

65.   National Association of Insurance Commissioners' ("NAIC") Model Regulation 830, which was adopted by most U.S. states effective January 1, 2000, imposed new, more conservative methodologies and assumptions for the calculation of reserves required by life insurers that issue guaranteed-level premium term life insurance policies and reinsurers.  These reserves are typically referred to in the industry as "Regulation XXX" or "Triple-X" reserves. Regulation XXX reserves (also referred to as "statutory" reserves) are far greater than "economic" reserves, those reserves that actuaries and accountants would determine (absent industry regulations) are sufficient to cover the future contractual obligations of insurers and reinsurers.  Regulation XXX reserves typically exceed economic reserves for up to 20 to 30 years, depending upon policy terms, and generally increase for the first 10-11 years of coverage before gradually declining.   This pattern is referred to by industry participants, including Scottish Re, as a "hump-back effect."  Similar statutory reserve requirements known as "Regulation AXXX" apply to "universal" life or "whole" life insurers and reinsurers, including Scottish Re.

66.   Scottish Re's Form 10-K for the fiscal year ended December 31, 2005 (the "2005 Form 10-K") provides a description of Regulation XXX reserve requirements:

The Valuation of Life Insurance Policies Model Regulation, commonly referred to as Regulation XXX, was implemented in the United States for various types of life insurance business beginning January 1, 2000.  Regulation XXX significantly increased the level of reserves that United States life insurance and life reinsurance companies must hold on their statutory financial statements for various types of life insurance business, primarily certain level term life products. The reserve levels required under Regulation XXX increase over time and are normally in excess of reserves required under Generally Accepted Accounting Principles in the United States.  [Emphasis added.]

**Scottish Re's ING Reinsurance Acquisition**

67.   Effective December 31, 2004, the Company acquired the U.S. individual life reinsurance business of ING.  According to statements made by Defendant Willkomm on October 18, 2004, at the time the acquisition was first announced by the Company, the acquisition doubled the number of lives reinsured by the Company from approximately 7.5 million to 15 million and transformed Scottish Re into the third largest life reinsurer in the United States.

68.   The ING acquisition also greatly increased the Company's Regulation XXX and Regulation AXXX reserve requirements.  As set forth in the Company's 2005 Form 10-K: "Most of the [ING] business involves guaranteed level premium term life insurance that is subject to the statutory reserve requirements of the Valuation of Life Insurance Policies Model Regulation XXX ("Regulation XXX") as well as universal life insurance that is subject to a similar statutory reserve requirement known as Regulation AXXX."

69.   In order to meet these requirements at the time of the acquisition, the Company reported that it had entered into an agreement with ING pursuant to which ING would maintain, for a fee, collateral for the XXX reserve requirements until such time as Scottish Re could make satisfactory alternative collateral arrangements.  The fee would increase over time from 100 to 175 basis points as the Regulation XXX reserve and ING collateral requirements peaked and the Company would be entitled to a partial rebate of the fee paid to ING to the

extent that it made alternative (and more cost effective) arrangements prior to the end of 2007.

As set forth in the Company's 2005 Form 10-K:

> Pursuant to the terms of the acquisition of the individual life reinsurance business of ING, ING is obligated to maintain collateral for the Regulation XXX and AXXX statutory reserve requirements of the acquired business for the duration of such requirements. <u>We pay ING a fee based on the face amount of the collateral provided until satisfactory alternative collateral arrangements are made.</u>  We are entitled to a partial rebate of this fee to the extent satisfactory alternative arrangements are implemented prior to the end of 2007.  [Emphasis added.]

## Scottish Re's Regulation XXX Securitization Plans

70.    Prior to the start of the Class Period, on February 11, 2005, Scottish Re formed a

new, wholly-owned subsidiary, Orkney Holdings, LLC ("Orkney"), which issued $850 million

of 30-year maturity securities used to fund Regulation XXX reserves associated with "organic"

Scottish Re or non-ING business.  As set forth in the Company's 2005 Form 10-K:

> Scottish Re (U.S.), Inc. Organic Business.  On February 11, 2005, we issued $850 million of 30-year maturity securities from our newly formed wholly-owned subsidiary, Orkney Holdings, LLC.  Proceeds from this transaction fully fund Regulation XXX reserves associated with business written by Scottish Re (U.S.), Inc. between January 1, 2000 and December 31, 2003.  This securitization successfully matches the long-term requirements imposed by Regulation XXX at a cost comparable to short-term pricing.  The securities have recourse to Orkney Holdings, LLC and not to any other Scottish Re entity.

71.    During an investor conference call on February 17, 2005, the first day of the Class

Period, Defendant Willkomm discussed the Company's "medium-term" and long-term

approach to managing Regulation XXX's demanding reserve requirements and contrasted the

long-term Orkney securitization to other medium-term facilities established by the Company

including a $200 million collateral finance facility with HSBC Bank USA, N.A. ("HSBC") that

closed on June 25, 2004, and a $325 million collateral facility entitled the Stingray Pass-

Through Trust ("Stingray") that closed on January 12, 2005:

> Let's talk a little bit about Regulation XXX reserves.  At Scottish Re we've been talking with analysts, investors and rating agencies about Triple X since 1998.  In

fact, our original IPO slideshow had some points on Triple X in that presentation. However, in the past year or two the Regulation XXX reserve requirement has started to receive some more focused attention from various industry observers.

As many of you may know, Triple X is a regulation that was adopted by the insurance departments of most of the states in the U.S. in late 1999 and into early 2000. It prospectively, not retroactively, changed the reserving basis for term life policies that have long-term premium rate guarantees. With Triple X, the statutory reserve grows over time and, in the case of Scottish Re's business, it peaks approximately 10-11 years from the date of issue and then declines to zero over time.

Approximately 75 percent of the life business reinsured by Scottish Re since 2000 is subject to this Triple X reserve requirement. I would also note that the ERC block that we acquired is pre-Triple X business and approximately half of the ING Re block is pre-Triple X paper. Many life insurers and reinsurers currently use letters of credit or other types of short-term funding mechanisms to secure or back their Triple X strain.

We believe that funding long-duration liabilities with shorter-term funding facilities is not suitable or sustainable in many respects from a prudent asset liability management perspective because it creates significant refinancing or rollover risk every year. And you've seen some of the rating agencies having highlighted this potential risk in comments that they published during the course of the past year.

Historically we at Scottish Re funded our Triple X reserve strain using a variety of capital resources including equity and debt on the balance sheet as well as a number of funding facilities including various collateral and surplus relief facilities. We have historically not relied on letters of credit, however, to secure our Triple X reserves as we believe that the duration mismatch was inconsistent with our firm's risk management philosophy.

Some of you may have noticed that last week Scottish Re closed an $850 million 30-year securitization from our newly-formed wholly-owned subsidiary which we call Orkney Holdings, LLC. Proceeds from this innovative transaction will fund Triple X reserves associated with business written by Scottish Re (U.S.) between January 1, 2000 and December 31, 2003.

*  *  *

The Orkney transaction represents a solution that addresses the cost and availability of collateral for the life of a block of business. It is a solution that best fits a closed block of business and requires considerable modeling effort and data. The Stingray trust and HSBC structures represent viable medium-term structures that provide prearranged availability and cost of collateral for a certain

period while also providing the flexibility to warehouse the strain created from several years of new business [production].

As these new business blocks reach an optimum size that they can be moved from the warehousing structures into another permanent type of structure like Orkney thus renewing our capacity to warehouse future years' production. [Emphasis added.]

72.   Similarly, at Scottish Re's annual Investor Day conference in New York City, on or about March 15, 2005, Scottish Re Chief Actuary Clifford Wagner stated that while shorter-term credit facilities can help "fill in the cracks," securitization is "the final piece to the puzzle." A securitization transaction typically involves the transfer of assets with reasonably predictable cash flow to a special purpose entity, which then sells debt securities backed by the cash flows to the capital markets. In the banking industry, securitizations date back to the 1970s, when banks began turning pools of mortgages, credit-card receivables and similar assets into asset-backed securities. Securitization in the life insurance industry began gaining momentum with the increased reserve requirements of Regulation XXX and Regulation AXXX, with the proceeds of the securitization used to meet those demanding capital requirements.

73.   On or about August 8, 2005, A.M. Best reported on the "growing popularity of securitization" to address Regulation XXX and Regulation AXXX reserve requirements. By the time of its report, A.M. Best reported that (including Scottish Re's Orkney securitization) at least four Regulation XXX securitizations had been completed by insurance and reinsurance companies. By September 14, 2006, an article written by Scottish Re officer Hugh McCormick, cited approximately 30 securitizations involving life insurance companies.

74.   Given its relatively smaller size, Scottish Re faced even more pressure than other industry participants to securitize Regulation XXX reserves. As acknowledged by Defendant

Willkomm during the February 17, 2005 conference call: "Scottish Re was the first life

reinsurer to not only do one securitization, but we have done now three financing – structured

financing techniques, <u>in some respects because we were smaller, we had a smaller balance

sheet</u>. We need to focus on ways to reduce cost of capital which at the end of the day is our

principal cost of goods as a financial intermediary." (Emphasis added.)  Willkomm made

similar statements in an article he prepared on or about March 1, 2006.  In the article,

Willkomm described securitization as "one of the most important innovations of modern

corporate finance" and a way to "enable smaller insurers to access cost of funds that are

competitive with the cost of funds enjoyed by larger competitors."  Thereafter, at the

Company's annual Investor Day meeting in New York City, on or about April 20, 2006,

Willkomm, in describing the benefits of securitization for a company the size of Scottish Re,

stated:

> Any time you're a big coinsurance term writer in the U.S. and you're putting several
> billion collateral requirements on your balance sheet – first, there is general concern
> that everybody has in the market.  <u>But, when you're the size of Scottish Re – we're not
> Swiss Re.  We're not Munich.  We don't have Met [Life] as our parent</u>.  So, naturally the
> rating agencies are a little more concerned about our ability to meet these long-term
> financing requirements.  [Emphasis added.]

75.    In fact, Scottish Re had been focused on securitizing its Regulation XXX reserve

requirements for quite some time.  During a panel discussion held in June 2005, Defendant

Willkomm commented that Scottish Re started "in earnest" to consider possible securitization

structures with the assistance of various Wall Street firms as far back as April 2000.  Similarly,

during a conference call on May 6, 2004, Willkomm commented that Scottish Re was seriously

working on securitization with outside experts "for a good portion of 2003:"

> First of all, it's no secret that for a good portion of 2003, we spent a lot of internal
> time and worked with some external experts, as well, to dimensionalize the

characteristics of our books of business. We looked at it a number of different ways.

As you can imagine, every investment banker in town has been to visit us at least a few times to talk about alternative forms of securitizing statutory strength, be it on XXX or be it on some other source of strength. We've actually invested an awful lot of time looking at that in 2003. I think generically speaking, it allows us to be substantially more efficient in terms of how we utilize our core capital, be it equity and near-equity and indebtedness. When we've talked about being more efficient, it brings our overall cost of capital down, and the like. So suffice to say, we're looking at a lot of those things pretty actively. [Emphasis added.]

76. Significantly, during the February 17, 2005 conference call, on the first day of the Class Period, Defendant Willkomm specifically highlighted Scottish Re's plans to securitize ING-related reserves as soon as the ING-acquired business reached optimum size:

We do anticipate sourcing our own sources of permanent collateral for this business within the near future which could improve the overall return on that transaction.

* * *

The way that the Triple X relationship with ING works is ING has agreed to provide the Triple X reserve strain on the block that we bought for the duration of the block. That reserve strain grows with time and then obviously it comes down, sort of has that hump-back effect. That has been agreed. As well as what the cost is. In negotiating our transaction with ING, we factored that change in the amounts of reserve that they would be providing as well as the price, because that does change with time, into our pricing model. We have focused on pricing that into our view on the business.

To the extent that we are able to finance that in a more cost efficient fashion, there is obviously the opportunity for enhancement of the returns on the acquisition of that block. It is our intention to do that. We were first focused, as you might imagine, on our own block, that which we knew the best. We had been working on it for some time, well before ING was in conversations with us. But, we do have plans to securitize or refinance, if you will, a large portion, if not all – and that is not all going to happen overnight because these things take a little while – but a large portion of the reserve strain related to the Triple X component on that block business. Just like you will see us do it on the production that we write, so the new business productions. This is not a one-off.

The securitization or structured financing, if you will, of reserves, not merely Triple X reserves, is a very important component of our view on where the

industry is going.  The simple answer is that we would anticipate it.  [Emphasis added.]

77.    Thereafter, during a conference call held on July 29, 2005, four months into the

Class Period, Willkomm stated:

> As you might imagine, we are very active in pursuing securitization of reserves as we have in the past.  And, we have effectively a dedicated team now that spends 80% of their time on those types of activities.  In fact, I'm on the road today talking to a party about that very concept.  That's something that is an important factor in the overall capital and liquidity picture.  In our view, securitization is going to become more and more, not only important but, beneficial as we increase the velocity of money, if you will – ultimately the return on the invested capital of the business.  [Emphasis added.]

And, during a conference call held on November 4, 2005, Willkomm stated:

> [O]ur dedicated securitization team is hard at work on a series of transactions that will enable us to refinance the Triple-X reserve facility that ING provided to Scottish Re in connection with our acquisition of that block.  [Emphasis added.]

78.    According to a former Charlotte, North Carolina Senior Vice President of Scottish

Re from the Spring of 2004 through the end of the Class Period responsible for information

technology and data, negotiations and due diligence related to the purchase of ING began in

the Summer of 2004.  According to the former employee, Scottish Re planned on securitizing

the ING business to raise Regulation XXX reserves from the time of the earliest due diligence

related to the acquisition.  According to the former employee, it was Scottish Re's plan to

securitize all business which had Regulation XXX reserve requirements.

79.    Not only did the Scottish Re Defendants plan on Regulation XXX securitization

for the ING business from the very start of the Class Period (or earlier), but their actions which

followed demonstrated that they diligently carried through with their plans.  Scottish Re

completed:  (i) three separate financing transactions in December 2005 (including the

Company's second Regulation XXX securitization through Orkney Re II, plc ("Orkney II"), an

orphaned special purpose vehicle incorporated under the laws of Ireland); and (ii) one in May 2006 (Ballantyne Re), to permanently finance all Regulation XXX reserve requirements relating to the business acquired from ING with sources alternative to ING collateral.

80.    According to Scottish Re's 2005 Form 10-K, Orkney II, a $450 million Regulation XXX securitization closed on December 21, 2005, and two other financing transactions closed in December 2005, permitting the Company to secure, within twelve months of the ING reinsurance acquisition, over 40% of the Regulation XXX reserves for business acquired from ING.  According to Scottish Re's Form 10-Q for the quarter ended March 31, 2006, proceeds from Ballantyne Re, a $2.1 billion Regulation XXX securitization closed on May 2, 2006, were used to fund the remaining Regulation XXX reserve requirements for the business acquired from ING.

**Scottish Re's Financial Statements Were Materially Misstated**
**Throughout the Class Period and at the Time of the Offerings**

81.    Throughout the Class Period, Scottish Re included in its financial statements deferred tax assets, arising principally from net operating loss carry-forwards or NOLs, which the Company represented were stated in conformance with GAAP.  For example, the Company's 2005 Form 10-K reported a deferred tax asset of $314,497,000 as of December 31, 2005, and stated:  "At December 31, 2005, we believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of $18.5 million."  (Emphasis added.).

82.    The Scottish Re Defendants also publicly discussed the Company's deferred tax benefits, both before and during the Class Period.  For example, during the October 18, 2004 conference call announcing the ING acquisition, Defendant Willkomm responded to an analyst's question describing Scottish Re's claimed tax advantages as follows:

**Andrew Kligerman** - UBS Securities – *Analyst*

And then the last question, Scott, is you mentioned in your presentation that one of your advantages in doing this transaction was the tax benefits. Could you give us sort of an example of where you might provide and where you might have an advantage when you buy this versus, you know . . . somebody else?

**Scott Willkomm** – Scottish Re - *President*

Well, it's no secret that we have certain net operating loss carry-forwards in our U.S. business and negative ceding commissions are treated as ordinary income for U.S. income tax purposes. <u>So, we have a fairly large net operating loss carried forward that allows us to minimize to a certain extent some of the tax impact of that negative ceding commission on the overall value to the Company.</u> There are a number of other elements as well, but that's a for example.

**Andrew Kligerman** - UBS Securities – *Analyst*

That's a very big one. Does the – does that sort of bring closer the time when there are no more NOLs and you're more profitable and the tax rate goes up pretty sharply?

**Scott Willkomm** – Scottish Re - *President*

No. Actually, the NOL in many cases is driven by the growth rate of new business that we write in the U.S. market. So a lot of that has to do with – is driven by new business origination, which we anticipate will continue at current or probably at the end of the day at higher rates post transaction. [Emphasis added.]

83. Given the Scottish Re Defendants' plans to securitize the ING business to raise capital for Regulation XXX reserve requirements, the Company could not satisfy the GAAP standards required to maintain a substantial portion of the Company's deferred tax assets on Scottish Re's balance sheet and, therefore, a valuation allowance (as was finally announced by the Company at the end of the Class Period) was required by no later than the first day of the Class Period. Thus, the financial statements issued by the Scottish Re Defendants, throughout the Class Period, were materially misstated and did not fairly and accurately represent the Company's financial position and results of operations.

84.   GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").  GAAP consists of a hierarchy of authoritative literature.  The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB").  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

85.   FASB Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("SFAS 109") was published in 1992 by the Financial Accounting Standards Board.  The principles described in SFAS 109 "establish[] financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes."

86.   At all times throughout the Class Period, the Scottish Re Defendants asserted that the Company was in compliance with GAAP and SFAS 109.  For example, the Company's Form 10-Q for the quarter ended June 30, 2005 stated:

Income Taxes

We determine our income tax provision in accordance with SFAS No. 109 "Accounting for Income Taxes."  The consolidated income tax expense or benefit is determined by applying the income tax rate for each subsidiary to its pre-tax income or loss.  These tax rates for our subsidiaries vary from jurisdiction to jurisdiction and range from zero to approximately 39%.  Income tax expense arises in periods where taxes on subsidiaries with pre-tax income exceed the tax

benefit on subsidiaries with pre-tax losses. An income tax benefit arises in periods where the tax benefit on subsidiaries with pre-tax losses exceeds the taxes on subsidiaries with pre-tax income. [Emphasis added.]

87.   Deferred tax assets arise when a company will be able to benefit from a tax reduction in the future, against future income. However, pursuant to SFAS 109, deferred tax assets may only be maintained on a company's balance sheet when it is "more likely than not" that they will be realized. The SFAS 109 Summary states:

**Deferred Tax Assets**

A deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carryforwards. . . . A valuation allowance is recognized if, based on the weight of available evidence, it is *more likely than not* that some portion or all of the deferred tax asset will not be realized. [Emphasis in original.]

88.   SFAS 109, ¶ 17e states that a company must:

Reduce deferred tax assets by a **valuation allowance** if, based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance should be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized. [Emphasis in original.]

89.   SFAS 109, ¶ 23 further states that:

Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Other examples of negative evidence include (but are not limited to) . . . underlined circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years. [Emphasis added.]

90.   As set forth in Appendix A to SFAS 109, these demanding standards were designed to require companies to value their deferred tax assets in a way that considers current expectations and comes closest to the expected future outcome:

The Board believes that the criterion required for measurement of a deferred tax asset should be one that produces accounting results that come closest to the expected outcome, that is, realization or non-realization of the deferred tax asset

in future years.  For that reason, the Board selected *more likely than not* as the criterion for measurement of a deferred tax asset.  Based on that criterion, (a) recognition of a deferred tax asset that is expected to be realized is required, and (b) recognition of a deferred tax asset that is not expected to be realized is prohibited.  [Emphasis in original.]

91.   Because the Scottish Re Defendants' plans to securitize the ING business (and other organic Scottish Re insurance business) would, by necessity, result in that very large block of business being placed in a separate, special purpose vehicle, the Company could not plan on future profits from that large block of business as a way to realize its deferred tax assets in accordance with SFAS 109.  At the very least, the Company's securitization plans rendered the ability of the Company to benefit from its material and growing deferred tax asset "unsettled" in accordance with paragraph 23 of SFAS 109.

92.   As Defendant Miller finally acknowledged during the August 4, 2006 conference call (after the end of the Class Period):  "All Ballantyne did was it put profitable business into a securitized vehicle that limited some flexibility on what you could do with that block of business."  Similarly, the Company's Form 10-Q for the 2006 third quarter ended September 30, 2006, filed with the SEC on or about November 9, 2006 (after the end of the Class Period), stated: "as previously indicated, the Company can no longer recognize tax benefits for certain legal entities."  This significant fact and its consequences were not accounted for by the Scottish Re Defendants in accounting for Scottish Re's material and growing deferred tax assets throughout the Class Period and, in violation of GAAP, no valuation allowance was taken in consideration of Scottish Re's plans to securitize its business until the end of the Class Period.

93.   To the contrary, prior to the end of the Class Period, the Company disclosed relatively minor valuation allowances on deferred tax assets which were ascribed to other

reasons, giving investors the expectation that deferred tax assets were properly stated under

GAAP. For example, the Form 10-K for the year ended December 31, 2004 stated:

> At December 31, 2004, we believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of $22.1 million established in 2004. This valuation allowance is in respect of negative proxy deferred acquisition costs and deferred acquisition costs arising in respect of the acquisition of the ING individual life reinsurance business. This was established as a result of the purchase accounting for the acquisition and therefore has not been included in the determination of net income. [Emphasis added.]

Similarly, the Form 10-K for the year ended December 31, 2005 stated:

> At December 31, 2005, we believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of $18.5 million. This valuation allowance is in respect of negative proxy deferred acquisition costs and deferred acquisition costs arising in respect of the acquisition of the ING individual life reinsurance business. This was established as a result of the purchase accounting for the acquisition and therefore was not included in the determination of net income in 2004. [Emphasis added.]

94.  Prior to the end of the Class Period, Scottish Re repeatedly stated in its public

filings that its deferred tax assets were maintained based on estimates of future profitability.

Under GAAP, however, the Scottish Re Defendants were required, but failed to consider, their

securitization plans in connection with their estimates of future profitability.

95.  At the end of the Class Period, the Scottish Re Defendants changed their

description and began describing the Company's deferred tax assets based on tax planning

strategies. For example, during the August 4, 2006 conference call, Defendant Miller stated as

follows:

> Scottish Re generates a deferred tax asset principally due to net operating losses, reserves and unrealized losses on investment securities. In accordance with U.S. GAAP, we must conclude if one of the future realization of our gross deferred tax asset is more likely than not to be realized. Sources of support for the gross deferred tax asset are the reversal of deferred tax liabilities within a carry-forward period, which in the U.S. is 15 years,  projected future taxable income or tax planning strategies, however, we are unable to use projections of future taxable

income, since we do not have a history of taxable income.  Therefore, we must
rely heavily on tax planning strategies, for support of the gross deferred tax asset.

*  *  *

In the second quarter, we completed Ballantyne Re, a XXX securitization.  While
this transaction eliminated the long-term financing mismatch which has become
an increasingly important issue in the industry, it eliminated a large cushion that
greatly reduced flexibility in our tax planning strategies and increase pressure on
our remaining strategies.  [Emphasis added.]

96.   Similarly, the Company's Form 10-Q for the quarter ended June 30, 2006, filed

with the SEC on or about August 15, 2006 (after the end of the Class Period), stated:

"Pursuant to guidance under SFAS No. 109, we are currently unable to rely on projections of

future taxable income.  Therefore, we must rely heavily on tax planning strategies for support

of the gross deferred tax asset." (Emphasis added.)  By contrast, the 2005 Form 10-K, filed

with the SEC during the Class Period, on or about March 16, 2006, stated: "The deferral of

benefits from tax losses is evaluated based upon management's estimates of the future

profitability of our taxable entities based on current forecasts and the period for which losses

may be carried forward." (Emphasis added.)

97.   As set forth herein, at all times during the Class Period, Scottish Re's financial

statements were not presented in accordance with GAAP, SFAS 109.  Scottish Re's financial

statements also violated GAAP FASB Concept Statements, including:

·     No. 1, ¶ 34:  "Financial reporting should provide information that is useful
to present and potential investors and creditors and other users in making rational
investment, credit and similar decisions."

·     No. 1, ¶ 40:  "Financial reporting should provide information about the economic
resources of an enterprise, the claims to those resources, and the effects of transactions,
events, and circumstances that change resources and claims to those resources."

·     No. 2, ¶¶ 58-59:  "That information should be reliable as well as relevant is a
notion that is central to accounting . . . .  The reliability of a measure rests on the
faithfulness with which it represents what it purports to represent . . . ."

· No. 2, ¶¶ 79-80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

· No. 2, ¶¶ 95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

## Scottish Re's Financial Misstatements Were Material

98.   Although Scottish Re's plans to securitize its acquired ING reinsurance business were publicly disclosed from the outset of the Class Period, given the Scottish Re Defendants' repeated assertions that the Company's financial statements were presented in accordance with GAAP (including, specifically SFAS 109), the severe tax consequences of the Company's securitization plans were not known and could not have been anticipated by investors.

99.   For example, on April 25, 2006, Fitch Ratings affirmed its "A-" insurer default rating for Scottish Re and stated that the Company's rating strengths included "sound capitalization, experienced management, disciplined underwriting and conservative investments." Its report stated: "Fitch also favorably views [Scottish Re's] use of securitizations and reserve credit trusts rather than letters of credit (LOCs) for collateral funding."

100.  When the Company's $112 million valuation allowance was disclosed to investors on July 31, 2006, the last day of the Class Period, the price of Scottish Re Ordinary Shares declined in one trading day by a staggering 75% on extraordinary trading volume, demonstrating that the Company's valuation allowance was unquestionably material to investors. Similarly, the price of Scottish Re HyCUs and Preferred Shares declined in one day by approximately 72% and 50%, respectively, on heavy trading on the last day of the Class Period.

101. In response to the Company's July 31, 2006 disclosures, Oppenheimer issued a "SELL" report on Scottish Re noting that the Company's "[a]bility to remain as ongoing concern is in doubt." Oppenheimer noted that "with such a large loss, there is a strong possibility of a credit ratings downgrade."

102. In response to the Company's July 31, 2006 disclosures, A.M. Best immediately downgraded the financial strength rating of Scottish Re from "A-" to "B++" and the issuer credit ratings of the Company's primary operating insurance subsidiaries from "A-" to "BBB+." An A.M. Best analyst stated: "There was never any guidance that there would be any question about the recoverability of the deferred tax asset.  The rating agencies had no prior knowledge of a possible impairment and neither did Wall Street." (Emphasis added.)

103. On July 31, 2006, Fitch also downgraded Scottish Re's issuer default rating from "A-" to "BBB." The next day, Fitch downgraded Scottish Re's issuer financial strength rating from "A-" to "BBB+" and stated that all of its ratings for the Company remained on "Rating Watch Negative." Fitch stated: "The announced write down of deferred tax asset by $112 million, as well as the impact on new business production of subsequent rating downgrades, are expected to further pressure the company's earnings performance going forward."

104. Because most insurance companies insist on a minimum of an "A-" rating, the reduced credit ratings for Scottish Re were expected to lead to substantially lower business retention and renewal. As reported on August 1, 2006 by MarketWatch: "A.M. Best and other rating agencies downgraded the company's ratings on Monday to below A-, a level that's considered important for reinsurers to attract and retain business. . . . There are also ratings triggers in some reinsurance contracts that allow customers to cancel policies and take back premiums."

105.  On July 31, 2006, Wachovia commented on Scottish Re's credit downgrades by stating: "Generally speaking, a life reinsurer needs a minimum of an A- (or the equivalent) rating to secure new life reinsurance business.  <u>Without one, a company is effectively out of the business</u>."  (Emphasis added.)  Similarly, Bear Stearns noted: "Scottish Re must increase its financial strength rating to the A level before being able to write a meaningful level of new business."  And Dow Jones reported: "Many in the insurance and reinsurance industry view an 'A-' as the absolute minimum for contracts to be signed and indeed it has now become de rigeur for brokers to require a client to sign a waiver or acknowledgement if they are placing business with a company that is not in the 'A' range."

106.  Anticipating these dire consequences, Scottish Re spokespersons stated in the Company's July 31, 2006 press release and during the August 4, 2006 conference call which followed, that the Company had engaged Goldman Sachs and Bear Stearns to assist with evaluating strategic alternatives, including the possible sale of the Company, and suspended its ordinary share dividend.

107.  Further evidencing the materiality of the Company's July 31, 2006 disclosure, the Company's disclosure was accompanied by the immediate resignations of Defendant Willkomm, President and CEO of Scottish Re, and Seth Vance, CEO of Scottish Re's North American segment.

108.  As industry commentators later noted, Scottish Re's reported 2006 second quarter loss resulting from the surprise tax valuation allowance was roughly the same size as the $125 million net profit Scottish Re reported for the entire 2005 fiscal year.  Oppenheimer analyst Sbaschning stated: "It wiped out an entire year of earnings.  That is pretty meaningful."

Similarly, A.M. Best analyst Pargeans noted that the reported loss was a measurable percentage of the Company's capital and weakened the Company's financial position.

109.  Accordingly, the Scottish Re Defendants' failure to comply with GAAP resulted in the Company's financial statements being materially misstated throughout the Class Period and at the time of the Offerings.

110.  Another way to measure the materiality of the Company's financial misstatements is to measure the growth in the Company's reported deferred tax assets over time in comparison with the Company's reported operating earnings.  The Company's total deferred tax asset increased from approximately $80 million as of December 31, 2003, to over $314 million as of December 31, 2005.  According to a June 15, 2006 report issued by Wachovia Securities, from the first quarter ended March 31, 2004 through the first quarter ended March 31, 2006 (and before the Company's surprise tax valuation allowance), an average of 21% of the Company's reported quarterly operating earnings were derived solely from increases in deferred tax benefits.  While Wachovia Securities noted this unusual fact in its June 15, 2006 report (as well as the fact that contribution to operating earnings from the Company's tax benefits appeared greatest in quarters when earnings otherwise appeared to fall short), at the time of its report, Wachovia Securities expressly noted that it did not challenge "Scottish Re's assertion, verified by its auditors," that the deferred tax assets were properly stated under GAAP.  However, after the Company's July 31, 2006 surprise tax valuation allowance, Wachovia issued a report which stated:  "At the time we were preparing our [June 15, 2006] report, we were assured of the recoverability of [Scottish Re's] deferred tax asset by various financial executives within the firm."  (Emphasis added.)

**Scottish Re's Poor Internal Controls**

111.  As set forth above, Scottish Re grew dramatically, including three major

acquisitions since 2001.  The Company increased its total assets from $2.1 billion at the end of

2001, to over $9 billion at the end of 2004.  During that time period, Scottish Re reported

various financial adjustments raising questions regarding the adequacy of the Company's

internal controls.  For example, prior to the start of the Class Period, the Company disclosed

the need to restate financial statements issued in the second and third quarters of 2004 to

correct for certain premium accrual errors at the Company's U.K. subsidiary.  Thereafter, in

the Form 10-K filed by the Company for the year ended December 31, 2004, the Company

disclosed certain material weaknesses in internal controls related to the Company's U.K.

subsidiary.  In connection with the Offerings and throughout the Class Period, however,

Defendants Willkomm, Murphy and Miller repeatedly issued sworn certifications as to the

adequacy of the Company's internal controls.  Only after the Offerings were completed, did the

Company reveal previously undisclosed information regarding additional, material deficiencies

in the Company's internal controls.

112.  On May 4, 2006, in connection with the announcement of Scottish Re's 2006 first

quarter results, the Company disclosed that:

> The earnings contribution of the Company's International segment was adversely
> impacted by adverse mortality and morbidity experience of approximately $4
> million on a pre-tax basis.  This was driven by the occurrence of ten large claims
> in the quarter, as compared to the typical expectation of one per month.  The
> segment also was negatively impacted by approximately $7 million of late
> reported claims by several ceding companies (some in excess of two years old)
> and a $4 million provision resulting from a review of retrocession recoveries on
> certain large claims.  <u>A review of the potential for similar issues to occur in the
> future was undertaken and additional reserves were established and included in
> these adjustments.</u>  [Emphasis added.]

113.   On May 5, 2006, during a conference call to discuss the Company's reported

2006 first quarter results, Defendant Willkomm stated:

> I think it goes without saying we are very disappointed with the quarter for a
> number of reasons. The most important of which is that the poor result
> overshadows the many successes achieved in the quarter.  As you have read in the
> earnings release, the International Segment was the reason we had not reported
> earnings consistent with expectations.
>
> *   *   *
>
> The earnings miss in International was due to a number of factors, including
> higher mortality than normally expected due to a small number of larger claims. .
> . . We also received claims reports or late reporting in general from several
> clients.
>
> *   *   *
>
> A review of the potential for similar issues to occur in the future was also
> undertaken, and additional reserves were established and are included in these
> adjustments that I have just mentioned.  <u>Where we erred was in not doing this
> sometime ago</u>.  [Emphasis added.]

114.   On May 5, 2006, following the above disclosures, the price of Scottish Re

Ordinary Shares closed at $21.01 per share, approximately 12% lower than the closing price of

Scottish Re Ordinary Shares on May 4, 2006.

115.   Following these disclosures, securities analysts were highly critical of the

Company's performance and controls.  For example, Wachovia issued a report dated May 4,

2006 which stated: "Given the length of time that Scottish [Re] has owned its international

operations (around 4 years), we are surprised to see these types of problems still plaguing the

unit.  Unfortunately, it's hard to say categorically that these types of losses won't repeat in the

future. . . .  We would note that this issue cropped up in the U.S. operation during 2004 at

which point we believed the company increased its auditing frequency and diligence regarding

issuer provided claim information."  Wachovia further noted:

Still, the shaky first quarter earnings report is merely the continuation of a pattern of unfavorable earnings surprises at Scottish Re, in our opinion. In the past we've attributed many of these events to growing pains. However, as the second largest North American reinsurer, growing pains may no longer be the order of the day, and are increasingly less acceptable, in our view. To us, Scottish Re's management has some work to do in order to earn back its credibility with investors.

116. Similarly, Bear Stearns issued a report on Scottish Re on or about May 5, 2006, which stated that the Company's 2006 first quarter results had "shaken our confidence that management has the operational and financial controls in place necessary to drive profitable business growth on a consistent basis." (Emphasis added.) Bear Stearns further stated: "The quarterly results exacerbate our fears that the company does not have adequate operational and financial controls in place . . . ." (Emphasis added.)

117. At and after the end of the Class Period, Scottish Re identified numerous additional required adjustments. For example, on August 4, 2006, during the conference call to review Scottish Re's reported loss for the 2006 second quarter ended June 30, 2006, Defendant Miller identified the following three, separate required adjustments (in addition to the $112 million tax valuation allowance) which adversely affected the Company's reported 2006 second quarter results:

[1]     Another area of significant adjustment relates to our external retrocession administration, and the related accounting. Following the acquisition and integration of the ING business, we recognized the need to improve the quality of our underlying data, and external retrocession systems. As a result of this initiative, we now have the ability to more accurately administer our retrocession, and identify that external retrocession premiums have been under-accrued in prior years, resulting in an adjustment of approximately $13 million this quarter. While this is primarily a catch-up adjustment, related to prior years, there will be some impact on future projected operating profits.

[2]     In addition to the improvements noted above, we performed a thorough review of the various experience refund and reserve calculations, related to our external retrocession programs. Based on this review, we refined certain of our calculations and processes to allow for a more accurate recording of the net cost

of reinsurance each quarter. <u>The impact of these changes resulted in an adjustment of approximately $8 million, in the second quarter</u>. Again, while this adjustment relates primarily to prior periods, there will be some impact on operating profits going forward.

[3]     I would like now to briefly discuss the impact of changes in our premium accruals. . . . <u>During the second quarter we made an $8 million adjustment in premium accruals in North America, resulting from a revision of estimates related to prior periods</u>. This adjustment related principally to the ING block, and resulted from unusual activity in premium levels post-acquisition, which made the use of historical trends less effective in estimating current period accruals. [Emphasis added.]

118.   Following these disclosures, A.M. Best analyst Pargeans stated: "There were three or four items in addition to the tax asset, all of which seemed to be related to either a system not performing the way it should have or a mis-estimate of one type or another." "The items all sound one-time in nature, but if you have enough one-time items, it becomes like a recurring problem . . ."

119.   Thereafter, on November 9, 2006, Annuity and Life Re, Ltd. (a non-Scottish Re insurance company) issued a press release which revealed more internal control problems at Scottish Re. The press release stated:

> <u>The Company has been informed that Scottish Re's reinsurance settlements for 2004 and 2005 were incorrect and Scottish Re is making corrections</u>. These corrections indicate that the Company [Annuity and Life] may have received overpayments of premiums and/or may not have been billed for claims for which it may be responsible. In October 2006, Scottish Re provided a summary of those corrections. Approximately $10 million would be owed by the Company . . .
>
> <u>The Company has also learned that Scottish Re has made adjustments to its billing methodology for 2004 and 2005</u>. These adjustments indicate that the Company [Annuity and Life] may have received overpayments of premiums and/or may not have been billed for claims for which it is responsible. [Emphasis added.]

120.   While the nature of the insurance business includes from time to time unexpected claims patterns, the number of the required adjustments disclosed by the Company after the

completion of the Offerings is reflective of poor internal controls and financial reporting.  For example, the Company's (i) admitted failure to establish certain incurred but not reported ("IBNR") claims reserves until the 2006 first quarter; and (ii) $13 million 2006 second quarter adjustment for under accrued external retrocession premiums, revealed previously undisclosed material deficiencies in the Company's internal controls.  Properly accounting for claims, premiums and mortality and morbidity experience is a core business function of any life insurer or reinsurer.  Indeed, as stated by Scottish Re's North American segment CEO Seth Vance during the Company's April 22, 2006 annual Investor Day:  "<u>As you know, claims are something that we in this business follow, very, very closely.  And it's important that we have both timely as well as accurate reports on claims</u>."  (Emphasis added.)  However, former employees of Scottish Re report a very different picture of Scottish Re's internal controls during the Class Period.

121.  According to a former Charlotte, North Carolina Vice President responsible for the processing and adjudication of claims at Scottish Re who worked at the Company for over five years and through the Spring of 2005, Scottish Re was ill-equipped to process claims because it never had a system in place that could capture all of the required data in a meaningful way.  According to the former employee, the lack of any reliable way to track claims made it difficult for the Company to close its books at the end of each month and to properly estimate IBNR claims reserves on its financial statements.  According to the former employee, Scottish Re also lacked employees within its claims and information technology departments who understood reinsurance and could process life insurance claims and suffered from a rapid turnover of personnel.

122. According to the former employee, Scottish Re's internal control problems became especially acute after Scottish Re acquired a large block of business from ERC in late 2003. According to the former employee, Scottish Re performed poor due diligence on the acquisition and ended up receiving far more claims than anticipated at the time of the transaction. According to the former employee, Scottish Re was ill-equipped to process the thousands of claims received from the ERC block of business which led to substantial delays in processing claims. According to the former employee, the large amount of unprocessed claims were kept stacked up literally in laundry baskets and these delays resulted in the failure to properly state Scottish Re's IBNR reserves in quarterly financial statements.

123. According to a former Charlotte, North Carolina Assistant Vice President responsible for marketing at Scottish Re who worked at the Company for four and one half years and through the Spring of 2006, there was significant discussion among Scottish Re management about the Company's fast growth and the inability of its systems to keep up with its rapid growth and, after the ING acquisition, things became even worse since the Company at that time had not yet fully addressed the issues faced with the ERC acquisition.

124. According to a former Charlotte, North Carolina senior finance executive at Scottish Re who worked at the Company for over six years and through the Spring of 2006, Scottish Re grew too big too fast and completed the ERC and ING acquisitions without having a sufficient administrative infrastructure and sufficiently trained employees and managers in place to handle its growth. According to the former employee, it was common knowledge within the Company that the Company's IT systems used to track premiums and claims were poor; that the Company's processing personnel were not well trained; and the Company's administrative management was weak. According to the former employee, because the

Company could not accurately track its premiums and claims, its financial statements could not be accurate as well. According to the former employee, the U.S. manager of these administrative functions was terminated by the Company in the Fall of 2005.

125. According to a former Charlotte, North Carolina Senior Vice President from the Spring of 2004 through the end of the Class Period responsible for information technology and data, at the direction of Seth Vance, certain year-end 2005 expenses at Scottish Re were improperly recorded as 2006 expenses (instead of 2005 expenses) to improve Scottish Re's reported year-end 2005 financial results and earnings per share. According to the former employee, among the 2005 expenses improperly recorded as 2006 expenses were approximately $1 million of information technology expenses and over $1 million of other expenses items. According to the former employee, Scottish Re also aggressively capitalized operating expenses to improve reported financial results. After the former employee complained about these financial adjustments to Seth Vance in writing, Defendant Willkomm who received the complaint (and to whom Seth Vance directly reported) told the former employee that the former employee was just being "paranoid" and that the former employee did not "have proof of anything." The former employee then resigned from Scottish Re rather than being demoted within the Company. (As set forth above, when the adverse disclosures were made by Scottish Re on the last day of the Class Period, the Company announced the immediate resignations of both Willkomm and Vance.)

126. According to the former employee, when Scottish Re acquired ERC's business, the Company did not have systems in place to process the data and there were literally stacks of paper that created numerous issues including difficulty with reserve calculations. According to the former employee, at the time the ING business was acquired, it was understood within

the Company that the acquisition would create additional administrative and information technology challenges because the ERC business had not yet stabilized.

127.  All of these former employees, individually and collectively, reveal core weaknesses in the Company's internal controls which are inconsistent with the Scottish Re Defendants' repeated certifications of internal controls during the Class Period.  According to criteria established by Internal Controls – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO" criteria) (pursuant to which Scottish Re's internal controls purportedly were evaluated during the Class Period), internal controls "help ensure the reliability of financial statements" and "minimize surprises along the way."  Under the COSO criteria, internal controls are defined as:

> [A] process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories:
>
> · Effectiveness and efficiency of operations
>
> · Reliability of financial reporting
>
> · Compliance with applicable laws and regulations

128.  Based on all of the facts set forth herein, the Scottish Re Defendants' repeated certifications as to internal controls, including in connection with the Offerings, were materially misstated throughout the Class Period.  The price of Scottish Re securities declined in May and July 2006, as the Scottish Re Defendants' disclosures revealed previously undisclosed internal control deficiencies at the Company.

**Defendant E&Y's Violation of Auditing Standards**

129.  Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in or do business with a public company.  The Public Company Accounting

Oversight Board ("PCAOB"), which was established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards the Generally Accepted Auditing Standards in existence on April 16, 2003. Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board (United States)" is a reference to GAAS.

130. During the Class Period, E&Y issued clean, unqualified audit opinions on the Company's financial statements for the years ended December 31, 2004 and December 31, 2005, dated March 11, 2005 and March 13, 2006, respectively. E&Y also issued opinions agreeing with Scottish Re management's assessment of internal controls as of December 31, 2004 and December 31, 2005, dated March 11, 2005 and March 13, 2006, respectively.

131. E&Y consented to the incorporation by reference in the registration statement for the Offerings of its clean and unqualified audit opinion letter on the Company's financial statements for the year ended December 31, 2004, and its opinion regarding Scottish Re management's assessment of internal controls over financial reporting as of December 31, 2004.

132. In all of its opinion letters, E&Y stated that it performed its audits and evaluations in accordance with the standards of the PCAOB, or GAAS. Each of these statements was materially misstated when made and at the time of the Offerings as E&Y's audits failed to comply with GAAS.

133. There are ten GAAS provisions, which are divided into three types of standards: (1) general standards, which provide guidelines for auditor staffing and maintaining independence from the client; (2) standards of fieldwork, which provide guidelines of audit

planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) standards of reporting, which are primarily concerned with ensuring that a company's financial statements are presented in accordance with GAAP.

134. GAAS General Standard No. 1 states that: "The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor. GAAS General Standard No. 3 states that: "Due professional care is to be exercised in the performance of the audit and the preparation of the report." At all relevant times, E&Y violated these GAAS General Standards.

135. E&Y did not staff its audits of Scottish Re with adequately trained and proficient auditors and failed to exercise due professional care in the performance of its audits and the preparation of its reports. According to a former senior finance executive at Scottish Re who worked at the Company for over six years and through the Spring of 2006 (after the issuance of E&Y's 2005 clean audit opinion), E&Y was either unable or unwilling to staff its audit of Scottish Re with adequately trained or proficient auditors. According to the former employee, E&Y audit partner Marty Connor was an absentee partner, rarely on site, and its audits were staffed with very junior people, particularly in years 2004-06, who were unable to perform effectively. According to the former employee, the inability or unwillingness of E&Y to staff its audits of Scottish Re with qualified auditors was the subject of repeated discussion within the Company. The failure of E&Y to staff its audits of Scottish Re with adequately trained and proficient auditors is further demonstrated by the inability or unwillingness of E&Y auditors to identify Scottish Re's material GAAP violations and core internal control deficiencies throughout the Class Period.

136. According to statements by Defendant Miller during the Company's August 4, 2006 conference call after the end of the Class Period, E&Y had reviewed the Company's deferred tax asset each quarter during the Class Period.  Miller further stated:  "And given the nature and subjectivity of an item like a valuation allowance, that was heavily scrutinized by E&Y and it has been in each period in which we issued the financials."  Despite E&Y's substantial involvement in the reporting of the Company's material and growing deferred tax asset, E&Y failed to identify, until at least the end of the Class Period, the Company's lack of compliance with GAAP, SFAS 109, in reporting that asset.  E&Y's failure to identify and raise the Company's material violations of GAAP, as well as Scottish Re's internal control weaknesses (other than the one identified by the Company, itself, with regard to its U.K. operations) resulted from E&Y's failure to staff its audits of Scottish Re with adequately trained and proficient auditors and to exercise due professional care in its audits of Scottish Re.

137. GAAS Standards of Field Work No. 1 states that:  "The work is to be adequately planned and assistants, if any, are to be properly supervised."  GAAS Standards of Field Work No. 2 states:  "A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed."  GAAS Standards of Field Work No. 3 states:  "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  At all relevant times, E&Y violated all of these GAAS Standards of Fieldwork.

138. As set forth above, E&Y audit partner Connor failed to properly supervise junior auditors assigned to work on the Scottish Re audits who were unable to perform effectively.