(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

In connection with the Quarterly Report of Scottish Re Group Limited (the "Company") on Form 10-Q for the quarterly period ended June 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that: (1) The Report fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company. [Emphasis added.]

280. As set forth in paragraphs 51-142 above, the above-referenced statements from the Scottish Re Defendants' press release, conference call and Form 10-Q for the second quarter ended June 30, 2005 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

281. On November 3, 2005, the Scottish Re Defendants issued a press release reporting earnings results for the third quarter ended September 30, 2005. Scottish Re reported net

- 100 -

income for the third quarter of $31.9 million, or $0.66 per diluted Ordinary Share. The press release contained financial highlights, consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months ended September 30, 2005, and the twelve months ended December 31, 2004 in accordance with GAAP.

282. On November 4, 2005, the Scottish Re Defendants held a conference call with analysts and investors. During the call, Defendant Miller reviewed the Company's reported financial results including reported net income for the quarter ended September 30, 2005. In response to an analyst question regarding Scottish Re's tax rate and expected tax benefit (as opposed to tax expense) through the end of 2005, Willkomm also stated that "we were able to more effectively structure the ING transaction from a tax perspective than we had anticipated when our original models were prepared." (Emphasis added.)

283. On or about November 8, 2005, the Scottish Re Defendants filed the Company's Form 10-Q for the quarter ended September 30, 2005. The third quarter 2005 Form 10-Q contained consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months ended September 30, 2005, and the twelve months ended December 31, 2004 in accordance with GAAP. The Form 10-Q stated:

> The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") .... In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. [Emphasis added.]

The third quarter 2005 Form 10-Q was signed by Defendants Willkomm and Miller.

284.  The third quarter 2005 Form 10-Q provided the following information regarding

Scottish Re's internal controls and procedures:

> Our Chief Executive Officer and Chief Financial Officer have evaluated the
> effectiveness of our disclosure controls and procedures (as defined in Rules 13a-
> 15(e) and 15d-15(e) under the Securities Exchange Act of 1934).  <u>Based on such
> evaluation, such officers have concluded that our disclosure controls and
> procedures were effective as of September 30, 2005 to ensure that information
> required to be disclosed by us in the reports filed and submitted by us under the
> Exchange Act were recorded, processed, summarized and reported within the time
> periods specified in the SEC's rules and forms.</u>
>
> \* \* \*
>
> As previously disclosed, in our Annual Report on Form 10-K (Item 9A) for the
> year ended December 31, 2004, management concluded that a material weakness
> exists regarding internal control over financial reporting in our U.K. subsidiary.
> The material weakness identified relates to the monthly financial statement
> closing process, the reconciliation of premium receivable balances and the
> analysis of results of operations.
>
> In response, we implemented a number of additional controls to improve the
> internal control over financial reporting in our U.K. subsidiary.
>
> \* \* \*
>
> Other than the changes discussed above, there have not been any changes in our
> internal control over financial reporting (as defined in Rules 13a-15(f) and 15 d-
> 15(f) promulgated by the SEC under Securities Exchange Act of 1934) during our
> most recently completed fiscal quarter that have materially affected, or are
> reasonably likely to materially affect, our internal control over financial reporting.
> [Emphasis added.]

285.  Accompanying the third quarter 2005 Form 10-Q as exhibits were certifications

signed by Defendants Willkomm and Miller which stated:

> (1) I have reviewed this quarterly report on Form 10-Q of Scottish Re Group
> Limited (the "registrant");
>
> (2) <u>Based on my knowledge, this report does not contain any untrue statement of
> a material fact or omit to state a material fact necessary to make the statements
> made, in light of the circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;</u>

(3) <u>Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;</u>

(4) The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f) for the registrant and have:

(a) <u>designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;</u>

(b) <u>designed such internal control over financial reporting, or caused such control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;</u>

(c) <u>evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;</u> and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) <u>all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;</u> and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

In connection with the Quarterly Report of Scottish Re Group Limited (the "Company") on Form 10-Q for the quarterly period ended September 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

  (1)  The Report fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934; and

  (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company. [Emphasis added.]

286.  As set forth in paragraphs 51-142 above, the above-referenced statements from the Scottish Re Defendants' press release, conference call and Form 10-Q for the third quarter ended September 30, 2005 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.  As set forth below, the Scottish Re Defendants continued to describe expected tax benefits (or savings) until Scottish Re's surprise disclosure at the end of the Class Period.

287.  On February 16, 2006, the Scottish Re Defendants issued a press release reporting earnings results for the fourth quarter and year ended December 31, 2005.  Scottish Re reported net income for the fourth quarter of $58.5 million, or $1.18 per diluted Ordinary Share, and net income for the year ended December 31, 2005 of $125.4 million, or $2.64 per diluted Ordinary Share.  The press release contained financial highlights, consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months and the year ended December 31, 2005 in accordance with GAAP.  The February 16, 2006 press release also contained a quoted statement attributed to defendant Miller which stated:  "Within just twelve months of purchase,

the Company has successfully and fully integrated the ING business and secured permanent funding for more than 40% of Regulation XXX reserve requirements associated with the block of business. These accomplishments clearly illustrate the Company's operational and financial effectiveness when large blocks of business are acquired." (Emphasis added.)

288. On February 17, 2006, the Scottish Re Defendants held a conference call with analysts and investors. During the call, Defendant Miller reviewed the Company's reported financial results including reported net income for the quarter and year ended December 31, 2005. During the conference call, Defendant Miller responded to an analyst's question regarding the Company's improved guidance for a 9-10% tax benefit in 2006 (rather than an expected tax expense to U.S. and foreign governments as follows): "So [ING] was a big transaction with significant tax implications. And what has changed is all of that has now been sorted out through post-acquisition structuring and analysis of all the legal entities and the tax position." (Emphasis added.) Defendant Willkomm further stated during the conference call: "With the securitization completed in December, we have succeeded in locking in long-term, cost-effective financing for approximately 40% of the XXX reserves associated with the ING block of business. And we did so within twelve months of purchase. These transactions provide long-term benefits to Scottish Re by securing reserve funding and a discount to the letter of credit rates agreed to with ING, while simultaneously freeing encumbered capital." (Emphasis added.)

289. On or about March 16, 2006, the Scottish Re Defendants filed the Company's Form 10-K for the quarter and year ended December 31, 2005. The 2005 Form 10-K contained consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the four

months and year ended December 31, 2005 in accordance with GAAP.  The 2005 Form 10-K

stated: "Our consolidated financial statements are prepared in accordance with accounting

principles generally accepted in the United States of America ("GAAP")."  The 2005 Form 10-

K reported a total deferred tax asset of approximately $314.5 million as of December 31, 2005,

based on a net operating loss carry-forwards, or NOLs, as of December 31, 2005, of

approximately $615.5 million and stated: "At December 31, 2005, we believe that <u>it is more

likely than not</u> that all gross deferred tax assets will reduce taxes payable in future years except

for a valuation allowance of $18.5 million." (Emphasis added.).   The 2005 Form 10-K was

signed by, among others, Defendants Willkomm and French.

     290.  With regard to the Company's internal controls, the 2005 Form 10-K stated:

The Company's Chief Executive Officer and Chief Financial Officer have
evaluated the effectiveness (design and operation) of our disclosure controls and
procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities
Exchange Act of 1934, as amended).  <u>Based on such evaluation, such officers
have concluded that these disclosure controls and procedures are effective as of
the end of the period covered by this Annual Report</u>.

Management is responsible for establishing and maintaining adequate internal
control over financial reporting and for the assessment of the effectiveness of
internal control over financial reporting, as defined in the Rule 13a-15(f) of the
Securities and Exchange Act of 1934, as amended.  Under the supervision and
with the participation of management, including our principal executive and
financial officers, we have conducted an evaluation of the effectiveness of our
internal control over financial reporting as of December 31, 2005.

        *  *  *

In making their assessment of internal control over financial reporting,
management used criteria established in "Internal Control – Integrated
Framework" issued by the Committee of Sponsoring Organizations of the
Treadway Commission.  <u>Based on their evaluation, management has concluded
that we maintained effective internal control over financial reporting as of
December 31, 2005, based on the COSO criteria</u>.

<u>Ernst & Young LLP, the independent registered public accounting firm that
audited our consolidated financial statements included in this report, have issued</u>

an attestation report on management's assessment of internal control over
financial reporting.

There have been no changes in internal control over financial reporting identified
in connection with our evaluation that occurred during the most recent fiscal
quarter that have materially affected, or are reasonably likely to materially affect,
our internal control over financial reporting. [Emphasis added.]

291.   Accompanying the 2005 Form 10-K as exhibits were certifications signed by

Defendants Willkomm and Miller which stated:

(1) I have reviewed this annual report on Form 10-K of Scottish Re Group
Limited (the "registrant");

(2) Based on my knowledge, this report does not contain any untrue statement of
a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;

(4) The registrant's other certifying officers and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act
Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as
defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f) for the registrant and
have:

(a) designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to ensure
that material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly
during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such
control over financial reporting to be designed under our supervision, to provide
reasonable assurance regarding the reliability of financial reporting and the
preparation of financial statements for external purposes in accordance with
generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and
procedures and presented in this report our conclusions about the effectiveness of

- 107 -

the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

In connection with the Annual Report of Scottish Re Group Limited (the "Company") on Form 10-K for the annual period ended December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company. [Emphasis added.]

292. As set forth in paragraphs 51-142 above, the above-referenced statements from the Scottish Re Defendants' press release, conference call and Form 10-K for the fourth quarter and year ended December 31, 2005 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period. For example, the Scottish Re Defendants' statements

that the Company had "successfully and fully integrated" ING and that such success "clearly

illustrate the Company's operational and financial effectiveness when large blocks of business

are acquired" as well as the Scottish Re Defendants' statements that tax issues had been "sorted

out through post-acquisition structuring and analysis of all the legal entities and the tax

position" materially misstated and omitted material facts as set forth in paragraphs 51-142

above.

     293.  The 2005 Form 10-K contained a "Report of Independent Registered Public

Accounting Firm" from Defendant E&Y which stated:

> We have audited the accompanying consolidated balance sheets of Scottish Re
> Group Limited and subsidiaries as of December 31, 2005 and 2004, and the
> related consolidated statements of income, comprehensive income, shareholders'
> equity and cash flows for each of the three years in the period ended December
> 31, 2005.  Our audit also included the financial statement schedules listed at Item
> 15(a)(2).  These financial statements and schedules are the responsibility of
> Scottish Re Group Limited's management.  Our responsibility is to express an
> opinion on these financial statements and schedules based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company
> Accounting Oversight Board (United States).  Those standards require that we
> plan and perform the audit to obtain reasonable assurance about whether the
> financial statements are free of material misstatement.  An audit includes
> examining, on a test basis, evidence supporting the amounts and disclosures in the
> financial statements.  An audit also includes assessing the accounting principles
> used and significant estimates made by management, as well as evaluating the
> overall consolidated financial statement presentation.  We believe that our audits
> provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all
> material respects, the consolidated financial position of Scottish Re Group
> Limited and subsidiaries at December 31, 2005 and 2004, and the consolidated
> results of their operations and their cash flows for each of the three years in the
> period ended December 31, 2005, in conformity with U.S. generally accepted
> accounting principles.  Also, in our opinion, the related financial statement
> schedules, when considered in relation to the basic financial statements taken as a
> whole, present fairly in all material respects the information set forth therein.
>
> We also have audited, in accordance with the standards of the Public Company
> Accounting Oversight Board (United States), the effectiveness of Scottish Re

Group Limited's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 13, 2006 expressed an unqualified opinion thereon.

As discussed in Note 2 to the financial statements, in 2003 the Company changed its accounting related to its funds withheld at interest.  [Emphasis added.]

Ernst & Young LLP
Philadelphia, Pennsylvania
March 13, 2006

294. The 2005 Form 10-K also contained a "Report of Independent Registered Public Accounting Firm" on internal controls from Defendant E&Y which stated:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting, that Scottish Re Group Limited maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Controls – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria).  Scottish Re Group Limited's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting.  Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.  Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances.  We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable

assurance that the transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

*   *   *

In our opinion, management's assessment that Scottish Re Group Limited maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the COSO control criteria. Also, in our opinion, Scottish Re Group Limited maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on the COSO control criteria.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Scottish Re Group Limited as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2005 and our report dated March 13, 2006 expressed an unqualified opinion thereon. [Emphasis added.]

Ernst & Young LLP
Philadelphia, Pennsylvania
March 13, 2006

295.  As set forth in paragraphs 51-142 above, these opinion letters were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

296.  On May 4, 2006, the Scottish Re Defendants issued a press release reporting earnings results for the first quarter ended March 31, 2006.  Scottish Re reported net income for the first quarter of $11.6 million, or $0.20 per diluted Ordinary Share.  The press release contained financial highlights, consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months ended March 31, 2006, and the twelve months ended December

- 111 -

31, 2005 in accordance with GAAP.  The press release also reported that Scottish Re had completed the $2.1 billion Ballantyne Re Regulation XXX securitization on May 2, 2006 and, as a result, Scottish Re had "refinanced all of the Regulation Triple-X business acquired in connection with the ING Re transaction."

297.  On May 5, 2006, the Scottish Re Defendants held a conference call with analysts and investors.  During the call, Defendant Miller reviewed the Company's reported financial results including reported net income for the quarter ended March 31, 2006.  During the call, Defendant Miller stated that there had been:  "<u>No change in any of our underlying tax calculations, assumptions and methodology from prior quarters</u>."  (Emphasis added.)

298.  On or about May 10, 2006, the Scottish Re Defendants filed the Company's Form 10-Q for the quarter ended March 31, 2006.  The first quarter 2006 Form 10-Q contained consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months ended March 31, 2006, and the twelve months ended December 31, 2005 in accordance with GAAP. The Form 10-Q stated:

> <u>The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP")</u> . . . .  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.  [Emphasis added.]

The first quarter 2006 Form 10-Q was signed by Defendants Willkomm and Miller.

299.  The first quarter 2006 Form 10-Q provided the following information regarding Scottish Re's internal controls and procedures:

> Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934.  <u>Based on such evaluation, such officers have concluded that our disclosure controls and</u>

<u>procedures were effective as of March 31, 2006 to ensure that information
required to be disclosed by us in the reports filed and submitted by us under the
Exchange Act were recorded, processed, summarized and reported within the time
periods specified in the SEC's rules and forms.</u>

There have not been any changes in our internal control over financial reporting
(as defined in Rules 13a-15(f) and 15 d-15(f) promulgated by the SEC under
Securities Exchange Act of 1934) during our most recently completed fiscal
quarter that have materially affected, or are reasonably likely to materially affect,
our internal control over financial reporting.  [Emphasis added.]

   300.  Accompanying the first quarter 2006 Form 10-Q as exhibits were certifications

signed by Defendants Willkomm and Miller which stated:

(1) I have reviewed this quarterly report on Form 10-Q of Scottish Re Group
Limited (the "registrant");

(2) Based on my knowledge, this report does not contain any untrue statement of
a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

(3) <u>Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;</u>

 (4) The registrant's other certifying officers and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act
Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as
defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f) for the registrant and
have:

      (a) <u>designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to ensure
that material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly
during the period in which this quarterly report is being prepared;</u>

      (b) <u>designed such internal control over financial reporting, or caused such
control over financial reporting to be designed under our supervision, to provide
reasonable assurance regarding the reliability of financial reporting and the
preparation of financial statements for external purposes in accordance with
generally accepted accounting principles;</u>

(c) <u>evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;</u> and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) <u>all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;</u> and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*   *   *

In connection with the Quarterly Report of Scottish Re Group Limited (the "Company") on Form 10-Q for the quarterly period ended March 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934; and

(2) <u>The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.</u> [Emphasis added.]

301. As set forth in paragraphs 51-142 above, the above-referenced statements from the Scottish Re Defendants' press release, conference call and Form 10-Q for the first quarter ended March 31, 2006 were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

- 114 -

**Scottish Re's July 31, 2006**
**And Post-Class Period Disclosures**

302.  On July 31, 2006, the last day of the Class Period, Scottish Re issued a press release announcing that the Company had suspended its Ordinary Share dividend and expected to report a net operating loss of approximately $130 million for the second quarter ended June 30, 2006.  The Company stated that the loss for the quarter was "principally related to a valuation allowance on deferred tax assets of approximately $112 million."  While Scottish Re listed several other items contributing to the Company's expected loss for the quarter (including a reduction in estimated premium accruals, increased retrocession costs and a write-down of deferred acquisition costs), unlike the valuation allowance, they were not quantified in the press release.  The press release further stated that the Company expected earnings for the 2006 third and fourth quarters to be lower than the Company's previously announced guidance due to, inter alia, "lower than expected new business volumes [and] higher . . . income tax expense due to the inability to recognize future deferred tax benefits."  The press release stated that Scottish Re had engaged Goldman Sachs and Bear Stearns "to assist with evaluating strategic alternatives and potential sources of capital."

303.  Also on July 31, 2006, Scottish Re issued a separate press release announcing that Defendant Willkomm had resigned his positions as President and Chief Executive Officer of the Company.

304.  In response to the Company's disclosures, the price of Scottish Re Ordinary Shares immediately declined in one trading day on July 31, 2006, by 75% on extraordinary trading volume.  Similarly, the price of Scottish Re HyCUs and Preferred Shares declined by approximately 72% and 50%, respectively, on heavy trading on the last day of the Class Period.

305. In response to the Company's July 31, 2006 disclosures, A.M. Best immediately downgraded the financial strength rating of Scottish Re from "A-" to "B++" and the issuer credit ratings of the Company's primary operating insurance subsidiaries from "A-" to "BBB+." An A.M. Best analyst stated: "There was never any guidance that there would be any question about the recoverability of the deferred tax asset. The rating agencies had no prior knowledge of a possible impairment and neither did Wall Street." (Emphasis added.) On July 31, 2006, Fitch also downgraded Scottish Re's issuer default rating from "A-" to "BBB." The next day, Fitch downgraded Scottish Re's issuer financial strength rating from "A-" to "BBB+" and stated that all of its ratings for the Company remained on "Rating Watch Negative." Fitch stated: "The announced writedown of deferred tax asset by $112 million, as well as the impact on new business production of subsequent rating downgrades, are expected to further pressure the company's earnings performance going forward." Because most insurance companies insist on a minimum of an "A-" rating, the reduced credit ratings for Scottish Re were expected to lead to substantially lower business retention and renewal. As reported on August 1, 2006 by MarketWatch: "A.M. Best and other rating agencies downgraded the company's ratings on Monday to below A-, a level that's considered important for reinsurers to attract and retain business. . . . There are also ratings triggers in some reinsurance contracts that allow customers to cancel policies and take back premiums." On July 31, 2006, Wachovia commented on Scottish Re's credit downgrades by stating: "Generally speaking, a life reinsurer needs a minimum of an A- (or the equivalent) rating to secure new life reinsurance business. Without one, a company is effectively out of the business." (Emphasis added.) Similarly, Bear Stearns noted: "Scottish Re must increase its

financial strength rating to the A level before being able to write a meaningful level of new business."

306.  On August 3, 2006, Scottish Re issued a press release reporting a net loss of $123.9 million, or $2.31 per diluted Ordinary Share, for the quarter ended June 30, 2006.  The press release stated that the Company's net loss was primarily attributable to:

    i.    Tax expense of $89.0 million principally related to a $112.4 valuation allowance established on deferred tax assets "resulted from revised statutory and tax projections of the Company combined with a reassessment of certain tax planning strategies;"

    ii.    An approximate $8.0 million reduction in premium accruals in North America "resulting from a revision of estimates relating to prior periods;"

    iii.    A deferred acquisition cost adjustment of approximately $13.0 million due to "higher than expected lapses on certain fixed annuity treaties;"

    iv.    External retrocession and reserve adjustments of approximately $21.0 million due to "revisions in estimates resulting from improved data and systems which administer retrocession accounts;" and

    v.    Severance and retirement and other non-recurring operating expenses of approximately $9 million.

307.  On August 4, 2006, during a conference call following the Company's press release, Defendant Miller stated:

I would like to now walk you through the most significant factors impacting the second quarter.  Scottish Re generates a deferred tax asset principally due to net operating losses, reserves and unrealized losses on investment securities.  In accordance with U.S. GAAP, we must conclude if one of the future realization of our gross deferred tax asset is more likely than not to be realized.  Sources of support for the gross deferred tax asset are the reversal of deferred tax liabilities within a carry-forward period, which in the U.S. is 15 years,  projected future taxable income or tax planning strategies, however, we are unable to use projections of future taxable income, since we do not have a history of taxable income.  Therefore, we must rely heavily on tax planning strategies, for support of the gross deferred tax asset.

\*  \*  \*

In the second quarter, we completed Ballantyne Re, a XXX securitization.  While this transaction eliminated the long-term financing mismatch which has become an increasingly important issue in the industry, <u>it eliminated a large cushion that greatly reduced flexibility in our tax planning strategies and increase pressure on our remaining strategies</u>.

\* \* \*

Allow me now to move on to the annuity DAC adjustment, or deferred acquisition costs.  In 2001, we wrote several deferred fixed annuity treaties, for which the terms of the underlying product allow the policy holder to surrender the policy at the end of five years, with no penalty.  . . . Based on the emerging lapse experience and an analysis of guaranteed crediting rate to the policyholder, compared to the current interest rates, we concluded that an adjustment of approximately $13 million was made, reflecting our current best estimate of the ultimate lapse rate on these treaties.

\* \* \*

Another area of significant adjustment relates to our external retrocession administration, and the related accounting.  Following the acquisition and integration of the ING business, <u>we recognized the need to improve the quality of our underlying data, and external retrocession systems</u>.  As a result of this initiative, we now have the ability to <u>more accurately administer our retrocession, and identify that external retrocession premiums have been under-accrued in prior years, resulting in an adjustment of approximately $13 million this quarter</u>.  While this is primarily a catch-up adjustment, related to prior years, there will be some impact on future projected operating profits.

In addition to the improvements noted above, we performed a thorough review of the various experience refund and reserve calculations, related to our external retrocession programs.  Based on this review, <u>we refined certain of our calculations and processes to allow for a more accurate recording of the net cost of reinsurance each quarter</u>.  The impact of these changes resulted in an adjustment of approximately $8 million, in the second quarter.  Again, while this adjustment relates primarily to prior periods, there will be some impact on operating profits going forward.

I would like now to briefly discuss the impact of changes in our premium accruals.  . . . <u>During the second quarter we made an $8 million adjustment in premium accruals in North America, resulting from a revision of estimates related to prior periods</u>.  This adjustment related principally to the ING block, and resulted from unusual activity in premium levels post-acquisition, which made the use of historical trends less effective in estimating current period accruals.
**[Emphasis added.]**

308. During the August 4, 2006 conference call, Scottish Re's newly-appointed Chief Executive Officer stated: "The Board of Directors and senior management are contemplating the following strategic options. First, the raising of an additional capital cushion, second a strategic partnership and finally, sale of the Company. To this end, the Board has hired both Goldman Sachs and Bear Stearns to advise on the various strategic options. This is proceeding on an accelerated timeline."

309. Following the end of the Class Period, the price of Scottish Re Ordinary Shares partially recovered as investors expected a sale of the Company. For example, on August 7, 2006, Dow Jones quoted analysts from Fox-Pitt as stating: "The number of potential bidders for Scottish Re could be significant, including all of the traditional global life reinsurance names, several large diversified primary insurers with strong ratings, and private equity." The reported bidders potentially interested in Scottish Re included Hannover Re and French reinsurer Scor.

310. On September 11, 2006, Scottish Re issued a press release reporting that the Company was "on track" to meet its objectives of completing an auction process for the possible sale of the Company. As part of the process, the Company reported that it had provided a number of parties with confidential due diligence information. The press release reported that it was possible that the process would lead to an announcement of transaction as early as mid-to-late October or early November 2006.

311. On November 9, 2006, Scottish Re issued a press release reporting a net loss of $30.5 million, or $0.54 per diluted Ordinary Share, for the 2006 third quarter ended September 30, 2006. The Company's reported loss "primarily related to a $30.1 million valuation allowance established on deferred tax assets."

312.  On or about November 9, 2006, Scottish Re filed its Form 10-Q for the quarter ended September 30, 2006.  The Form 10-Q stated the following regarding the Company's additional tax valuation allowance:

> Income tax expense in the third quarter ended September 30, 2006 was $20.8 million compared to an income tax benefit of $6.7 million in the same period in 2005.  The change in our effective tax rate in the third quarter ended September 30, 2006 compared to the same period in 2005 is primarily related to a $30.1 million valuation allowance established on deferred tax assets.

> The valuation allowance principally relates to current period tax benefit not being recognized (as previously indicated, <u>the Company can no longer recognize tax benefits for certain legal entities</u>) and an additional valuation allowance established on prior period deferred tax assets resulting from revised statutory and tax projections related to certain legal entities.  [Emphasis added.]

313.  On November 10, 2006, the price of Scottish Re Ordinary Shares closed at $6.40 per share, down approximately 20% from the closing price of $8.02 per share on November 9, 2006.  The closing price of Scottish Re Ordinary Shares on November 10, 2006, was down by over 40% from the closing price of $11.14 per Ordinary Share on November 6, 2006.  Reuters attributed the decline to concerns about the possible sale of Scottish Re.  Among the potential bidders who announced they were no longer interested in acquiring the Company after having access to confidential due diligence information regarding Scottish Re and its data and internal systems, were Hannover Re and Scor.

314.  On November 27, 2006, the price of Scottish Re Ordinary Shares closed at $5.85 per share, down over 11.75% from the closing price of $6.63 per share on November 24, 2006, following disclosure of the Company's agreement (subject to shareholder approval) to sell approximately 69% of the Company to private-equity firm Cerberus Capital Management, L.P. and MassMutual Capital Partners LLC for approximately $600 million, representing a valuation of just $4 per Ordinary Share, or 40% less than the market value of the Company on

November 24, 2006. In connection with the disclosure, a Company spokesperson stated: "The Board of Directors fully recognizes the implied valuation per ordinary share is below our current market price and also below many investors' expectations." According to the Company, some of the contributing factors that led to the unfavorable terms of the agreement were: (i) the fact that "auction participants had access to [the Company's] liquidity analysis and were fully aware of the liquidity requirements demanded by the business for the near and long term;" (ii) "due to Scottish Re's tight liquidity and the negative impact of the ratings downgrades, the Company was under increasing pressure to complete a sale or substantial capital infusion in order to meet capital requirements to sustain the business going forward;" and (iii) "rating agency downgrades suspended meaningful new business."

### THE SCOTTISH RE DEFENDANTS
### AND DEFENDANT E&Y ACTED WITH SCIENTER

315. At all relevant times, Defendants Scottish Re, Willkomm, Murphy, Miller, French and E&Y acted with scienter, in making materially false and misleading statements throughout the Class Period. Each of these Defendants had actual knowledge that the statements made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements. These Defendants' intent to deceive or reckless disregard for the truth is demonstrated by substantial circumstantial evidence supporting a strong inference of scienter.

316. As set forth above, throughout the Class Period, the Scottish Re Defendants failed to record a valuation allowance under GAAP, SFAS 109, for the Company's material and growing deferred tax asset notwithstanding the Company's plans to securitize the ING (and other reinsurance) business from the very start of the Class Period. Given the substantial amount of time the Scottish Re Defendants spent planning and analyzing securitization both with internal and external industry and tax experts as well as the Scottish Re Defendants'

substantial prior experience with an earlier securitization, Orkney, the Scottish Re Defendants acted intentionally or recklessly in failing to record a valuation allowance under GAAP for the Company's material and growing deferred tax asset.

317.  At the end of the Class Period, Defendant Miller explained the Company's material $112 million tax valuation allowance by stating, inter alia, that the Ballantyne securitization had placed "profitable business into a securitized vehicle" that limited flexibility in what the Company could do with that business.  Similarly, the Form 10-Q issued by the Company for the quarter ended September 30, 2006 stated:  "as previously indicated, the Company can no longer recognize tax benefits for certain legal entities."

318.  The fact that the Company's ING business was going to be placed in separate, special purpose vehicles could not have come as a surprise to the Scottish Re Defendants.  According to the public statements and presentations by these same Defendants (each of whom has extensive financial and industry experience), that is the very nature of a securitization.  Assets are transferred to separate, special purpose vehicles which sell debt securities backed by the cash flow of the assets.  Moreover, Scottish Re completed two major securitizations, Orkney and Orkney II, prior to Ballantyne Re.  The first securitization, Orkney, was completed before the start of the Class Period, and all three securitizations required extensive planning with internal and external industry and tax experts.  The statements by the Scottish Re Defendants set forth in paragraphs 70-80 above demonstrate that the Company began considering securitization as far back as April 2000, and had a dedicated team working with outside experts on securitization for a substantial amount of time.

319.  The Scottish Re Defendants, themselves, also repeatedly referred to their own extensive securitization experience.  For example, on or about September 5, 2005, the Scottish

Re Defendants issued a press release describing the Company as "a leader in development of life insurance securitization" and announced that Willkomm would deliver a presentation to analysts and investors on "the development of life insurance securitization, including its use as a capital and risk management tool."

320. The Scottish Re Defendants' experience with the Orkney securitization before the start of the Class Period alone gave them actual knowledge regarding the tax consequences of such a transaction. In fact, during a conference call on November 4, 2005, Defendant Willkomm described that experience as follows:

> I think it is probably fair to say, based upon what we see right now, once again, the securitizations can influence the tax outcome as well, as one is, in effecting these, recapturing business from different parts of our organization with different tax rates, and then effectively reallocating them to different jurisdictions with different tax rates. We saw that, for example, in the first quarter with our Orkney Re transaction where we took business from higher tax rate environments in part – or lower tax rate environments rather, recaptured them into a higher tax rate environment. [Emphasis added.]

321. The Scottish Re Defendants also repeatedly demonstrated their knowledge of the relevant GAAP requirements, by quoting SFAS 109 in the Company's Forms 10-K and 10-Q and repeatedly claiming that the Company's financial statements complied with SFAS 109. Moreover, as set forth above, the demanding "more likely than not" standard established by SFAS 109 is unambiguous.

322. Thus, the Scottish Re Defendants acted knowingly or at least recklessly throughout the Class Period. As one securities analyst from Lehman Brothers commented during the Company's post-Class Period August 4, 2006 conference call:

> I've listened to everything that's been said. I've tried to understand everything that's been said and I think I understand sort of what happened but it's the whys that continue to baffle me in the following sense. Scottish [Re] is not new to securitization, you've been doing it for a while, you have the world's legal experts and tax experts who have been involved with the securitizations forever.

> Presumably, they know that securitizations produce income inside trusts which deferred tax assets cannot be used, if that is the idea here. You are working on Ballantyne for months. How does Ballantyne suddenly jump up and surprise the world's leading tax experts? [Emphasis added.]

323. Further evidencing the Scottish Re Defendants' scienter is the highly unusual and suspicious pattern reported by Wachovia on or about June 15, 2006, that contribution to Scottish Re's operating earnings from the Company's tax benefits was greatest in quarters when earnings otherwise appeared to fall short. At the time of its report, Wachovia Securities expressly noted that it did not challenge "Scottish Re's assertion, verified by its auditors," that the deferred tax assets were properly stated under GAAP. In fact, after the Company's July 31, 2006 surprise valuation allowance, Wachovia issued a report which stated: "At the time we were preparing our [June 15, 2006] report, we were assured of the recoverability of [Scottish Re's] deferred tax asset by various financial executives within the firm." (Emphasis added.)

324. The Scottish Re Defendants' knowledge or recklessness regarding tax issues is further demonstrated by the fact that the Company was originally founded and continues to be located and run in a way to maximize offshore tax benefits.

325. In August 2006, the Senate Committee on Homeland Security and Governmental Affairs released a reported entitled "Tax Haven Abuses: the Enablers, the Tools and Secrecy" (the "Senate Report") in connection with its hearing on various tax haven abuses. The Senate Report detailed six case studies, one of which examined Defendant French and the Wyly Brothers' offshore investment activities, including their founding of, and investment in, Scottish Annuity & Life. In short, between 1993 and 2006, the Wyly Brothers' offshore business ventures, such as Scottish Annuity & Life, received in excess of $500 million untaxed, offshore dollars, and $250 million of these funds were then transferred to two hedge funds that were founded and controlled by the Wyly Brothers, known as Maverick and Ranger.

- 124 -

326. Although the Wyly Brothers resigned from Scottish Re in 2000, Defendant French stayed in control and the Company, itself, was requested to produce documents to the SEC and the Senate Committee in connection with the investigation into tax abuses. The Company's Form 10-K for the year ended December 31, 2005 states:

> We have received separate subpoenas from the staff of the SEC and the Permanent Subcommittee on Investigations of the United States Senate Committee on Homeland Security and Governmental Affairs ("PSI"). The SEC subpoena seeks documents and other information regarding transactions and trading involving Scottish Re securities by certain former officers and directors of Scottish Re (each of whom left those positions by mid-year 2001), by certain original shareholders of Scottish Re, and by our current Chairman [Michael French]. The PSI subpoena is in connection with PSI's general review of compliance with anti-money laundering, tax and securities laws and regulations related to financial transactions by individuals and domestic and offshore entities. The PSI subpoena seeks documents regarding the formation of Scottish Re, certain wealth management products and transactions involving the individuals mentioned above.

327. Suspiciously, the Company's surprise July 31, 2006 disclosures on the last day of the Class Period, came just one day before Defendant French was scheduled to testify before the Senate Committee.

328. Throughout the Class Period, the Scottish Re Defendants also repeatedly provided sworn certifications as to the Company's purported compliance with GAAP and the adequacy of its internal controls. However, as set forth above, the Company has since reported (in addition to the tax valuation allowance) numerous required adjustments revealing previously undisclosed weaknesses in internal controls and violations of GAAP. Moreover, as set forth in paragraphs 51-142 above, while the Scottish Re Defendants repeatedly certified the adequacy of the Company's internal controls it was common knowledge within the Company that core business functions including Company's IT systems used to track premiums and process claims were poor; that the Company's processing personnel were not well trained; and that the

- 125 -

Company's administrative management were weak.  These Defendants either recklessly ignored the Company's obvious and internally well known internal controls weaknesses in preparing their repeated, sworn certifications, or acted with knowledge of those internal control problems.

329.  Among other things, given the importance of financial reporting, the Scottish Re Defendants either knew or recklessly disregarded the difficulties faced by the Company in closing its books at the end of each month during the Class Period due to poor claims processing systems and insufficiently trained employees, including the fact that there were stacks of unprocessed claims kept literally in laundry baskets.  Indeed, these problems were severe enough to lead to the termination of the Scottish Re U.S. manager of these functions in the Fall of 2005, yet no disclosure was made.

330.  Further evidencing the Scottish Re Defendants' scienter is the deliberate manipulation of reported financial results and violations of GAAP set forth above directed by Seth Vance (CEO of Scottish Re North America who reported directly to Defendant Willkomm), pursuant to which the Company improperly and intentionally reported certain year-end 2005 expenses as 2006 expenses and improperly capitalized other expenses in order to improve the Company's reported results and earnings per share.  Moreover, as set forth above, when one Senior Vice President voiced a complaint about the Company's manipulation of year-end 2005 expenses (which reflected poor internal controls at the highest levels of the Company), the former employee was told by Willkomm that the former employee was just being "paranoid" and that the former employee did not "have proof of anything."  This reaction by Willkomm reflects the opposite of what an honest executive would have done when faced with such a complaint.  Moreover, it demonstrates intentional wrongdoing, or at the very least,

an unwillingness to investigate serious problems and a reckless disregard for the truth.  By

contrast, the only internal weakness ever disclosed by the Scottish Re Defendants prior to the

end of the Class Period was one that was repeatedly described as being limited to the

Company's U.K. operations and being fully addressed.

331.  The fact that the Company's July 31, 2006 disclosures were accompanied by the

immediate resignations of Defendant Willkomm and Seth Vance is further evidence of

wrongdoing on their part.  Similarly, Defendant French resigned as Chairman of the Board of

Scottish Re just one day before Scottish Re's adverse disclosures on May 4, 2006.

332.  The Scottish Re Defendants further anticipated the dire consequences of their end

of Class Period disclosures by engaging Goldman Sachs and Bear Stearns to advise the

Company on strategic options, including a sale of the Company, prior to their disclosures on

July 31, 2006.

333.  Given their substantial industry experience, at all relevant times during the Class

Period, the Scottish Re Defendants knew or recklessly disregarded that disclosing a material

valuation allowance would threaten the Company's ability to retain an "A" level credit rating,

necessary for Scottish Re to stay in the reinsurance business.  Accordingly, the Scottish Re

Defendants had both a substantial and unusual motive to commit fraud given that the entire

future of the Company would be placed into jeopardy if the true facts were disclosed.  Indeed,

following Defendant Willkomm's ouster at the end of the Class Period and the disclosure of

the Company's material valuation allowance and other required adjustments, it is now

uncertain whether Scottish Re will continue as a going concern.  While the Company publicly

disclosed its efforts to sell Scottish Re, because the Company has now proposed to raise cash at

a substantial discount and dilution to shareholders, that transaction may not receive required

two-thirds shareholder approval.  A number of other bidders withdrew from the biding process

after gaining access to certain internal Company facts raising questions about whether

additional adverse disclosures will be forthcoming.

334.  At all relevant times, the Scottish Re Defendants were further motivated by the

substantial proceeds realized by the Company in connection with the Offerings of Scottish Re

Preferred Shares and Ordinary Shares during the Class Period as well as the Company's

forward sale arrangements.

335.  As set forth above, pursuant to the forward sale agreements entered into at the

time of the Company's December 2005 Ordinary Share offering, the Company also agreed to

deliver a variable number of Ordinary Shares based on the average market price of the shares,

subject to a floor price of $22.80 and a cap price of $28.80, to the Forward Sale underwriter

Defendants in exchange for additional payments of $75 million on September 29, 2006 and

December 29, 2006.  As Defendant Miller stated during a February 17, 2006 conference call,

the forward sale of 3,150,000 Ordinary Shares "enabled [the Company] to lock in minimum

issue price, while retaining significant upside in the share price."

336.  On June 26, 2006, while in possession of material adverse undisclosed

information regarding the Company's anticipated tax valuation allowance, Scottish Re

exercised its (maximum) right of prepayment under the forward sale agreements in order to

receive 75% of the $150 million proceeds totaling $110 million, net of prepayment discounts

of $2.5 million, in exchange for its delivery of Ordinary Shares.  By tendering the shares early,

Scottish Re was able to benefit from an average market price for the shares which was higher

than the average market price on September 29, 2006 (after the Scottish Re Defendants'

adverse disclosures beginning on July 31, 2006).  Just two months earlier, during the

Company's April 20, 2006 annual Investor Day, the Company stated that it did not plan on tendering its shares before the scheduled September 29 and December 29, 2006 dates.

337.   Defendant E&Y also acted knowingly, or at least recklessly, in certifying that it audited the Company's financial statements and reviewed management's assessments of internal controls in accordance with GAAS.

338.   According to statements by Defendant Miller, E&Y had reviewed the Company's deferred tax asset each quarter during the Class Period. During a conference call on August 4, 2006, Defendant Miller stated that the Company's tax planning strategies were "heavily scrutinized by E&Y . . . in each period in which we issued the financials."

339.   According to statements made by Defendant Willkomm during conference calls on October 18, 2004 and November 4, 2004, E&Y also provided "extensive" due diligence support for Scottish Re as it considered acquiring ING's life reinsurance business.

340.   E&Y's fees to Scottish Re also reflect substantial tax and due diligence related services.  According to the Schedule 14A Definitive Proxy Statement filed by the Company with the SEC on or about April 3, 2006, for the years ended December 31, 2004 and December 31, 2005, E&Y was paid:  (a) fees for audit services of approximately $2,498,000 and $1,800,000, respectively; (b) fees for tax services and tax planning of approximately $1,004,000 and $1,675,000, respectively; and (c) fees for audit related services, including due diligence services related to mergers and acquisitions, of approximately $1,184,000 and $710,000, respectively.  E&Y also served as the auditors for Ballantyne Re in Ireland.

341.   At all relevant times, given E&Y's substantial access to information; its extensive role in performing due diligence related to the Company's ING acquisition; its substantial involvement with reviewing the Company's deferred tax assets; and its role in auditing

Ballantyne Re, E&Y acted intentionally or recklessly in certifying the Company's financial statements as presented in accordance with GAAP notwithstanding the Company's failure to record a valuation allowance for the Company's material and growing deferred tax asset in accordance with GAAP, SFAS 109.

342.   Given its substantial access to information; its extensive due diligence work; substantial involvement in reviewing the Company's deferred tax asset; and its role in auditing Ballantyne Re, E&Y, just like the Scottish Re Defendants, was aware, at all relevant times, of the fact that the Company's ING business was going to be securitized in a separate, special purpose vehicles.  Similarly, E&Y knew of and worked on the Company's two major securitizations, Orkney and Orkney II, prior to Ballantyne Re. Yet, notwithstanding the fact that the Company's material and growing deferred tax asset necessarily would be adversely affected by the transfer of the Company's assets to special purpose vehicles in connection with the securitizations and the demanding requirements of SFAS 109, E&Y knowingly or recklessly issued two, separate clean and unqualified audit opinions as to the Company's financial statements for the years ended December 31, 2004 and December 31, 2005, respectively.

343.   E&Y also turned a blind eye to the highly unusual and suspicious fact pattern reported by Wachovia on or about June 15, 2006, that contribution to Scottish Re's operating earnings from the Company's tax benefits was greatest in quarters when earnings otherwise appeared to fall short.

344.   E&Y had unfettered access to Scottish Re's books and records throughout the Class Period and, in certifying management's assessment of internal controls, similarly ignored numerous "red flags."  Instead of conducting a further investigation and expanded audit in the

face of management's reported internal control weakness in the U.K. as well as the Company's prior history of internal control problems, E&Y never disagreed with management's own assessment of its internal controls throughout the Class Period.  In fact, E&Y certified management's assessments of internal controls despite such obvious core deficiencies as difficulties experienced by the Company's U.S. operations in closing its books each month and processing claims both of which were well known within Scottish Re.

345.  As set forth above, according to former employees of Scottish Re, the Company's inability to process claims in a timely manner manifested itself in such obvious ways such as stacks of unprocessed claims kept literally in laundry baskets.  Rather than properly examining these facts and contrary to the explicit requirements of GAAS, E&Y instead chose to staff its audits of Scottish Re with very junior people who were not adequately supervised by the audit partner, Marty Connor, who was rarely on site.

346.  Given E&Y's approach to its audits of Scottish Re, it is unfortunately not surprising that investors suffered substantial losses when Defendant Willkomm left the Company and the true facts began to be disclosed.

## LOSS CAUSATION

347.  Throughout the Class Period, the price of Scottish Re Ordinary Shares, Preferred Shares and HyCUs were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  As set forth above, when the true facts became known by the market and investors and the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of these securities declined precipitously as the artificial inflation was removed from the price of these securities, causing damage to Plaintiffs and members of the Class.

348. Moreover, the adverse consequences of the Scottish Re Defendants' end of Class Period disclosures, including the reduced credit ratings assigned to the Company and its subsidiaries and the adverse impact of those reductions on the Company's business going forward, were foreseeable to Defendants at all relevant times. Indeed, as set forth herein, the Scottish Re Defendants anticipated the dire consequences of their end of Class Period disclosures by engaging Goldman Sachs and Bear Stearns to advise the Company on strategic options, including a sale of the Company, prior to their disclosures on July 31, 2006.

349. Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

350. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this complaint. First, none of the statements complained of herein was a forward-looking statement, nor were any of the statements identified as forward-looking statements when made. Rather the statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

351. To the extent to which any of the false or misleading statements alleged herein can be construed as forward-looking statements, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. In fact, the first time Scottish Re disclosed a risk with regard to the recovery of the Company's deferred tax assets was after the end of the Class

Period in the Form 10-Q for the period ended June 30, 2006, filed on or about August 15, 2006. That document added, for the first time, to the Company's list of risks and uncertainties: "changes in expectations regarding future realization of gross deferred tax assets."

352. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Scottish Re who knew that the statement was materially false or misleading when made.

## THE PRESUMPTION OF RELIANCE

353. The market for Scottish Re Ordinary Shares, Preferred Shares and HyCUs was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the price of these Scottish Re securities.

354. Scottish Re securities were traded on the New York Stock Exchange, a highly efficient market. The Company was consistently followed, before and throughout the Class Period, by a number securities analysts who published reports regarding Scottish Re. The price of Scottish Re securities reacted promptly to the dissemination of new information regarding the Company. Scottish Re securities were actively traded throughout the Class Period.

355. Accordingly, Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Scottish Re securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT NINE

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on Behalf of Purchasers of Scottish Re Ordinary Shares, Preferred Shares and/or HyCUs, Against Defendants Scottish Re, Willkomm, Murphy, Miller, French And E&Y**

356.  Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

357.  This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and members of the Class against Defendants Scottish Re, Willkomm, Murphy, Miller, French and E&Y.

358.  As alleged herein, throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  These Defendants intended to and did, as alleged herein:  (i) deceive the investing public, including Plaintiffs and other members of the Class; (ii) artificially inflate and maintain the price of Scottish Re securities; and (iii) cause Plaintiffs and the members of the Class to purchase Scottish Re securities at artificially inflated prices.

359.  The Scottish Re Defendants and E&Y were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having prepared, approved, signed and/or disseminated

documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

360. As set forth above, these Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Scottish Re securities during the Class Period.

361. In ignorance of the false and misleading nature of these Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Scottish Re securities, Plaintiffs and other members of the Class purchased Scottish Re securities at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Scottish Re securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of these securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Scottish Re securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

362. By reason of the foregoing, Defendants Scottish Re, Willkomm, Murphy, Miller, French and E&Y are liable to Plaintiffs and the members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>COUNT TEN</u>

**For Violations of Section 20(a) of the Exchange Act, on Behalf of Purchasers of Scottish Re Ordinary Shares, Preferred Shares and/or HyCUs, Against Defendants  Willkomm, Murphy, Miller and French For Control Person Liability (Based on Violations By Scottish Re of Section 10(b) and Rule 10b-5)**

363.  Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

364.  This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Willkomm, Murphy, Miller and French, on behalf of Plaintiffs and members of the Class.

365.  As alleged herein, Scottish Re violated Section 10(b) and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of Defendants Willkomm, Murphy, Miller and French and others who knew of or recklessly disregarded the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

366.  Defendants Willkomm, Murphy, Miller and French were controlling persons of Scottish Re during the Class Period, due to their senior executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the Company's public filings.

367.  By virtue of the foregoing, Defendants Willkomm, Murphy, Miller and French each had the power to influence and control, and did influence and control, directly or

indirectly, the decision making of Scottish Re, including the content of its financial statements and public statements.

368.  As set forth above, these Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Scottish Re securities during the Class Period.

369.  In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Scottish Re securities, Plaintiffs and other members of the Class purchased Scottish Re securities at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased Scottish Re securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of these securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Scottish Re securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

370.  By reason of the foregoing, Defendants Willkomm, Murphy, Miller and French are liable to Plaintiffs and the members of the Class for violations of Section 20(a) of the Exchange Act.

## JURY DEMAND

371.  Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff and the Richard Baehr Trust as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C.    Awarding rescission and/or rescissory damages in favor of Plaintiffs and the members of the Class;

D.    Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E.    Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F.    Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
December 4, 2006

**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**

By: _____
Max W. Berger (MB-5010)
Salvatore J. Graziano (SG-6854)
Stephen W. Tountas (ST-8395)

1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Lead Plaintiff and the Class*

- 138 -

Marvin L. Frank, Esq.
MURRAY, FRANK & SAILER, LLP
275 Madison Avenue
New York, New York 10016
Telephone:  (212) 682-1818
Facsimile:  (212) 682-1892

David B. Kahn, Esq.
Mark E. King, Esq.
DAVID B. KAHN & ASSOCIATES, LTD.
One Northfield Plaza
Suite 100
Northfield, Illinois 60093
Telephone:  (847) 501-5083
Facsimile:  (847) 501-5086

***Counsel for Plaintiff Richard Baehr Trust***