**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X
                                              :
**IN RE SCOTTISH RE GROUP**           :    **OPINION AND ORDER**
**SECURITIES LITIGATION**             :
                                              :    **06 Civ. 5853 (SAS)**
------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

This putative class action is brought on behalf of a class of

shareholders of Scottish Re Group Ltd. ("Scottish Re" or the "Company") against

(1) Scottish Re and certain of Scottish Re's officers and directors, (2) Ernst &

Young LLP ("E&Y"), the Company's outside auditor, and (3) underwriters and

forward purchasers involved in two of the Company's offerings. The

Consolidated Class Action Complaint (the "Complaint") alleges that defendants

violated federal securities laws in connection with Scottish Re's accounting for

deferred tax assets in its financial statements and its certifications of the adequacy

of the Company's internal controls.[1] All defendants now move to dismiss the

Complaint. For the reasons discussed below, defendants' motions are granted in

part and denied in part.

---

[1]     The same conduct formed the basis of a shareholder derivative action
dismissed by this Court in May 2007. *See Winn v. Schafer*, No. 06 Civ. 10170,
2007 WL 1346656 (S.D.N.Y. May 7, 2007).

-1-

# I.    BACKGROUND

## A.    Facts[2]

During the period from February 17, 2005 through July 31, 2006 (the
"Class Period"), Scottish Re was a holding company engaged in the international
reinsurance business and incorporated in the Cayman Islands, with its principal
offices located in Bermuda.[3]  Scottish Re was co-founded in 1994 by Sam Wyly,
Charles J. Wyly, Jr. and Michael C. French.[4]  The Company has been trading on
the New York Stock Exchange (both under its prior name, Scottish Annuity &
Life Holdings, Ltd., and its current name) since its initial public offering on
November 30, 1998 (the "IPO").[5]

The "Officer Defendants" are Scott Willkomm, Elizabeth Murphy,
Dean E. Miller, and French.  Willkomm served as Chief Executive Officer
("CEO") of Scottish Re from January 1, 2005 until his resignation on July 31,
2006.[6]  Murphy served as Chief Financial Officer ("CFO") of Scottish Re from

---

[2]     The facts summarized in this section are drawn from the Complaint
and are presumed to be true for the purpose of these motions.

[3]     *See* Complaint ("Compl.") ¶¶ 1, 4, 51.

[4]     *See id.* ¶ 52.

[5]     *See id.* ¶¶ 53-54, 57.

[6]     *See id.* ¶ 16.

-2-

April 2002 until August 10, 2005 and Executive Vice President of Finance from August 11, 2005 until her resignation on March 31, 2006.[7] Miller served as Executive Vice President and CFO from August 10, 2005 through the end of the Class Period.[8] French served as Chairman of the Board of Directors of Scottish Re from March 2000 to May 3, 2006, and as a director from the time the Company was founded through the end of the Class Period.[9] He also served as CEO of the Company from May 1998 to December 31, 2004.[10] Scottish Re and the Officer Defendants are referred to collectively as the "Scottish Re Defendants."

The "Director Defendants" are Michael Austin, William Caulfeild-Browne, Robert Chmely, Lord Norman Lamont, Hazel O'Leary, and Glenn Schafer.[11] Each of the Director Defendants was a director of Scottish Re during the Class Period and signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public

---

[7] *See id.* ¶ 17.

[8] *See id.* ¶ 18.

[9] *See id.* ¶ 19.

[10] *See id.*

[11] *See id.* ¶¶ 23-28.

during the Class Period.[12]

## 1. The ING Acquisition and the Ballantyne Re Securitization Transaction

As a life reinsurance company operating within the United States, insurance regulations require Scottish Re to maintain certain minimum levels of reserves.[13] As of January 1, 2000, those reserves requirements were increased (known as "Regulation XXX" and "Regulation AXXX" reserves).[14] On December 31, 2004, Scottish Re acquired the in-force life reinsurance business of ING (the "ING Acquisition").[15] As a result of the ING Acquisition, by the start of the Class Period, Scottish Re purported to be the third largest life reinsurer in the United States.[16] The ING Acquisition also greatly increased Scottish Re's Regulation XXX and Regulation AXXX reserve requirements.[17]

In order to meet the reserve requirements, the Company entered into an agreement with ING pursuant to which ING would maintain, for a fee,

12    *See id.*

13    *See id.* ¶ 64.

14    *See id.* ¶¶ 65-66.

15    *See id.* ¶¶ 59, 67.

16    *See id.*

17    *See id.* ¶ 68.

-4-

collateral for the XXX and AXXX reserves (the "ING Collateral Agreement").[18]

The ING Collateral Agreement was merely a temporary solution for funding the

ING-related reserves until Scottish Re could make satisfactory alternative

collateral arrangements.[19]  Scottish Re's plan was to fund the XXX and AXXX

reserves through the use of securitizations.[20]  Securitization involves the transfer

of assets with reasonably predictable cash flows to a separate special purpose

entity, which then sells debt securities backed by the cash flows from those assets

on the capital markets.[21]  Once an asset is securitized, it is no longer capable of

generating net income on that company's books because the cash flows from that

asset are committed to the debt holders of the separate entity.[22]

On February 17, 2005, the first day of the Class Period, Willkomm

stated during the Company's investor conference call for the first quarter of 2005

---

18    *See id.* ¶ 69.

19    *See id.*

20    *See id.* ¶¶ 70-80.

21    *See id.* ¶ 72.

22    *See* International Monetary Fund, *Coordinated Portfolio Investment Survey Guide* 159, available at http://www.imf.org/external/pubs/ft/cpis/2002/pdf/cpis_index.pdf (2d ed. 2002).

that Scottish Re planned to securitize the ING-related reserves in the near future.[23]

That intention was reiterated during conference calls for the second and third

quarters of 2005.[24]

 In order to securitize the ING-related reserves, Scottish Re completed

several separate financings. In December 2005, Scottish Re completed a $450

million XXX securitization through an orphaned special purpose entity, Orkney

Re II, plc, incorporated in Ireland.[25] In May 2006, Scottish Re completed a $2.1

billion securitization of all ING Acquisition assets that had Regulation XXX and

AXXX reserve requirements through a special purpose entity called Ballantyne Re

plc, also incorporated in Ireland (the "Ballantyne Re transaction").[26] As a result,

those assets were no longer capable of generating net income for Scottish Re.

## 2. Scottish Re's Financial Statements

 The Financial Accounting Standards Board ("FASB") is a non-profit

entity responsible for developing generally accepted accounting principles

---

[23]  *See* Compl. ¶ 76.

[24]  *See id.* ¶ 77.

[25]  *See id.* ¶¶ 79-80.

[26]  *See id.*

("GAAP").[27] FASB Statements of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("SFAS 109") governs the maintenance of deferred taxes on a company's balance sheet.[28] Deferred tax assets arise when a company will be able to benefit in future years by offsetting past tax losses against future taxable income.[29] In accordance with SFAS 109, however, deferred tax assets may be maintained on a company's balance sheet only when it is expected that they will be realized, *i.e.*, that these losses will be used to reduce taxes payable in future years.[30] The SFAS 109 Summary states that "'[a] valuation allowance [*i.e.*, a reduction in the booked value of the deferred tax asset] is

---

[27]    GAAP are a detailed framework of accounting principles that govern the preparation of financial statements in the United States. These are distinct from generally accepted auditing standards ("GAAS"), which are a collection of ten general statements that address proper accounting practices. GAAS are maintained by the American Institute of Certified Public Accountants. *See* Generally Accepted Auditing Standards, American Institute of Certified Public Accountants, *available at* http://www.aicpa.org/download/members/div/auditstd/AU-00150.PDF.

[28]    *See id.* ¶ 85. Relevant provisions of SFAS 109 are attached as Exhibit ("Ex.") B to the Declaration of Evan M. Rosen, counsel for Scottish Re Defendants and Director Defendants ("Rosen Decl.").

[29]    *See* Compl. ¶ 87. "A deferred tax asset is recognized for temporary differences ['between the tax basis of an asset or liability and its reported amount in financial statements'] that will result in deductible amounts in future years and for carryforwards." SFAS 109 Summary.

[30]    *See* Compl. ¶ 87.

recognized if, based on the weight of available evidence, it is *more likely than not* that some portion or all of the deferred tax asset will not be realized.'"[31] Cumulative losses in recent years or "'unsettled circumstances'" that if not resolved would adversely affect operations or profits in the future make it "'difficult'" to conclude that a tax valuation allowance or charge is *not* needed.[32]

In the Form 10-K for the year ended December 31, 2004, Scottish Re reported: "[W]e believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of \$22.1 million established in 2004."[33] In the Company's Form 10-K for the year ended December 21, 2005, it reported: "[W]e believe that it is more likely than not that all gross deferred tax assets will reduce taxes payable in future years except for a valuation allowance of \$18.5 million."[34] The Company reported that the valuation allowances resulted from the deferred acquisition costs of the ING Acquisition.[35]

---

[31]   *Id.* (quoting SFAS 109 Summary (emphasis in original)). *Accord id.* ¶ 88 (quoting SFAS 109 ¶ 17e).

[32]   *Id.* ¶ 89 (quoting SFAS 109 ¶ 23).

[33]   *Id.* ¶ 93.

[34]   *Id.*

[35]   *See id.*

During the Class Period, Scottish Re stated repeatedly that it
maintained its deferred tax assets based on management's estimates of the future
profitability of its taxable entities, which in turn were based on current forecasts
and forecasts for the period for which losses may be carried forward.[36]  However,
in August 2006, the Company stated that because there was no history of taxable
income, it must rely heavily on tax planning strategies for support of the gross
deferred tax assets.[37]

Scottish Re never disclosed to investors the potential impact of the
Company's securitization plans on the deferred tax assets.[38]  These securitization
plans had materialized in December 2005 and May 2006 and had resulted in the
transfer of income-producing assets from Scottish Re to separate and distinct
entities.  Nonetheless, the Scottish Re Defendants repeatedly issued financial
statements and signed certifications asserting that the Company was in compliance
with SFAS 109.[39]

## 3.    Internal Controls

---

[36]    *See id.* ¶¶ 94, 96.

[37]    *See id.* ¶¶ 95, 96.

[38]    *See id.* ¶ 98.

[39]    *See id.* ¶ 86.

-9-

Throughout the Class Period, Scottish Re suffered from serious internal control deficiencies.[40] Nevertheless, Willkomm, Murphy and Miller repeatedly issued sworn Sarbanes-Oxley certifications attesting to the adequacy of the Company's internal controls.[41] The Company's Forms 10-Q for the first, second, and third quarters of 2005 also stated that the Company possessed adequate internal controls.[42]

On May 4, 2006, in connection with the announcement of the Company's results for the first quarter of 2006, Scottish Re disclosed that its net income was adversely impacted by approximately $15 million as the result of mortality and morbidity claims, late claims reported by several ceding companies, and the belated addition of reserves for such claims in the future.[43] On May 5, 2006, during the investor conference call for the first quarter of 2006, Willkomm stated that the Company had undertaken a review of the potential for similar issues to arise and had established additional reserves, acknowledging that "[w]here we

---

[40]     *See id.* ¶¶ 111-128.

[41]     *See id.* ¶ 128.

[42]     *See id.* ¶ 154 (first quarter 2005); ¶ 163 (second quarter 2005); ¶ 165 (third quarter 2005).

[43]     *See id.* ¶ 112.

erred was in not doing this sometime ago."[44] Following that announcement, Bear

Stearns issued an analyst report that stated that the Company's first quarter results

had "shaken our confidence that management had the operational and financial

controls in place necessary to drive profitable business growth on a consistent

basis."[45]

Several confidential witnesses ("CWs"), former employees of

Scottish Re, have asserted that the Company had poor internal controls throughout

the Class Period. These failings included a lack of a reliable method to track

premiums and claims, an inability to timely process thousands of claims associated

with the Company's acquisitions, and poor IT systems, all of which are likely to

severely impair the smooth functioning of an insurance company.[46]

According to several CWs,[47] Scottish Re did not have an adequate

---

44    *Id.* ¶ 113.

45    *Id.* ¶ 115.

46    *See id.* ¶¶ 120-127.

47    These CWs include a former Charlotte, North Carolina Vice President
responsible for the processing and adjudication of claims at Scottish Re who
worked at the Company for five years through Spring 2005, *see id.* ¶ 121, a former
Charlotte, North Carolina Assistant Vice President responsible for marketing who
worked at the Company for over four years through Spring 2006, *see id.* ¶ 123,
and a former Charlotte, North Carolina senior finance executive who worked at
the Company for over six years through Spring 2006, *see id.* ¶ 124.

-11-

system in place to track and process claims, which in turn made it difficult to estimate claims reserves on its financial statements.[48] The Company's employees were neither trained in nor knowledgeable about reinsurance.[49] These flaws were exacerbated by the Company's rapid growth, including one of the Company's earlier acquisitions and the subsequent ING Acquisition, which caused an overflow of claims and overwhelmed Scottish Re's already inadequate systems.[50]

Another CW, a former Charlotte, North Carolina Senior Vice President responsible for information technology and data, claims Seth Vance, the CEO of Scottish Re's North American segment, directed that certain 2005 year-end expenses be recorded as 2006 expenses in order to artificially inflate Scottish Re's reported year-end financial results and earnings for 2005.[51] The former employee complained to Vance in writing about those adjustments, but was told by Willkomm that she was just being "paranoid" and that she did not "have proof of anything."[52]

---

[48] *See id.* ¶ 111.

[49] *See id.*

[50] *See id.* ¶¶ 122-124.

[51] *See id.* ¶ 125.

[52] *Id.*

-12-

## 4. E&Y

E&Y served as the Company's outside auditor from its IPO through the end of the Class Period.[53]  During the Class Period, E&Y issued clean, unqualified audit opinions on Scottish Re's financial statements for the years ended December 31, 2004 and December 31, 2005.[54]  At the same time, E&Y issued separate opinions supporting the Company's internal controls for the same two periods.[55]  E&Y also consented to incorporation by reference of both opinions for the year ended December 31, 2004 in the registration statement for the offerings of Scottish Re Preferred Shares and Ordinary Shares that took place during the Class Period.[56]  In addition, E&Y served as auditor for Ballantyne Re[57] and worked on the Company's two major securitizations prior to the Ballantyne Re transaction.[58]

Plaintiffs allege that E&Y did not staff its audits of Scottish Re with

---

[53]   *See id.* ¶ 29.

[54]   *See id.* ¶¶ 29, 130.

[55]   *See id.* ¶ 130.

[56]   *See id.* ¶ 131.

[57]   *See id.* ¶ 340.

[58]   *See id.* ¶ 342.

adequately trained auditors, and that it failed to exercise due professional care in the performance of its audits and the preparation of its reports.[59]  Plaintiffs also allege that E&Y failed to obtain a sufficient understanding of the Company's lack of internal controls despite the "common knowledge" within the Company that the Company's IT systems used to track premiums and claims were poor, that the Company's claims processing personnel were poorly trained, and that the administrative management was weak.[60]  Moreover, plaintiffs allege that E&Y failed to verify the recoverability of the Company's growing deferred tax assets.[61]  Thus, according to plaintiffs, due to an absentee E&Y partner and very junior auditors assigned to handle the Scottish Re audit, the GAAP violations and internal control weaknesses went undetected or unidentified by E&Y throughout the Class Period.[62]

### 5.    The Offerings

The Underwriters include Lehman Brothers Inc., Bear Stearns & Co. Inc., Banc of America Securities LLC, Keefe Bruyette & Woods, Inc.,

---

[59]    *See id.* ¶ 135.

[60]    *Id.* ¶ 139.

[61]    *See id.* ¶ 140.

[62]    *See id* ¶ 135.

Oppenheimer & Co. Inc., Advest, Inc., RBC Dain Rauscher Inc., Stifel, Nicolaus & Company, Incorporated, Goldman, Sachs & Co., Wachovia Capital Markets, LLC, A.G. Edwards & Sons, Inc., and Fox-Pitt, Kelton Incorporated.[63] The Forward Purchasers include Bear Stearns International Limited and Lehman Brothers OTC Derivatives.[64] Unless otherwise distinguished, Underwriters and Forward Purchasers will be referred to collectively as "Underwriter Defendants."

On or about July 6, 2005, Scottish Re sold approximately five million Preferred Shares to the public (the "July 2005 Offering"), which raised net proceeds of approximately $120 million.[65] The July 2005 Offering was made pursuant to a registration statement and prospectus signed by French, Willkomm, Murphy and each of the Director Defendants and filed with the SEC.[66] Those filings expressly incorporated Scottish Re's Form 10-K for the year ended December 31, 2004 and Form 10-Q for the quarter ended March 31, 2005.[67]

On or about December 23, 2005, Scottish Re sold approximately 7.66

---

[63]   *See id.* ¶¶ 30-41.

[64]   *See id.* ¶¶ 42-43.

[65]   *See id.* ¶ 143.

[66]   *See id.* ¶ 144.

[67]   *See id.* ¶ 145. *See also id.* ¶¶ 146-156 (describing the contents of the incorporated filings).

million Ordinary Shares to the public at $24.00 per share (the "December 2005 Offering," and together with the July 2005 Offering, the "Offerings"), which raised net proceeds of approximately $174 million.[68] The December 2005 Offering was made pursuant to a registration statement and prospectus signed by Willkomm, Murphy and each of the Director Defendants and filed with the SEC.[69] Those filings expressly incorporated Scottish Re's 2004 Form 10-K and Forms 10-Q for the quarters ended March 31, 2005, June 30, 2005, and September 30, 2005.[70] In addition, the Forward Purchasers borrowed and sold approximately 3.15 million Ordinary Shares in the December 2005 Offering in exchange for the Company's agreement to issue Ordinary Shares to the Forward Purchasers on settlement dates nine and twelve months after the Offering.[71]

### 6. The Unexpected Tax Valuation

On July 31, 2006, the Company announced that it would suffer a net operating loss of approximately $130 million for the second quarter ended June 30, 2006, due principally to an unexpected $112 million tax valuation allowance

[68]    *See id.* ¶ 157.

[69]    *See id.* ¶ 159.

[70]    *See id.* ¶ 160. *See also id.* ¶¶ 146-156, 162-168 (describing the contents of the incorporated filings).

[71]    *See id.* ¶¶ 42-43, 158.

-16-

on deferred tax assets.[72]  Industry analysts reported that the valuation allowance effectively wiped out all of Scottish Re's earnings for the 2005 fiscal year.[73]

At the same time, the Company also announced the resignation of Scottish Re's CEO, Scott Willkomm and the CEO of Scottish Re's North American segment, Seth Vance.[74]  The Company further disclosed that it had engaged two investment banks to assist with evaluating strategic alternatives, including the possible sale of the Company.[75]

Immediately following these announcements, the price of Scottish Re stock declined by seventy-five percent on high trading volume.[76]  Rating agencies also immediately downgraded the credit rating of Scottish Re from A- to B++, which jeopardized the Company's ability to conduct its business.[77]  After the unexpected announcement, an A.M. Best analyst stated:  "There was never any guidance that there would be any question about the recoverability of the deferred

---

[72]     *See id.* ¶ 302.

[73]     *See id.* ¶ 108.

[74]     *See id.* ¶ 107.

[75]     *See id.* ¶ 106.

[76]     *See id.* ¶ 100.

[77]     *See id.* ¶¶ 102-105.

tax asset. The rating agencies had no prior knowledge of a possible impairment and neither did Wall Street."[78]

## B. Procedural History

Shortly after the July 31, 2006 announcements, beginning in August 2006, a series of putative securities class actions were filed against Scottish Re and certain individual defendants. In October 2006, this Court consolidated the cases and appointed Lead Plaintiff and Lead Counsel. Lead Plaintiff, the State Teachers Retirement System of Ohio, together with Plaintiff Richard Allen Baehr as trustee of the Richard Allen Baehr Living Trust, subsequently filed a consolidated class action complaint alleging securities law violations by Scottish Re and various other defendants, including current and former officers and directors of the Company arising out of misrepresentations concerning the Company's deferred tax assets and internal controls. On March 7, 2007, the Scottish Re Defendants and Director Defendants moved to dismiss the Complaint. On March 14, 2007, E&Y and the Underwriter Defendants separately filed motions to dismiss. On April 30, 2007, plaintiffs submitted an omnibus opposition. On May 30, 2007, Scottish Re Defendants and Director Defendants submitted their reply, followed on June 6, 2007 by E&Y's and Underwriter

---

[78]    *Id.* ¶ 102.

-18-

Defendants' respective replies. On July 9, 2007 and July 13, 2007, with the

Court's permission, Scottish Re and plaintiffs submitted supplemental letter briefs

regarding *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court's

intervening decision on the standard for pleading scienter.[79]

---

[79]     *See* — U.S. —, 127 S. Ct. 2499 (2007).

## II.  LEGAL STANDARD

### A.  Motion to Dismiss

When deciding a defendant's motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[80] and "draw all inferences in the light most favorable to the non-moving party[]."[81] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[82]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[83]

---

[80]    *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007). *Accord In re NYSE Specialists Sec. Litig.*, — F.3d —, No. 06-1038-cv, 2007 WL 2701341, at *5 (2d Cir. Sept. 18, 2007).

[81]    *In re NYSE Specialists*, 2007 WL 2701341, at *5.

[82]    *Id.* at *5 (quotation omitted).

[83]    *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

-20-

### 1. In General

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[84] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[85] Although the complaint need not provide "detailed factual allegations,"[86] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[87] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief."[88] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[89]

---

[84]  *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[85]  *See Bell Atlantic*, 127 S. Ct. at 1970.

[86]  *Id.* at 1964. *See also ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Twombly's* anti-trust context).

[87]  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

[88]  *Bell Atlantic*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)). *Accord id.* ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[89]  *ATSI*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S. Ct. at 1965).

-21-

### 2. Securities Fraud

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."[90] Those heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[91]

#### a. Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud . . . be stated with particularity."[92] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[93] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

---

[90] *Id.* at 99.

[91] 15 U.S.C. § 78u-4(b).

[92] Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[93] *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

-22-

fraudulent."[94]  "Allegations that are conclusory or unsupported by factual

assertions are insufficient."[95]

### b.    PSLRA

"Private securities fraud actions must also meet the PSLRA's

pleading requirements or face dismissal."[96]  The PSLRA requires plaintiffs to state

with particularity "both the facts constituting the alleged violation, and the facts

evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or

defraud."[97]  The PSLRA specifies that the plaintiffs must "state with particularity

facts giving rise to a strong inference that the defendant acted with the required

state of mind."[98]  The Supreme Court recently clarified the strong inference of

scienter requirement in *Tellabs*.  There, the Court held that in order to determine

whether scienter is adequately plead, courts must look at the complaint as a whole

---

[94]    *Rombach*, 355 F.3d at 170 (quotation omitted).  *Accord ATSI*, 493
F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[95]    *ATSI*, 493 F.3d at 99.

[96]    *Id.* (citing 15 U.S.C. § 78u-4(b)(3)(A)).

[97]    *Tellabs*, 127 S. Ct. at 2504 (quotation omitted) (citing 15 U.S.C. §
78u-4(b)(1), (2)).

[98]    *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

and "must take into account plausible opposing inferences."[99] "[A]n inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[100] The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences.'"[101] The inquiry on a motion to dismiss is as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[102]

"If the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is

---

[99]    *Id.* at 2509. These plausible opposing inferences, however, may be based only on the complaint and other public documents on which Courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true." *Id.* at 2509, 2511-12.

[100]    *Id.* at 2504-05.

[101]    *Id.* at 2510 (citation omitted).

[102]    *Id.* at 2511. *Accord id.* at 2510 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

formed.'"[103]

## B.    Exchange Act Violations

### 1.    Section 10(b) and Rule 10b-5

In order to state a claim under Rule 10b-5 for misrepresentations, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[104]  With respect to the first element, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[105]

"Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."[106]  In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[107]

---

[103]    *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

[104]    *Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[105]    *Rombach*, 355 F.3d at 172 (quotation omitted).

[106]    *Novak*, 216 F.3d at 308 (citation omitted).

[107]    *Id.* at 309 (citation omitted).

-25-

Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[108]

Scienter can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[109] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures

---

[108]   *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." (quotations omitted)).

[109]   *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)). The Supreme Court in *Tellabs* noted that it had "previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5," but that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required." 127 S. Ct. at 2507 n.3. The Court again declined to address the issue. *Id.* ("The question whether and when recklessness satisfies the scienter requirement is not presented in this case."). Thus, Second Circuit law, which permits scienter to be shown by recklessness, continues to bind this Court.

alleged."[110] Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[111]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[112] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[113]

Finally, in order to state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."[114]

---

[110]   *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quotations omitted).

[111]   *Id.* (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation").

[112]   *Id.* at 142.

[113]   *Id.* (quotation omitted).

[114]   *ATSI*, 493 F.3d at 106.

-27-

Transaction causation requires a plaintiff to demonstrate that "'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[115] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[116] "To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."[117]

"'The standard for pleading auditor scienter is demanding.'"[118] "For an accountant to be found to have acted recklessly during an audit, its alleged misconduct must 'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'"[119] "This standard requires more than a failure to follow GAAP."[120] Rather, plaintiffs must allege sufficient facts to show

---

[115]   *Id.* (quoting *Lentell*, 396 F.3d at 172).

[116]   *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[117]   *ATSI*, 493 F.3d at 107 (citing *Lentell*, 396 F.3d at 173).

[118]   *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007) (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, Nos. MDL 1744, 04 Civ. 8144, 2006 WL 2057194, at *30 (S.D.N.Y. July 20, 2006)).

[119]   *Id.* (quoting *Rothman*, 220 F.3d at 98 (citation omitted)).

[120]   *Id.* (quotation omitted).

-28-

that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."[121] "Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter."[122]

## 2.   Control Person Liability:  Section 20(a)

In order to plead a prima facie case of control person liability under section 20(a), a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[123]  A plaintiff must plead "actual control, not merely control

---

[121]    *Id.* (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).

[122]    *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (citing *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001)).

[123]    *ATSI*, 493 F.3d at 108.  Section 20(a) provides:
        Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally

-29-

person status."[124]

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[125] Thus, "'[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard'" and "'[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.'"[126]

## C. Securities Act Violations

### 1. Section 11 and Section 12(a)(2) Liability

"'[Section] 11 provides a cause of action for any person acquiring a security issued pursuant to a materially false registration statement unless the

---

with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[124]    *In re Refco*, 503 F. Supp. 2d at 637 (quotation omitted).

[125]    *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[126]    *In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003)).

-30-

purchaser knew about the false statement at the time of acquisition.'"[127] "Section

12(a)(2) of the Securities Act imposes liability on any person who offers or sells

securities by means of a prospectus containing material misstatements."[128] A

---

[127] *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003)). *Accord Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."). Section 11(a) provides in part,

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue –
> (1) every person who signed the registration statement;
> (2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted . . . .

15 U.S.C. § 77k(a).

[128] *Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005). Section 12(a)(2) provides, in pertinent part,

> Any person who . . .
> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care

-31-

misstatement under Section 11 or Section 12(a)(2) is established when "material facts have been omitted or presented in such a way as to obscure or distort their significance."[129]

Although fraud "is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," those claims "may be – and often are – predicated on fraud."[130] In such circumstances, Rule 9(b), which applies to "'all averments of fraud,'" will be applied.[131] The wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."[132] Thus, although fraud is not an element of a claim under Section 11 or Section 12(a)(2), where the claims are predicated on allegations of fraud, they will be subject to

> could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him ... [for] the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77 *l* (a)(2).

[129] *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (quotation omitted).

[130] *Rombach*, 355 F.3d at 171.

[131] *Id.* (quoting Fed. R. Civ. P. 9(b)).

[132] *Id.*

Rule 9(b).[133]

## 2. Control Person Liability: Section 15

In order to state a claim for control person liability under section 15 of the Securities Act, a plaintiff must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."[134] Unlike section 20(a), the plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15.[135]

---

[133]   *See id.* ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b).").

[134]   *In re Refco*, 503 F. Supp. 2d at 637. Section 15 provides,
Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
15 U.S.C. § 77o.

[135]   *See In re Refco*, 503 F. Supp. 2d at 637.

-33-

### D. Leave to Replead

Whether to permit a plaintiff to amend his pleadings is a matter committed to the Court's "sound discretion."[136] Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."[137] Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[138] "[A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated."[139] In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."[140]

## III. DISCUSSION

### A. Section 10(b) and Rule 10b-5

---

[136] *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[137] Fed. R. Civ. P. 15(a).

[138] *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

[139] *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003) (quotation omitted).

[140] *Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)).

Plaintiffs assert that the Scottish Re Defendants and E&Y

fraudulently misstated the Company's financial statements and E&Y's audits of

those statements because "the Company's history of income tax losses and long-

planned securitization transactions required Scottish Re to establish a tax

valuation allowance under GAAP by no later than the start of the Class Period."[141]

Plaintiffs further allege that the Scottish Re Defendants' certifications and E&Y's

audits regarding internal controls were fraudulent. As discussed below, the

Complaint states a claim for securities fraud sufficient to survive a motion to

dismiss as to the Scottish Re Defendants and E&Y on both grounds.

## 1. Scottish Re Defendants

### a. Falsity

#### i. Financial Statements

The Complaint alleges that Scottish Re should have taken a valuation

allowance for its deferred tax assets at the beginning of the Class Period, when the

Company first announced its plans to securitize the ING Acquisition assets.

Plaintiffs allege that once the securitization took place, Scottish Re would be

unable to rely on any future income from that block of business as a means to

---

[141]     Plaintiffs' Memorandum of Law in Opposition to Defendants'
Motions to Dismiss the Consolidated Class Action Complaint ("Pl. Mem.") at 22.

-35-

realize tax benefits from its deferred tax assets. Coupled with the Company's history of income tax losses, which continued to grow, plaintiffs allege that planning a securitization on the order of the Ballantyne Re transaction left Scottish Re with insufficient future income to support the level of deferred tax assets the Company was maintaining on its books. In short, the Complaint alleges that the prospect of the Ballantyne Re transaction made it more likely than not under SFAS 109 that the Company would be unable to realize its deferred tax assets in the future and that a valuation allowance was thus required as soon as those plans were announced. By failing to record the valuation allowance earlier, plaintiffs allege that the value of the Company was overstated and that shareholders were harmed as a result when the true facts were made known and the stock declined seventy-five percent in one day of trading.

Plaintiffs' claim is supported by several alleged facts and reasonable inferences drawn from those facts. For example, the timing of the events at the center of the Complaint, namely that the announcements of the Ballantyne Re transaction's closing and the large surprise valuation allowance occurred in the same quarter of 2006, supports an inference that the two events were causally related.

Similarly, several of Miller's statements from the August 4, 2006

conference call also support an inference that the Ballantyne Re transaction was at least in part linked to the need for the valuation allowance. On that call, Miller stated that the Ballantyne Re transaction "put profitable business into a securitized vehicle that limited some flexibility on what you could do with that block of business."[142] He also stated that the Ballantyne Re transaction "eliminated a large cushion that greatly reduced flexibility in our tax planning strategies and increase[d] pressure on our remaining strategies."[143]

Further, plaintiffs rely on Scottish Re's Form 10-Q for the quarter ended September 30, 2006, in which the Company stated that it "can no longer recognize tax benefits for certain legal entities."[144] Plaintiffs assert that this statement directly links the valuation allowance to the Ballantyne Re transaction. Plaintiffs also cite Scottish Re's statements during the August 4, 2006 conference call and in its Form 10-Q for the quarter ended June 30, 2006 that the Company is unable to use projections of future taxable income due to the lack of history of taxable income and that as a result, the Company "must rely heavily on tax

---

[142]    Compl. ¶ 92.

[143]    *Id.* ¶ 95.

[144]    *Id.* ¶ 92.

planning strategies [] for support of the gross deferred tax asset."[145] Plaintiffs
assert that these statements demonstrate the materially misleading nature of the
Company's prior statement that it evaluated its deferred tax assets properly under
SFAS 109 based "upon management's estimates of the future profitability of [its]
taxable entities" was materially misleading.[146]

    The allegations in the Complaint, taken as a whole and drawing all
reasonable inferences in plaintiffs' favor, are adequate to plead that the
Company's financial statements were materially misstated at this stage. A
reasonable inference may be drawn from the facts and statements outlined above
that the Ballantyne Re transaction contributed in large part, if not in full, to
requiring the $112 million valuation allowance. Likewise, given that SFAS 109
requires a prospective inquiry, it is reasonable to infer that the Scottish Re
Defendants' plans to complete that securitization made it more likely than not that
they would not be able to realize the benefits from their deferred tax assets in full.

    SFAS 109 states that a valuation allowance should be taken "if, based
on the weight of available evidence, it is more likely than not (a likelihood of more
than 50 percent) that some portion or all of the deferred tax assets will not be

---

[145]    *Id.* ¶¶ 95 (conference call), 96 (Form 10-Q).

[146]    *Id.* ¶ 96.

realized" and that "[a]ll available evidence, both positive and negative, should be considered."[147]  Plaintiffs have pled enough facts that existed at the time the deferred tax assets were reported to demonstrate that there were sufficient negative factors weighing against the Company's ability to realize its deferred tax assets. Moreover, as discussed above, SFAS 109 provides that cumulative losses in recent years or "'unsettled circumstances'" that if not resolved would adversely affect operations or profits in the future make it "'difficult'" to conclude that a tax valuation allowance or charge is *not* needed.[148]  At the very least, the Complaint alleges facts sufficient to give rise to such "'unsettled circumstances.'"[149]

The Complaint alleges that the Company was planning a major $2.1 billion transaction that would prevent it from using any income generated by those substantial assets in the future to offset the deferred tax assets the Company was keeping (and growing) on its books.  How the Company could treat the plan as if it had *no effect* on a balance sheet item that is specifically targeted at the Company's

---

[147]    SFAS ¶¶ 8(d), 17(e), 20.

[148]    Compl. ¶ 89 (quoting SFAS 109 ¶ 23).

[149]    The Scottish Re Defendants' arguments as to why the Ballantyne Re transaction did not require the Company to take the valuation allowance and the like are inappropriate at this stage of the litigation.  Opposing inferences may only be based on the allegations of the Complaint, which must be taken as true, and other documents properly before the court on a motion to dismiss.

future income is puzzling. Even more puzzling is how the Company's treatment and its failure to report any effects could continue in light of the Company's history of income tax losses. Although the Company's plans to securitize the ING Acquisition assets were publicly disclosed, the investing public was unaware of the consequences those plans would have on the deferred tax assets.

It is also troubling that at the same time the Company was silent as to the effects the securitization would have on the deferred tax assets, the Company reported relatively small valuation allowances for other stated reasons. This may have further misled investors to believe that the Company was properly reporting and evaluating its deferred tax assets and taking valuation allowances when needed. The absence of a valuation allowance in light of the securitization plans could plausibly have suggested to investors that the securitization would have no negative effect. The seventy-five percent drop in the share price that accompanied the eventual (and perhaps inevitable) valuation allowance shows that no effect was self-evident to the public and that the shareholders were relying on management to truthfully report the Company's financials.

The Complaint adequately alleges that by failing to report the valuation allowance when the securitization plans were announced, the Company made a false and misleading statement. The Complaint states a claim that the

Scottish Re Defendants, who had been planning the securitization and reporting deferred tax assets and valuation allowances throughout the Class Period, should have recorded the valuation allowance much earlier than they did, which renders the financial statements false when made.[150]

## ii. Sarbanes-Oxley Certifications

The Sarbanes-Oxley Act of 2002 requires certain officers and the accountants of a public company to execute certifications that are filed with the company's Forms 10-K and 10-Q.[151] These certifications must discuss the company's internal control systems and must explain the effectiveness of those internal controls.[152]

The Complaint alleges that Wilkomm and Murphy violated section

---

[150] Other cases that have dismissed securities fraud claims based on failure to take an earlier valuation allowance on deferred tax assets are distinguishable. *See Frank v. Dana Corp.*, No. 3:05CV7393, 2007 WL 2417372 (N.D. Ohio Aug. 21, 2007) (dismissing the complaint for failure to allege facts supporting a claim that the defendants "knew or recklessly disregarded facts from which they should have known of the fraud or accounting errors"); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (W.D. Wash. 2006) (dismissing for failure to allege that the financial statements were false when made as opposed to a change in circumstances followed by the prompt reporting of a valuation allowance and where there were no allegations of "'systematic' over-reporting").

[151] *See* Pub. L. No. 107-204, 116 Stat. 745 (2002).

[152] *See* 15 U.S.C. § 7241(a)(4).

-41-

10b and Rule 10b-5 by providing false Sarbanes-Oxley certifications in connection with the Company's Forms 10-K for 2004 and 2005 and Forms 10-Q for the first, second and third quarters of 2005 and the first quarter of 2006.[153] These certifications stated that to the best of their knowledge, each Form "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."[154] Thus, for these certifications to be materially false, it is insufficient for the financial statements themselves to have been false – defendants must also have had knowledge of that falsity.[155] Plaintiffs thus must allege that these certifications were false in that defendants knew the stated value of the deferred tax assets was a material false statement. The certifications also state that Wilkomm and Murphy had implemented internal controls over the company's financial reporting sufficient "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted

[153] *See* Compl. ¶¶ 263, 273, 279, 285, 291, 300, 328.

[154] *Id.* ¶ 300.

[155] *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091 (1991) (discussing circumstances in which liability can attach to opinion statements).

-42-

accounting principles."[156]  Further, they explain that the forms disclose "all significant deficiencies and material weaknesses in the design or operation" of those internal controls that are "reasonably likely to adversely affect" the financial statements.[157]

As discussed above, plaintiffs have alleged sufficient facts to support the inference that defendants knew of the incorrect valuation at the time they began planning the securitization transactions.  Because plaintiffs' allegation that the certifications at issue represent false statements is plausible, the motion to dismiss the Sarbanes-Oxley claim is denied.

Plaintiffs claim that the financial statements were materially misleading in that the Company's internal controls were structurally inadequate. The allegations state that the internal controls were lacking, and, as a result, the Company was able to improperly report expenses.  Moreover, plaintiffs allege that the Company had "serious weaknesses in processing and tracking insurance claims."[158]  Defendants have moved to dismiss on the ground that plaintiffs have failed to provide factual allegations that illustrate problems with the Company's

---

156    Compl. ¶ 300.

157    *Id.*

158    *Id.* ¶ 7.

-43-

internal controls. Defendants observe that while the Company restated its financial statements for the first two quarters of fiscal year 2006,[159] it has not conceded any failure in its internal controls.

Plaintiffs allege several facts in support of their claim. *First*, they allege that the Company's restatement of its financials during the period in question is indicative of a failure in internal controls.[160] *Second*, they plead that four CWs claim that the Company lacked adequate internal controls. The first CW, described as a Vice President who worked on adjudication of claims at the Company for five years (ending in the Spring 2005), claims that the internal data-gathering system was inadequate and observes that the Company was unable to maintain accurate financial information.[161] The second CW, described as an Assistant Vice President who worked in marketing for four years (through Spring 2006), states that management was aware of the Company's inability to grow its financial reporting systems at the same pace as the growth of its business.[162] The third CW, described as a "senior finance executive" who worked at the Company

---

[159]   *See id.* ¶¶ 117, 120 (discussing Company's establishment of claims reserves and premium adjustments for first and second quarter 2006).

[160]   *See id.*

[161]   *See id.* ¶¶ 121-122.

[162]   *See id.* ¶ 123.

-44-

for six years (through Spring 2006), notes that the Company lacked the administrative infrastructure and skilled employees required to handle its growth, and that it was common knowledge at the Company that its internal systems were inadequate to track its premiums and claims.[163] The fourth CW, a Senior Vice President responsible for information technology during the Class Period, proffers testimony that the Company deliberately manipulated its financial statements to improve the appearance of short-term results.[164] That CW alleges that when she complained of certain irregularities, Willkomm told her that she was "paranoid" and did not "have proof of anything."[165] The CW resigned rather than face demotion.[166]

Plaintiffs are not necessarily required to reveal the identity of their witnesses at the pleading stage.[167] "[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants'

---

[163] *See id.* ¶ 124.

[164] *See id.* ¶¶ 125-126.

[165] *Id.* ¶ 125.

[166] *See id.*

[167] *See Novak*, 216 F.3d at 313 ("[O]ur reading of the PSLRA rejects any notion that confidential sources must be named as a general matter . . . .").

statements were false."[168] However, if the other facts are not independently sufficient, the confidential witnesses must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[169] Thus, sufficiency and particularity are intertwined; the greater the basis for a belief, *i.e.*, the more clearly sufficient plaintiffs' sources are, the less particularity is required in their identification. The threshold requirement is that the allegations must satisfy the court that plaintiff's claim is not "unwarranted."

In the instant case, I need not determine whether additional facts must be pled because the allegations of the CWs provide an adequate basis for believing defendants' statements were false. Here, the CWs' identities are sufficiently particular as to suggest that they possess the information alleged. The CWs, all of whom claim knowledge of a systemic failure in the Company's ability to manage its financial information, occupied positions that would have allowed for relevant hands-on experience in various parts of the Company. Because the CWs' allegations are sufficiently particular as to support their plausibility, they state a claim without regard to plaintiffs' other allegations.

[168] *Id.* at 314.

[169] *Id.*

-46-

### b. Scienter

Although plaintiffs have adequately pled falsity, "allegations of

GAAP violations or accounting irregularities, standing alone, are insufficient to

state a securities fraud claim. Only where such allegations are coupled with

evidence of corresponding fraudulent intent might they be sufficient."[170] This

Complaint, taken as a whole, adequately pleads an inference of scienter as to each

of the Scottish Re Defendants that is cogent and at least as compelling as any

plausible opposing inference of nonfraudulent intent.

Scienter may be pled "by identifying circumstances indicating

conscious behavior by the defendant, though the strength of the circumstantial

allegations must be correspondingly greater" than with motive allegations.[171]

---

[170] *Novak*, 216 F.3d at 309 (quotations omitted). *Accord In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at \*8 (S.D.N.Y. June 23, 2004) ("To satisfy Rule 9(b) and the PSLRA, the Plaintiffs must plead particular facts supporting their theory that the Defendants' failure to take the accounting charges earlier was due to something nefarious, rather than simply imperfect economic forecasting. The complaint lacks the requisite particularity.").

[171] *Kalnit*, 264 F.3d at 142. Plaintiffs' motive theory of scienter is insufficient because they have not pled any "concrete and personal benefit" to the Scottish Re Defendants. *Id.* at 139. For example, plaintiffs' argument that an inference of fraud may be drawn based on the Scottish Re Defendants' desire to raise funds in securities offerings fails. *See Rombach*, 355 F.3d at 177 (holding that the complaint's allegations of several corporate acquisitions and a secondary public offering worth nearly \$100 million, which were purportedly part of an effort to "artificially inflate and maintain the market price of [Family Golf]

Here, plaintiffs' allegations, taken as true, adequately plead that the Scottish Re

Defendants' conduct, *i.e.*, not taking an earlier valuation allowance, was "highly

unreasonable" and "an extreme departure from the standards of ordinary care to

the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it."[172]

The Scottish Re Defendants knew that SFAS 109 governed the

application of deferred tax assets and valuation allowances. Indeed, they applied

and quoted the standard in the Company's financial statements both before and

throughout the Class Period. Moreover, they knew that the Company was

---

common stock" and to "complete a previously arranged corporate acquisition of
Eagle Quest and to retire debt," without allegations that defendants engaged in
these transactions "to secure personal gain" were insufficient to allege scienter
because "these steps are part of the officers' and directors' financial
responsibilities to the Company" (quotation omitted)). Likewise, defendants'
motive to protect the Company from financial jeopardy is also insufficient, as such
a goal is shared by all corporate officers. *See, e.g.*, *id.* ("Action taken to 'maintain
the appearance of corporate profitability, or of the success of an investment . . .
does not entail concrete benefits' sufficient to demonstrate motive." (quoting *Chill
v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996))); *San Leandro Emergency
Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 814 (2d Cir.
1996) ("We do not agree that a company's desire to maintain a high bond or credit
rating qualifies as a sufficient motive for fraud in these circumstances, because
'[i]f scienter could be pleaded on that basis alone, virtually every company in the
United States that experiences a downturn in stock price could be forced to defend
securities fraud actions.'" (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54
(2d Cir. 1995))).

[172]    *Kalnit*, 264 F.3d at 42 (quotation omitted).

-48-

planning to enter into a large transaction to securitize the ING Acquisition assets. They also knew that such a securitization, once complete, would preclude the Company from using any income generated by the securitized assets in the future. Thus, they knew that a large block of future income would no longer be available to offset the Company's deferred tax assets.

In short, all of the reasons supporting an inference that the financial statements were false, as discussed above, were known to the Scottish Re Defendants *at the time they made the statements*. It is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the transactions' consequences on the Company's deferred tax assets. The Complaint adequately alleges that the Scottish Re defendants knew, or were at the very least reckless in not knowing, that the financial statements were false when made. The "unsettled circumstances" that were created by the securitization plans were staring them in the face. Moreover, the fact that there was a large, $112 million "surprise" valuation that allegedly wiped out a year's worth of the Company's earnings[173]

---

[173]    *See* Compl. ¶ 108.

also provides some circumstantial evidence of scienter.[174]

This is not a case where plaintiffs are pleading fraud based on

changed circumstances that were unforeseen by defendants at the time they made

their statements.[175] Rather, plaintiffs have cited contemporaneous circumstances

(none of which changed), of which the Scottish Re Defendants' were aware, and

which made their failure to take an earlier valuation allowance tantamount to

conscious misbehavior sufficient to support a strong and cogent inference of

---

[174] Even though a GAAP violation itself is insufficient to establish scienter, that is not to say that it can never weigh in favor of scienter. "[T]o the contrary, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter (or, conversely, in favor of a nonculpable state of mind)." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000). *Accord PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 685-86 (6th Cir. 2004); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 704-05 (S.D. Tex. 2006); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1361-62 (N.D. Ga. 2005).

[175] *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (dismissing complaint where plaintiff claimed that defendant's statement that it believed its loan loss reserve was adequate was false when made because "misguided optimism is not a cause of action, and does not support an inference of fraud" and because the allegations did "not say . . . that the company's disclosures were inconsistent with current data. The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.").

scienter.[176] Taking the allegations of the Complaint as true, I conclude that a reasonable person would deem the inference of scienter at least as strong as any opposing inference.[177]

Defendants have moved to dismiss the charges that relate to false statements regarding internal controls on the ground that plaintiffs have failed to plead adequate evidence of scienter. As discussed above, plaintiffs must plead allegations that "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness"[178] sufficient to make the inference at least as plausible as any other inference.[179]

The Complaint alleges that defendants' "intent to deceive or reckless disregard for the truth is demonstrated by substantial circumstantial evidence supporting a strong inference of scienter."[180] This circumstantial evidence

---

[176] Moreover, the additional "highly unusual and suspicious facts" lend further support to the inference of scienter in this case. For example, the resignations of Willkomm and Vance, although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud.

[177] *See Tellabs*, 127 S. Ct. at 2511.

[178] *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

[179] *See Tellabs*, 127 S. Ct. at 2511.

[180] Compl. ¶ 315.

-51-

includes testimony from CWs that the Company's reporting systems were in such poor condition that it could not properly track unprocessed claims and that the individual in charge of maintaining financial reporting systems in the United States was dismissed in connection with these failures.[181] These allegations, taken as true for purposes of this motion, sufficiently support the inference that defendants were reckless in their failure to discover and disclose these weaknesses. As a result, this charge cannot be dismissed at this stage in the proceeding.

### c.    Loss Causation[182]

Defendants also move for dismissal of the internal controls claim on the ground that plaintiffs have failed to allege a causal connection between the Company's failure to establish adequate internal controls and plaintiffs' losses. The Second Circuit has explained that loss causation can be described "in terms of the tort-law concept of proximate cause" – that is, the damages must be a foreseeable consequence of the misrepresentation.[183] This does not mean that the

---

[181]    *See id.* ¶ 329.

[182]    Defendants do not challenge transaction causation in this case, nor do they challenge loss causation as to the misstatements regarding the deferred tax assets.

[183]    *Lentell*, 396 F.3d at 172.

misrepresentation itself must "cause" the drop in value of the security, but rather that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged."[184] Therefore, in order to plead loss causation, the facts alleged must demonstrate that the misrepresentation was the true "cause" of the loss suffered.[185] It is insufficient as a matter of law to allege simply that the price of the securities was inflated at some time because of the misrepresentations.[186] Plaintiffs must also allege some relationship between the misrepresentations and the actual loss suffered.[187]

On August 4, 2006, Miller announced that the Company had made three adjustments to its financial statements for the second quarter of 2006 in addition to the tax deferred asset valuation allowance. These were adjustments to premiums that were "under-accrued in prior years" amounting to approximately $13 million, a change in the way reinsurance was expensed that approximated $8

---

[184]     *Id.* at 172-73 (citing *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 238 (2d Cir. 2000) (Winter, J., dissenting)).

[185]     *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).

[186]     *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).

[187]     *See id.* at 343.

million, and a change in premium accruals that amounted to $8 million.[188]

Plaintiffs allege that defendants concealed material weaknesses in the Company's internal controls, and that because of those weaknesses, the Company failed to detect these problems earlier. In support of this proposition, plaintiffs point out that the Company admitted it had a "need to improve the quality" of financial information available[189] and that upon disclosure of these problems, analysts remarked that the failures in the Company's internal control system likely prevented the Company from earlier discovery of these problems.[190] Had the Company revealed these internal control weaknesses, investors could have arrived at a valuation of the securities that more accurately reflected the risk of the Company suffering from financial problems not reflected on its balance sheets. Instead, trusting that the Company possessed adequate internal controls, it is plausible that investors believed such financial problems would be discovered

---

[188]     Compl. ¶ 117.

[189]     *Id.*

[190]     *Id.* ¶¶ 115-116. Defendants correctly observe that analyst speculation regarding internal control failures is generally insufficient to survive a motion to dismiss. However, where that speculation is supported by other factual allegations, it can be used to support the plausibility of the allegations. In this case, plaintiffs' claim is also supported by allegations based on information provided by the CWs, statements made by defendants, and inferences drawn from adjustments to the Company's financial statements.

-54-

without undue delay.

Plaintiffs allege that "[t]he price of Scottish Re securities declined in May and July 2006, as the Scottish Re Defendants' disclosures revealed previously undisclosed internal control deficiencies at the Company."[191] They also allege that "when the true facts were subsequently disclosed, the price of [Scottish Re] securities declined precipitously and Plaintiffs . . . were harmed and damaged as a direct and proximate result of their purchases of Scottish Re securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed."[192] These allegations, accepted as true, adequately describe a causal relationship between concealment of the failings of the Company's internal controls and the loss suffered by plaintiffs.

## 2. E&Y

Plaintiffs have raised two discrete grounds for their section 10(b) and Rule 10b-5 claims against E&Y. *First*, plaintiffs allege that E&Y falsely stated that its audits of the Company were performed in accordance with GAAS. *Second*, plaintiffs allege that E&Y vouched for the accuracy of the Company's financial statements notwithstanding the fact that E&Y knew or should have

---

[191]    *Id.* ¶ 128.

[192]    *Id.* ¶ 361.

-55-

known that these financial statements were false.[193]

### a. E&Y's Statements Regarding Its Audit of the Company

In connection with the Company's Forms 10-K for fiscal years 2004 and 2005, E&Y provided reports stating that its audits of the Company had been conducted "in accordance with the standards of the Public Company Accounting Oversight Board,"[194] including GAAS.[195] This statement forms the core of plaintiffs' first claim against E&Y.

Accounting standards require that an audit be "performed by a person or persons having adequate technical training and proficiency as an auditor" and require that "[d]ue professional care [be] exercised in the performance of the audit and the preparation of the report."[196] Plaintiffs allege that E&Y's reports were false or misleading in that E&Y's audit was not conducted in accordance with

---

[193]     Plaintiffs are thus not alleging aiding and abetting liability. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (holding that section 10(b) does not create a cause of action for aiding and abetting liability); *In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006) (concluding that *Central Bank* applies to all Rule 10(b)-5 claims), *cert. granted sub. nom Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 75 U.S.L.W. 3034 (U.S. Mar 26, 2007) (No. 06-43).

[194]     Compl. ¶¶ 265, 293.

[195]     *Id.* ¶ 132.

[196]     *Id.* ¶ 134.

-56-

those standards.

To support these allegations, plaintiffs introduce testimony from a CW who was a "senior finance executive" at the Company for six years.[197] The CW states that E&Y's audits were performed by unqualified auditors during the relevant time period.[198] Plaintiffs also indicate that E&Y's failure to detect the Company's improper accounting of the deferred tax assets and the Company's internal control failings, notwithstanding that the deferred tax assets were "heavily scrutinized by E&Y . . . in each period in which" the Company issued financial statements, evinces their failure to perform a comprehensive audit.[199]

As discussed above, where the testimony of a confidential witness is necessary to bolster the plausibility of a plaintiff's claim, the witness must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[200] In this case, there is little question that a senior executive at the Company would be familiar with the interaction between the Company and its auditors.

---

[197]   *Id.* ¶ 135.

[198]   *See id.*

[199]   *Id.* ¶ 136.

[200]   *Novak,* 216 F.3d at 314.

Even considering the allegations of the CW together with E&Y's failure to detect the alleged errors in the valuation of the deferred tax assets, plaintiffs have failed to allege sufficient facts to show that E&Y's statement was false. Plaintiffs allege that the auditors sent by E&Y were "very junior people . . . who were unable to perform effectively."[201] But plaintiffs do not allege that E&Y's auditors were not certified public accountants, nor have they alleged facts that make plausible the suggestion that they were improperly trained or that they performed inadequately. Because the allegations in the Complaint regarding E&Y's ineffective performance are conclusory and implausible, defendants' motion to dismiss this claim against E&Y is granted with leave to replead.

### b.     E&Y's Approval of the Company's Financial Statements

E&Y also certified the Company's financial statements in connection with the Preferred Shares Offering[202] and provided a letter in connection with the Company's Form 10-K for 2005 stating that in E&Y's opinion, the Company's internal controls were adequate, and that E&Y believed its audit provided a

---

[201]    Compl. ¶ 135.

[202]    *See id.* ¶ 178.

reasonable basis for that opinion.[203]  Plaintiffs allege that this opinion and certification were inaccurate.[204]

### i.    Falsity

The Supreme Court has clarified that an opinion can be actionable if the speaker deliberately misrepresented its opinion.[205]  An opinion can also be actionable if it is made in reckless disregard for its truth.[206]  In this case, plaintiffs have alleged that E&Y knew or recklessly failed to discover that the Company's financial statements were inaccurate and that its internal controls were inadequate.[207]

As discussed above, plaintiffs' factual allegations, accepted as true, suggest that the Company recklessly or intentionally misled investors as to the

---

[203]    *See id.* ¶ 294.

[204]    *See id.* ¶ 178.

[205]    *See Virginia Bankshares*, 501 U.S. at 1092.

[206]    *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) ("'A representation certified as true . . . when knowledge there is none [sic], a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability."') (quoting *State St. Co. v. Ernst*, 278 N.Y. 104, 112 (1938)).

[207]    *See Compl.* ¶¶ 139, 140, 171.

state of its internal controls and the value of its deferred tax assets.[208] Given E&Y's alleged familiarity with the state of the Company's finances and failure to provide experienced auditors, as well as its alleged involvement in the Company's securitization transactions and familiarity with Ballantyne Re, I conclude that these allegations, if true, suggest that E&Y's opinion was false.

## ii. Scienter

As discussed above, there is a high standard for pleading auditor scienter. Plaintiffs must allege that "'[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful . . . .'"[209]

For purposes of this motion, I accept that the Company assigned an unrealistic value to the deferred tax assets and possessed inadequate internal controls. Plaintiffs allege that E&Y was familiar with the Company's past securitization transactions and had conducted a detailed analysis of the deferred tax assets' value.[210] Plaintiffs further allege that there were clear indications of a

---

[208]    *See supra* Part III.A.1.

[209]    *In re Refco*, 503 F. Supp. 2d at 658 (quoting *Price Waterhouse*, 797 F. Supp. at 1240) (alteration in original).

[210]    *See* Compl. ¶ 342.

-60-

lack of proper internal controls that E&Y should have discovered.[211]

Notwithstanding these allegations, scienter has not been adequately

pled. At best, plaintiffs have alleged that a reasonable auditor would have

discovered the problems with the Company's valuation of the deferred tax assets

and internal controls. However, such allegations would support a claim of

negligence, but would not "'approximate an actual intent to aid in the fraud being

perpetrated . . . .'"[212] Defendants' motion to dismiss is therefore granted as to this

claim against E&Y with leave to replead.

**B. Section 11 and Section 12(a)(2) Claims**

The Complaint alleges claims against the Scottish Re Defendants,

Officer Defendants and Underwriter Defendants under section 11 and against

Scottish Re and the Underwriter Defendants under section 12(a)(2). For the same

reasons the Complaint adequately pleads falsity under 10(b) and 10b-5, the

Complaint adequately alleges material misstatements under section 11 and section

12(a)(2).[213] However, certain defendants have raised specific defenses, which I

---

[211]     *See id.* ¶ 344.

[212]     *Rothman*, 220 F.3d at 98 (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982)).

[213]     *See supra* Part III.A.1.a.i. Because the Complaint states a claim even under the heightened pleading standards of Rule 9(b), I need not decide whether

now address.

### 1. Section 12(a)(2) "Seller" Restriction

The Complaint charges that the Company and the Underwriter
Defendants violated section 12(a)(2) in the issuance or sale of shares in
accordance with the Preferred Shares Prospectus and Ordinary Shares
Prospectus.[214] A claim under section 12(a)(2) can be brought against "[a]ny
person who . . . offers or sells a security."[215]

The Complaint is not entirely clear as to the extent of plaintiffs' claim
under section 12(a)(2). Plaintiffs allege that "Defendants issued or sold" both
Preferred Shares and Ordinary Shares,[216] and that plaintiffs purchased securities in
the Offerings.[217] However, the putative class consists of "all . . . persons and
entities . . . who purchased or acquired [Scottish Re securities] during the" Class
Period, with various exceptions.[218] The Class Period is defined as February 17,

---

the Complaint sounds in fraud for purposes of determining whether Rule 8(a) or
Rule 9(b) governs the pleading of the section 11 and section 12(a)(2) claims.

[214]   *See* Compl. ¶¶ 195-204 (preferred); *id.* ¶¶ 237-246 (ordinary).

[215]   15 U.S.C. § 77*l* (1).

[216]   Compl. ¶ 198 (preferred); ¶ 240 (ordinary).

[217]   *See id.* ¶ 202 (preferred); ¶ 244 (ordinary).

[218]   *Id.* ¶ 1.

2005 through July 31, 2006. Thus, the putative class includes not only those purchasers who acquired their securities in the Offerings (July 6, 2005 and December 23, 2005), but also persons who acquired their securities on the open market. Nevertheless, accepting the allegations of the Complaint as true for purposes of this motion, I will proceed on the assumption that the plaintiffs purchased securities in the Offerings.

The Company asserts that because the Offerings were effected in "firm commitment" underwritings, the Company cannot qualify as a statutory "seller" under section 12. In a firm commitment underwriting, the issuer sells all the offered shares directly to its underwriters, which then sell those shares to investors. Thus, the Company had no direct interaction with investors.

The Second Circuit has explained that "the term seller includes a person 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"[219] Thus, it applies not only to the seller who is in privity with the investor-plaintiff, but also with other persons, not in privity, who "solicited the sales in question for

---

[219]     *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 616 (2d Cir. 1994) (quoting *Pinter v. Dahl,* 486 U.S. 622, 647 (1988)).

financial gain."[220]

The Company's motion to dismiss thus raises two issues of fact: (1) whether the Company solicited sales of its securities; and (2) if so, whether it was motivated by financial gain. Plaintiffs allege that the Company conducted a public offering of its securities through the Underwriter Defendants and imply that the Company benefitted financially from the sale of those securities.[221] These allegations, presumed true, are sufficient to state a claim that the Company was a statutory seller under section 12.[222]

The Underwriter Defendants also assert that the section 12 claims against them must be dismissed as plaintiffs have failed to allege that the Underwriter Defendants "sold" or "solicited" a sale. However, as discussed

---

[220] *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989). *Accord Commercial Union Assurance Co.*, 17 F.3d at 616 ("Privity between the buyer and seller is no longer required in a § 12(2) action."); *Pinter*, 486 U.S. at 647 (discussing the scope of liability under similar provision of the Securities Act). *Wilson* distinguished persons soliciting the sale of securities for their personal financial gain from persons, such as attorneys, that perform merely ministerial tasks associated with an offering. Persons in the latter group are not "sellers" under section 12. *See Wilson*, 872 F.2d at 1126-27.

[221] *See* Compl. ¶ 336.

[222] *See Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) (citing *Degulis v. LXR Biotechnology, Inc.*, No. 95 Civ. 4204, 1997 WL 20832, at *6 (S.D.N.Y. Jan. 21, 1997); *In re Chaus Sec. Litig.*, No. 88 Civ. 8641, 1990 WL 188921, at *12 (S.D.N.Y. Nov. 20, 1990)).

above, the Complaint adequately alleges that defendants, including the

Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs

acquired securities in the Offerings. A reasonable inference is that plaintiffs

acquired their securities from the Underwriter Defendants. The Complaint thus

states a claim under section 12(a)(2).[223]

## 2. Forward Purchaser Liability Under Section 11

The Forward Purchasers move to dismiss on the ground that they are

not alleged to have functioned as underwriters with respect to the securities.

Section 11 provides a cause of action against "every underwriter with respect to

[the offered] security."[224] That section defines "underwriter" as "any person who

has purchased from an issuer with a view to, or offers or sells for an issuer in

connection with, the distribution of any security, or participates or has a direct or

---

[223]    *See WorldCom*, 219 F.R.D. at 283 (noting that plaintiff has standing
to pursue a section 12 claim against "any underwriter from whom it bought Notes
or who successfully solicited the purchase"); *Feiner v. SS&C Techs., Inc.*, 47 F.
Supp. 2d 250, 254 (D. Conn. 1999) ("Purchasers who did not acquire their shares
directly from [the underwriters], however, lack § 12(a)(2) standing."); *cf. In re
American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 430, 438-
39 (S.D.N.Y. 2000) (holding underwriters to be sellers where the putative class
consisted of investors who acquired shares in the initial public offering).

[224]    15 U.S.C. § 77k.

-65-

indirect participation in any such undertaking."[225] "An 'underwriter' is commonly understood to be a person who 'buys securities directly or indirectly from the issuer and resells them to the public, or [] performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the issuer and the public.'"[226] Thus, "courts have determined whether a defendant was an underwriter by analyzing its role in the underwriting process."[227]

Plaintiffs allege that the Forward Purchasers "borrowed and sold an aggregate of approximately 3,150,000 Ordinary Shares . . . in exchange for the agreement by the Company to issue Ordinary Shares to the Forward Purchasers on settlement dates nine and twelve months after the offering."[228] Like a traditional underwriter, the Forward Purchasers sold shares to the public and sought to profit from the difference between the market price of the securities and the price at which they could purchase the securities from the issuer. The alleged role of the Forward Purchasers was that of underwriters – they formed a key step in the transmission of securities from the Company to the public. Plaintiffs thus state a

---

[225] *Id.* § 77b(a)(11).

[226] *WorldCom*, 308 F. Supp. 2d at 343 (quoting *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977)).

[227] *Id.* at 344.

[228] Compl. ¶ 42.

-66-

claim under section 11 against the Forward Purchasers.

## C. Control Person Liability

The Complaint alleges control person liability (under section 20(a) and/or section 15) against Willkomm, Murphy, Miller and French. Willkomm, Murphy and Miller challenge these claims only on the basis that the Complaint fails to allege a primary violation. For the reasons stated above, this challenge fails.

French, however, asserts that in addition to the failure to plead a primary violation, the control person claims against him fail because his control has not been adequately alleged. This argument fails. In order to plead control under Rule 8, the complaint must allege "that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[229] Moreover, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."[230]

---

[229] *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

[230] *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

Here, the Complaint alleges that French held a "senior executive position[],"[231] was "direct[ly] involve[d] in [the Company's] day-to-day operations, including its financial reporting and accounting functions,"[232] and "signed the registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered and sold to the public during the Class Period."[233] It further alleges that French, along with the other alleged control persons "influence[d] and control[led], directly or indirectly, the decision making of Scottish Re, including the content of its financial statements and public statements."[234] These allegations are more than sufficient to give French fair notice of the claim that he was a control person and the grounds on which that claim rests, which is all that is required at this stage.[235]

---

[231]  Compl. ¶ 366.

[232]  *Id.*

[233]  *Id.* ¶ 19.

[234]  *Id.* ¶ 367.

[235]  *See In re Converium Holding*, 2006 WL 3804619, at *14 (citing *In re WorldCom*, 294 F. Supp. 2d at 415-16). *See also Catton v. Defense Tech. Sys., Inc.*, 457 F. Supp. 2d 374, 385 (S.D.N.Y. 2006) (allegations of control were sufficient to give defendants fair notice of the claim that they acted as control persons where the plaintiffs alleged, *inter alia*, that "[b]y virtue of their high level and controlling positions within the Company, participation in and/or awareness of the Company's actual performance, these defendants had the requisite power to directly or indirectly control or influence specific corporate policy").

-68-

Thus, because the Complaint adequately pleads a primary violation under both the Exchange Act and the Securities Act, as discussed above, the Complaint also states a claim for control person liability as to each of the alleged control persons.[236]

---

[236]     *See ATSI*, 493 F.3d at 108 ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability."); *Rombach*, 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary [control person liability claims] must also be dismissed.").

## IV. CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are granted in part and denied in part. The Clerk of the Court is directed to close these motions [Nos. 47, 70 and 72 on the Docket Sheet]. In an order dated January 25, 2007 [No. 43 on the Docket Sheet], the Court granted defendants' motion for an extension of time relating to these motions. Accordingly, the Clerk of the Court is directed to close that motion as well [No. 41 on the Docket Sheet]. If plaintiffs choose to file an amended complaint, they must do so by November 29, 2007. A conference is scheduled for November 30, 2007, at 3:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          November 1, 2007

## - Appearances -

**For Lead Plaintiff and the Class:**

Max W. Berger, Esq.
Salvatore J. Graziano, Esq.
John C. Browne, Esq.
Eric T. Kanefsky, Esq.
Bernstein Litowitz Berger &
Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

John R. Climaco, Esq.
David M. Cuppage, Esq.
Scott D. Simpkins, Esq.
Climaco, Lefkowitz, Peca, Wilcox &
Garofoli Co.
55 Public Square, Suite 1950
Cleveland, OH 44113
(216) 621-8484

**For Plaintiff Richard Baehr Trust:**

Marvin L. Frank, Esq.
Murray, Frank & Sailer, LLP
275 Madison Avenue
New York, NY 10016
(212) 682-1818

David Kahn, Esq.
Mark E. King, Esq.
David B. Kahn & Associates, Ltd.
One Northfield Plaza, Suite 100
Northfield, IL 60093
(847) 501-5083

**For Defendants Scottish Re Group Limited, Elizabeth Murphy, Dean E. Miller, Michael C. French, Michael Austin, William Caulfeild-Browne, Robert Chmely, Lord Norman Lamont, Hazel O'Leary and Glenn Schafer:**

Evan M. Rosen, Esq.
Lyle Roberts, Esq.
George Anhang, Esq.
LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Ave., N.W.
Washington, D.C. 20009
(202) 986-8000

**For Defendant Scott Willkomm:**

Dennis E. Glazer, Esq.
Elliot Moskowitz, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**For Defendant Ernst & Young LLP:**

William R. Maguire, Esq.
Marc A. Weinstein, Esq.
Sarah L. Cave, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000

**For Defendants Lehman Brothers Inc., Bear Stearns & Co. Inc., Banc of America Securities LLC, Keefe Bruyette & Woods, Inc., Oppenheimer & Co. Inc., Advest, Inc., RBC Dain Rauscher Inc., Stifel, Nicolaus & Company, Incorporated, Goldman, Sachs & Co., Wachovia Capital Markets, LLC, A.G. Edwards & Sons, Inc., Fox-Pitt, Kelton Incorporated, Lehman Brothers OTC Derivatives, and Bear Stearns International Limited:**

James E. Brandt. Esq.
Jeff G. Hammel, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200