UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SCOTTISH RE GROUP SECURITIES LITIGATION | Master File No. 06-CV-5853 (SAS)<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, PRELIMINARY CERTIFICATION OF THE CLASS AND APPROVAL OF NOTICE TO THE CLASS**

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP
Max W. Berger (MB-5010)
Salvatore J. Graziano (SG-6854)
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444

Counsel for Lead Plaintiff and the Class

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

I.      DESCRIPTION OF THE LITIGATION ..........................................................3

      A.     Nature of the Action.............................................................................3

      B.     Procedural History ..............................................................................4

II.     SETTLEMENT DISCUSSIONS AND CONSIDERATIONS...........................5

      A.     Settlement Discussions ........................................................................5

      B.     Lead Plaintiff's Considerations in Agreeing to Settle ............................6

III.    THE BENEFIT TO THE CLASS ....................................................................10

IV.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL..........13

V.     THE PROPOSED PLAN OF ALLOCATION WARRANTS PRELIMINARY APPROVAL ..............................................................................17

VI.    SCHEDULE OF EVENTS ...........................................................................18

VII.   THE PROPOSED CLASS SHOULD BE PRELIMINARILY CERTIFIED UNDER RULES 23(a) and (b)(3).........................................................19

      A.     The Class Members Are Too Numerous To Be Joined ........................20

      B.     Common Questions of Law and Fact Exist .........................................20

      C.     Lead Plaintiff's Claims Are Typical Of Those Of The Class ...............21

      D.     Lead Plaintiff and Its Counsel Will Fairly and Adequately Represent The Proposed Class ...............................................................................22

      E.     The Proposed Class Satisfies The Requirements Of Rule 23(b)(3).......................23

           1.     Common questions of law and fact predominate.......................24

           2.     A class action is superior to other available methods for resolving this litigation. ...............................................................24

CONCLUSION...........................................................................................................25

<strong><u>TABLE OF AUTHORITIES</u></strong>

<strong>Page(s)</strong>

**CASES**

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)..................................................................................... 23, 24-25

*Aramburu v. Health Fin. Servs.*,
No. 02 cv 6535 (ARR), 2005 U.S. Dist. LEXIS 42257 (E.D.N.Y. Apr. 18, 2005)................19

*Armstrong v. Bd. of Sch. Dirs.*,
616 F.2d 305 (7th Cir. 1980) ................................................................................14

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)................................................................................. 22-23

*City of Detroit v. Grinnell Corp.*,
356 F. Supp. 1380 (S.D.N.Y. 1972).......................................................................15

*Cromer Fin. Ltd. v. Berger*,
205 F.R.D. 113 (S.D.N.Y. 2001) ..................................................................... 20, 24-25

*De La Fuente v. DCI Telecomms., Inc.*,
206 F.R.D. 369 (S.D.N.Y. 2002) ..........................................................................20

*Greebel v. FTP Software*,
939 F. Supp. 57 (D. Mass. 1996) ..........................................................................14

*In re Am. Bank Note Holographics*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001).....................................................................17

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................................25

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
No. 05 CV 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007 )................................15

*In re Global Crossing Sec. and ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................20, 22

*In re Initial Pub. Offering Sec. Litig.*,
243 F.R.D. 79 (S.D.N.Y. 2007) ....................................................................... 13-14, 15, 20

*In re NASDAQ Market-Makers Antitrust Litig.*,
No. 94 CIV. 3996(RWS), 1997 WL 805062 (S.D.N.Y. Dec. 31, 1997) ................................17

-ii-

*In re Oxford Health Plans, Inc.*, Sec. Litig.,
  191 F.R.D. 369 (S.D.N.Y. 2000) ........................................21

*In re Parmalat Sec. Litig.*,
  04 Civ. 0030 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ..............................20-21

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ....................................... 13, 14-15, 19

*In re Top Tankers, Inc. Sec. Litig.*,
  No. 06 Civ. 13761 (CM), 2008 WL 2944620 (S.D.N.Y. July 31, 2008 ..................13

*In Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ........................................22

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................... 17-18

*Maywalt v. Parker & Parsley Petroleum Co.*,
  147 F.R.D. 51 (S.D.N.Y. 1993) ........................................20

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
  237 F.R.D. 26 (E.D.N.Y. 2006) ........................................16

*Robinson v. Metro-North Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001)...........................................21

*Teachers Ret. Sys. Of Louisiana v. ACLN Ltd.*,
  No. 01 civ. 1184 (LAP), 2004 U.S. Dist. LEXIS 25927 (S.D.N.Y. Dec. 20, 2004) ..............21

*Trief v. Dun & Bradstreet Corp.*,
  144 F.R.D. 193 (S.D.N.Y. 1992) .......................................21

*Weinberger v. Kendrich*,
  698 F.2d 61 (2d Cir. 1982).............................................19

## STATUTES

15 U.S.C. § 77z-1(a)(4).................................................11

15 U.S.C. § 77z-1(a)(7).................................................2, 11

15 U.S.C. § 78u-4(a)(4) ................................................11,16

15 U.S.C. § 78u-4(a)(7) ................................................2

Fed. R. Civ. P. 23(a)(2)...............................................21

Fed. R. Civ. P. 23(a)(3)................................................................................21

Fed. R. Civ. P. 23(b)(3)..........................................................................23, 24

**OTHER AUTHORITIES**

5 James Wm. Moore, *Moore's Federal Practice* (3d ed. 1999)...................16

2 *Newberg on Class Actions* ...................................................................24

*Manual for Complex Litigation* (Fourth) ..................................................19

## INTRODUCTION

Lead Plaintiff the State Teachers Retirement System of Ohio ("Lead Plaintiff" or "STRS"), on behalf of itself and the other members of the Class (as hereinafter defined) and defendants Scottish Re Group Limited ("Scottish Re" or the "Company"), the Individual Defendants,[1] the Underwriter Defendants[2] and defendant Ernst & Young LLP ("E&Y") have reached an agreement to settle this class action litigation (the "Action") subject to Court approval for payment of $37,500,000 in cash (the "Settlement") on the terms provided in the Stipulation and Agreement of Settlement filed with the Court on August 21, 2008 (the "Stipulation").[3]  As set forth below, this agreement was reached at a time when the parties had a good understanding of the relative strengths and weaknesses of their respective positions and only after intense negotiations, which included three full days of mediation under the auspices of a retired Federal Judge and the active participation of Lead Plaintiff.  Lead Plaintiff and Lead Counsel believe that the proposed settlement is in the best interests of the Class.

---

[1] The Individual Defendants are: Scott Willkomm, Elizabeth Murphy, Dean E. Miller, Michael C. French, Michael Austin, William Caulfeild-Browne, Robert Chmely, Lord Norman Lamont, and Hazel O'Leary.

[2] The Underwriter Defendants are: Lehman Brothers Inc., Bear, Stearns & Co. Inc., Banc of America Securities LLC, Keefe, Bruyette & Woods, Inc., Oppenheimer & Co. Inc., Advest, Inc., RBC Dain Rauscher Inc., Stifel, Nicolaus & Company, Incorporated, Goldman, Sachs & Co., Wachovia Capital Markets, LLC, A.G. Edwards & Sons, Inc., Fox-Pitt, Kelton Incorporated, Bear Stearns International Limited, and Lehman Brothers OTC Derivatives.

[3] A copy of the Stipulation and the exhibits thereto is appended as Exhibit 1 to Lead Plaintiff's Notice of Unopposed Motion for Preliminary Approval of Settlement, Preliminary Certification of the Class and Approval of Notice to the Class ("Notice of Motion") submitted concurrently herewith.  The Stipulation has not been modified in anyway from the previously submitted document, but as indicated below, there were several modifications to the Notice of: (1) Pendency and Proposed Settlement of Class Action and (2) Hearing on Proposed Settlement (the "Notice") (Exhibit A-1 to the Stipulation).  All capitalized terms herein not otherwise defined shall have the meaning ascribed to them in the Stipulation.

At the final settlement approval hearing (the "Fairness Hearing"), the Court will have before it more extensive motion papers submitted in support of the proposed Settlement, and will be asked to make a determination as to whether the Settlement is fair, reasonable and adequate under all of the circumstances surrounding the Action. At this juncture, however, Lead Plaintiff requests only that the Court grant preliminary approval of the Settlement so that notice of the Settlement may be sent to the Class.

Lead Plaintiff respectfully requests that this Court enter the proposed Order Preliminarily Approving Proposed Settlement ("Preliminary Approval Order"), a copy of which is attached as Exhibit 4 to the accompanying Notice of Motion, which, among other things, will:

(i)     preliminarily approve the Settlement on the terms set forth in the Stipulation;

(ii)    approve the form, substance and requirements of the Notice, the Summary Notice of: (1) Pendency and Proposed Settlement Of Class Action, and (2) Hearing On Proposed Settlement (the "Summary Notice"; together, the "Notices"), and the Proof of Claim and Release form (the "Claim Form");

(iii)   find that the procedures established for publication, mailing and distribution of the Notices substantially in the manner and form set forth in the Preliminary Approval Order constitute the best notice practicable under the circumstances, and are in full compliance with the notice requirements of due process, Fed. R. Civ. P. 23, Section 27 (a)(7) of the Securities Act of 1933, 15 U.S.C. § 77z-1(a)(7) and Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), as amended by the Private Securities Litigation Reform Act (the "PSLRA"); and

(iv)    set a schedule and procedures for dissemination or publication of the Notices, for requesting exclusion from the Class, for submitting papers in support of final approval of the Settlement, for objecting to the Settlement, and for the Fairness Hearing.

Lead Plaintiff also requests preliminary certification of the proposed class for settlement purposes. Such certification complies with Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

I.      **DESCRIPTION OF THE LITIGATION**

   A.      **Nature of the Action**

During the Class Period, Scottish Re was one of the largest reinsurance companies in the United States.  As a life reinsurance company operating within the United States, Scottish Re was required by U.S. insurance regulations to maintain certain minimum levels of reserves.  In order to meet its reserve requirements, Scottish Re planned on securitizing a large portion of its business.  Lead Plaintiff alleged that these securitization plans, at all relevant times, rendered certain "tax planning strategies" that the Company was relying on to support its deferred tax assets ("DTA") neither prudent nor feasible, therefore, under Generally Accepted Accounting Prinicples ("GAAP"), the Company should have recorded a valuation allowance against its DTA by no later than the start of the Class Period, February 17, 2005.

The gravamen of this Action is that Scottish Re issued financial statements that were materially misstated and not presented in accordance with GAAP and that the Company's senior executive officers signed sworn Sarbanes-Oxley certifications that were materially misstated because they failed to reveal serious deficiencies in the Company's core internal controls.  Lead Plaintiff generally alleges that, as a result of Defendants' dissemination of the allegedly false and misleading statements during the Class Period, the market price of Scottish Re Securities was artificially inflated, thereby causing damage to Class Members.

During the Class Period, Scottish Re conducted two public offerings pursuant to registration statements and prospectuses:  the July 2005 offering of Preferred Shares December 2005 offering of Ordinary Shares.  Lead Plaintiff alleges that the registration statements and prospectuses for each of those offerings were materially false and misleading because they contained the allegedly false financial statements, including the year-end 2004 financial statements and defendant E&Y's unqualified auditor's report with respect to those statements,

which itself is alleged to be materially false and misleading, as well as allegedly false representations with respect to Scottish Re's internal controls.

Lead Plaintiff further alleges that, on July 31, 2006 there was a partial disclosure of the alleged fraud when the Company announced that it would take a $112 million valuation allowance against its DTA, because the Company could not rely on certain "tax planning strategies" to support carrying the DTA on its books.  Lead Plaintiff alleges that the remaining artifical inflation was removed from the price of the stock on February 20, 2007 when Scottish Re announced that it was taking a $91 million valuation allowance against its DTA due to the failure of a second previously undisclosed tax planning strategy to support Scottish Re's DTA.

### B.    Procedural History

Beginning on or about August 2, 2006, the first of eight class action complaints was filed in the United States District Court for the Southern District of New York (the "Court") against certain of the Defendants on behalf of investors.  By Order entered October 13, 2006, all previously filed actions, together with any subsequently filed or transferred actions on behalf of investors who purchased Scottish Re securities related to the claims asserted in those actions, were consolidated for all purposes.  The October 13, 2006 Order also appointed STRS as Lead Plaintiff, and approved its selection of Lead Counsel for the Action.

On December 4, 2006, Lead Plaintiff filed a Consolidated Class Action Complaint (the "First Complaint").  The First Complaint generally alleges violations of the federal securities laws through, among other things, misstatements and omissions by the Defendants regarding the Company's accounting for its DTA in its financial statements and its certifications of the adequacy of the Company's internal controls.  The First Complaint asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  On March 7 and 14, 2007,

Defendants moved to dismiss the First Complaint.  By Order dated November 1, 2007, the Court denied the motions, except with respect to the claim asserted against E&Y for violation of Section 10(b) of the Exchange Act, and Rule 10b-5.

On July 11, 2008, Lead Plaintiff filed the Amended Consolidated Class Action Complaint (the "Amended Complaint") which (i) extended the Class Period to add the period from August 1, 2006 through and including February 20, 2007 (the "Extended Class Period") based on allegations of additional misrepresentations and omissions relating to Scottish Re's accounting for its DTA and internal controls during the Extended Class Period, (ii) repled the previously dismissed Section 10(b) claim against E&Y; and (iii) added additional factual allegations relating to Lead Plaintiff's previously pled claims.  On July 18, 2008, E&Y moved to dismiss the repled Section 10(b) claim against it as well the claim for the Extended Class Period and, on July 23, 2008, the Scottish Re Defendants and the Underwriter Defendants each filed motions to dismiss the claims for the Extended Class Period.  On August 1, 2008, Lead Plaintiff filed its opposition to E&Y's motion to dismiss.

Lead Counsel conducted an extensive investigation into the facts and legal issues.  They reviewed and analyzed millions of pages of documents produced in discovery and they consulted with three separate experts on issues relating to liability, accounting, damages and materiality.

## II.    SETTLEMENT DISCUSSIONS AND CONSIDERATIONS

### A.    Settlement Discussions

In February 2008, counsel for Scottish Re and the Individual Defendants broached the subject of settlement with Lead Counsel.  On February 20, 2008, these Defendants' counsel made a detailed presentation to Lead Counsel setting forth their view of the case.  Lead Counsel advised these Defendants' counsel that it was premature to discuss settlement at that time as they had only begun to receive documents in response to their discovery requests and would not

discuss settlement until they had the opportunity to review the evidence and make their own assessment of the strengths and weaknesses of the case.

The Settlement proposed in the Stipulation was achieved only after three full-day mediation sessions under the auspices of the Honorable Layn Phillips (ret.), a former Federal judge with significant experience in mediating complicated securities class actions, and follow-up negotiations thereafter.  In connection with the sessions held on May 21–22, 2008, the parties each prepared detailed mediation statements which they exchanged, as well as statements in reply.  After two full days of intense arm's-length negotiations, no agreement to settle was reached and the parties resumed litigation of the case.  In June and July, with the assistance of Judge Phillips, the parties continued to explore the possibility of settlement and a third day of mediation before Judge Phillips was scheduled for July 30, 2008.  At the close of that day's session Lead Plaintiff was close to an agreement with Scottish Re, the Individual Defendants and the Underwriter Defendants which, pursuant to further discussions over the next two days, was reached on August 1, 2008.  Discussions with defendant E&Y continued over the next week under the auspices of Judge Phillips and, on August 6, 2008, an agreement in principle to settle was reached with E&Y, the last remaining defendant.  Lead Plaintiff was actively involved throughout these negotiations including being present at all mediation sessions.

### B.    Lead Plaintiff's Considerations in Agreeing to Settle

At the time the agreements in principle to settle the Action were reached, Lead Plaintiff and Lead Counsel had a thorough understanding of the case.  While they believe that the claims asserted against Defendants have merit, they also recognize that there were serious risks as to whether Lead Plaintiff would ultimately prevail on the merits.  Additionally, there was a very substantial risk that, even if Lead Plaintiff were to prevail on the merits, the ability to recover as much as the Settlement Amount on a judgment, much less more than the Settlement Amount,

was far from certain.  The Company's ability to contribute to the Settlement was capped by its creditors and the proceeds of the D&O insurance policies which Lead Plaintiff was successful in obtaining as part of the Settlement consideration would be severely depleted, if not exhausted by continuing litigation.  Thus, the Class faced the very likely prospect of recovering very little to nothing from the Company if this case did not settle.  The proposed Settlement includes both a substantial contribution from the Company (up to the limits approved by its creditors) and its D&O insurance policies.  In addition, based on Lead Counsel's assessment of the evidence, the claims against the Underwriter Defendants and E&Y would be more difficult to establish than the claim against the Company, thus, limiting the prospects of a significant recovery from these defendants if the litigation continued against them.

While Lead Plaintiff's investigation and analysis of the evidence provides support for its claims, Lead Plaintiff also recognizes that there is evidence that Defendants could point to that could lead a jury to conclude that there were no material misstatements or, that if there were misrepresentations, they were not made with the requisite *scienter* or even negligence.  Thus, for example, with respect to whether there had been any material misstatements with respect to the DTA carried on Scottish Re's balance sheet, Defendants would have argued (i) that the GAAP provisions setting forth the requirements for carrying the DTA are based management's judgment and belief; (ii) that, contrary to the allegations of the complaint, the valuation allowances taken were not caused by Scottish Re's securitization strategy, and that the Company had assets other than those that were securitized that were sufficient to support the DTA; (iii) that the losses announced and valuation allowances taken were caused by changed circumstances including liquidity and capital raising concerns and downgrades by rating agencies; and (iv) that the Company was never required to restate its financial statements.

Defendants would argue that all of these factors, for which they would be able to provide supporting evidence, demonstrated that the DTA carried on Scottish Re's balance sheet was not materially misstated during the Class Period.   With respect to the allegations of misrepresentations regarding internal controls, Defendants would cite to the fact that the Company had several outside auditing firms review the Company's compliance with Sarbanes Oxley and none of them required the Company to issue a statement that there were material deficiencies in the Company's internal controls.  The same factors that Defendants would point to in support of their contention that there were no material misstatements also would impact Lead Plaintiff's ability to establish *scienter* and damages.  Even as to the negligence based claims against the Underwriter Defendants and E&Y for violations of the Securities Act, Lead Plaintiff had to consider the possibility that these Defendants would be able to establish a "due diligence" defense.   Thus, for example, the Underwriter Defendants could very well have established that they made all the required inquiries and that they were entitled to rely on the representations at issue because they were contained in portions of the registration statements that were "expertised" by Scottish Re's auditors; and E&Y would be able to point to a considerable amount of documentary evidence in support of its assertion that it made the appropriate inquiries of Scottish Re management.  Moreover, the maximum potential liability against the Underwriter Defendants and E&Y on the negligence based claims is significantly lower than the potential liability for the fraud based claims. With respect to the fraud claim against E&Y, even assuming plaintiffs' claim survived E&Y's motion to dismiss and assuming plaintiffs could overcome the substantial burden of establishing any liability against E&Y in light of the evidence E&Y would cite supporting its audit opinions, recovery of fraud damages against E&Y would be limited to E&Y's proportionate fault under the PSLRA.

In addition to the consideration inherent in all complex cases of this type which is the certainty of payment now as opposed to having to wait years for a final resolution after a jury trial and the appeals that would follow, there was far more at stake in this Action than the time/cost of money and the possibility that the ultimate recovery might be less than the amount of the proposed Settlement.  Following the February 20, 2007 disclosure which ended the Class Period, Scottish Re's stock was delisted from the NYSE.  The future of the Company appears to be in substantial doubt.  As part of its 2007 Form 10-K filed with the SEC on July 11, 2007, Scottish Re reported $971.7 million in impairment charges on investments affected by the subprime mortgage crisis.  That Form 10-K further states that Scottish Re's available liquidity is currently insufficient to fund its needs beyond the near term, and if it fails to successfully execute on its current strategies, it could run out of liquidity by the first quarter of 2009 or sooner.  As a result of these and other negative developments at the Company, E&Y issued a "going-concern" opinion that is included as part of the Company's publicly filed financial statements.  Indeed, the seriousness of Scottish Re's financial condition was a direct factor in the settlement negotiations.  While Lead Plaintiff successfully tapped into each of the four layers of available insurance that the Company had, when it came to negotiating how much the Company itself would contribute to the Settlement, both sides were constrained by the limitations that Scottish Re's creditors imposed on it.  The Company had entered into forebearance agreements with its creditors, which Scottish Re represented limited the amount that it could pay or distribute in connection with a settlement of this Action to $3 million.  If the case were to go forward, this amount would also have to cover any ongoing fees incurred by the Underwriter Defendants pursuant to the indemnity agreements that Scottish Re had entered into in connection with the

Offerings.   It is clear that the $3 million (and a substantial portion of the D&O insurance) would have been lost to the Class if the case proceeded.

## III.   <u>THE BENEFIT TO THE CLASS</u>

The proposed Settlement provides an immediate and assured recovery of $37.5 million to Class Members before the deduction of any Court-awarded fees and expenses, including the costs of Notice and administration.  Had plaintiffs prevailed with their theory of the case that the adverse disclosures eventually made by the Company could have and should have been made by no later than the very first day of the Class Period, the Settlement Amount represents approximately 9% of the maximum recoverable damages in this case.[4]  *See* Declaration of Jane D. Nettesheim ("Nettesheim Dec."), Ex. 2 to the Notice of Motion at ¶15.  Lead Plaintiff's damages expert estimates that there were approximately 48.75 million shares of Scottish Re Securities traded during the Class Period which may have been damaged (38 million Ordinary Shares; 5 million Preferred Shares; and 5.75 million HyCU Shares) (*id*. at ¶14) and that the average recovery per damaged share under the Settlement, assuming that claims are submitted for all damaged shares, is $0.76 per damaged Ordinary Share for Class Members who only have the Exchange Act claims and $1.01 per damaged Ordinary Share for Class Members who have both the Exchange Act and the Securities Act claims, $0.48 per damaged Preferred Share (Class Members who purchased Preferred Shares have both the Securities Act and Exchange Act claims); and $0.59 per damaged HyCU Share (Class Members who purchased HyCU Shares

---

[4]  While Defendants did not submit their own expert reports regarding damages by the time of the Settlement, Defendants were expected to dispute that the corrective disclosures should have or could have been made by the first day of the Class Period and the amount of damages.  As set forth in footnote 5 below, Lead Plaintiff has amended the Notice to estimate Class Members' percentage recovery after payment of all estimated fees and costs which total approximately $6,625,000 at the high end.

only have the Exchange Act claims) before deduction of Court-awarded attorneys' fees and expenses and the costs of notice and administration (*id.* at ¶20).  Based on experience, it is reasonable to expect that claims will not be submitted for all damaged shares, thus the amount available to those Class Members who do file valid Proofs of Claim will increase accordingly.

As set forth in the Notice, Lead Counsel will be applying for an award of attorneys' fees in the amount of 15% of the Settlement Amount, i.e, $5,625,000, reimbursement of plaintiffs' counsel's expenses in an amount not to exceed $600,000 (with interest on those amount at the same rate as is earned by the Escrow Account into which the Settlement Amount is deposited). Thus, Lead Counsel will be applying for an award of fees and expenses from the Settlement Amount not to exceed $6,225,000.  The fee being applied for was negotiated with and approved by the Court-appointed Lead Plaintiff and will represent little to no multiplier on counsel's lodestar in this Action.   Additionally, Lead Counsel will apply for reimbursement of Lead Plaintiff's expenses in an amount not to exceed $10,000.00.[5]

The amount available for distribution to Claimants will also be reduced by the Notice and Administration Costs which are estimated to total at the high end $400,000.

In order to comply with the requirements of Fed. R. Civ. P. 23, § 77z-1(a)(7) and § 78u-4(a)(7) of the PSLRA, Lead Plaintiff has proposed a plan for providing individual notice to all

---

[5]  Attached as Exhibit A-1 to the Stipulation, is the current draft of the proposed Notice.  It has been modified to incorporate reference to the fact that Lead Counsel will be asking the Court to reimburse Lead Plaintiff for the expenses it incurred in connection with its representation of the Class in accordance with the provisions of the Private Securities Litigation Reform Act., 15 U.S.C. §77z-1(a)(4) and 15 U.S.C. §78u-4(a)(4).   Other than the reimbursement of these expenses as provided for by statute, Lead Plaintiff, like all other Class Members, will only receive its *pro rata* share of the Net Settlement Fund pursuant to the plan of allocation approved by the Court.  Additionally, further detail has been added to paragraph 55 of the Notice with respect to Class Members' potential recovery after deduction of all fees and expenses.  For the Court's convenience, a redlined copy of the Notice reflecting the changes made to the previously submitted Notice is attached hereto as Exhibit 1.

Class Members who can reasonably be identified as well as publication Notice.  While the costs of Notice cannot be precisely determined at this juncture, as set forth in the Affidavit of Anya Verkhovskaya of A.B. Data, Ltd. ("Verkhovskaya Aff."), Ex. 3 to the Notice of Motion, it is currently anticipated that the number of Notices and Proof of Claim forms to be printed and mailed range from a low of 47,500 to a high of 124,280.  *Id*. at ¶33.  Given the size of these documents, and based on the estimated average number of printed documents, it is estimated that the cost of printing and postage for the mailing as well as reimbursements to brokers and other nominees will range from a low of $94,120.25 to a high of $236,121.57.  *Id.* at ¶35. Additionally, the Notice program contemplates publishing the Summary Notice once in the global edition of *The Wall Street Journal* and once in the *Financial Times*.  The cost of one-time one/eighth page ads in these publications will be $ 35,062.13.[6]  *Id.* at ¶29.

In addition to the cost of Notice, the Settlement Fund will be reduced by the costs of claims administration.  Lead Counsel solicited bids from several claims administrators, all of whom Lead Counsel believes are qualified to administer the Settlement.  Lead Counsel determined to proffer A.B. Data to the Court for approval because it agreed to perform the administration on the most favorable terms to the Class.  A.B. Data has agreed to perform the claims administration for a fixed per claim fee of $10.00 per claim for the first 10,000 claims and $7.50 per claim for each claim above 10,000 plus reimbursement of certain out-of-pocket

---

[6]    In addition to these expenses, there are costs associated with reimbursing brokers and nominees for their reasonable costs in identifying potential Class Members and, should they elect to do so, postage for mailing directly to their clients (postage paid to brokers and nominees would offset to some extent the amount reflected above in the costs of printing and postage); and other miscellaneous costs such as costs associated with updating addresses on returned mail.

expenses.[7]  As set forth in the Verkhovskaya Affidavit, using per claim fees as opposed to hourly rates results in a less costly claims administration process.  *Id*. at ¶38.  Based on the estimated number of claims and estimates of the attendant additional reimbursable expenses, A.B. Data, estimates that the cost of administration will range from a low of $76,464.82 to a high of $125,906.51.  *Id.* at ¶ 42.  In total, Notice and administration costs will be in the range of $205,647.20 to $397,090.21.  *Id.* at ¶43.

## IV.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

The settlement of complex class action litigations are clearly favored by the courts.  *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761 (CM), 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008) ("Courts observe a general policy favoring the settlement of disputed claims, especially with respect to class actions."); *In re Prudential Inc. Sec. Ltd. P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.").  In considering whether to grant preliminary approval to a class action settlement agreement, courts make a preliminary evaluation of the fairness of the settlement, prior to a hearing on notice.  As this Court stated:

> Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant

---

[7]    The only out-of pocket expenses for which A.B. Data will be reimbursed are the cost of: printing, including but not limited to the Notice and Proof of Claim form and checks (if a captive or in-house printer is used, such costs will be competitive with charges available from independent third-party printers); postage, including but not limited to Notice and Proof of Claim, correspondence with Claimants, and checks; reimbursement to brokers and other nominees for researching their records for notification purposes; long-distance telephone charges; and travel expenses should any necessarily be incurred in connection with its work in this Action.  Additionally, A.B. Data will bill at a discounted hourly rate for the cost of specialized affidavits.  Verkhovskaya Aff. at ¶40.

> preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.

*In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007) (J. Scheindlin) (citations omitted) ("*IPO Sec. Litig.*").  Additionally, where as here, the settlement was reached under the supervision of an appropriately selected institutional Lead Plaintiff, it is entitled to an even greater presumption of reasonableness.  *See Greebel v. FTP Software*, 939 F. Supp. 57, 64 (D. Mass. 1996) ("'Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' . . .'").

The preliminary approval hearing "is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing."  *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980) (footnote omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).  The parties here request only that the Court take the first step in this process, which is to grant preliminary approval of the proposed Settlement, because the Settlement satisfies the standard for such approval.  The proposed Settlement, which provides the sum of $37.5 million in cash for distribution to eligible Class Members less Court-awarded fees and expenses, is clearly beneficial to the Class. Given the complexities of this Action, and the continued risks if the parties were to proceed to trial, the Settlement represents a reasonable resolution, and eliminates the risk that the Class might not otherwise recover from Defendants (or recover an amount substantially less than the $37.5 million Settlement proposed here).  *See, e.g., Prudential Sec. Litig.*, 163 F.R.D. at 210 ("Instead of the lengthy, costly, and uncertain course of further

14

litigation, the settlement provides a significant and expeditious route to recovery for the Class.")[8] Additionally, in this case, it is clear that even if Lead Plaintiff were to secure a greater judgment at trial, the Company, which undoubtedly would have been found to be primary wrongdoer, could not have satisfied that judgment, nor would it in all likelihood even have been able to match the amount Lead Plaintiff obtained from the Company and the D&O insurers in the proposed Settlement.  As noted above, the Company is in dire financial straits and obtaining a judgment at trial would in all likelihood have put the Company in bankruptcy.  This is another factor that strongly militates in favor of approval of the proposed settlement.  *See e.g., In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 CV 10240 (CM), 2007 WL 2230177, at *8 (S.D.N.Y. July 27, 2007) ("The risk that a successful prosecution will result in the bankruptcy of the defendant strongly weighs in favor of approval of a settlement."); *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1389 (S.D.N.Y. 1972) *aff'd in part, rev'd in part by* 495 F.2d 448 (2d Cir. 1974) (the "prospect of a bankrupt judgment debtor at the end of the road does not satisfy anyone involved in the use of class action procedures").

Moreover, reference to the factors set forth above considered by courts in granting preliminary approval of class action settlements lend support to the proposition that the

---

[8]   The proposed Settlement represents approximately 9% of what Lead Plaintiff's damages expert calculated as the maximum damages (or 7.6% after deduction of the total highest estimated fees and expenses).  Recovery of the maximum damages assumes that Lead Plaintiff would prevail on all its claims against all Defendants; an assumption that ignores the substantial risks attendant to establishing liability and damages in this Action.  Indeed, as this Court has noted, the fact that "a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.  A review of securities class action settlements indicates that the median settlement recovery in 2005 was approximately three percent of plaintiffs' estimated damages." *IPO Sec. Litig.*, 243 F.R.D. at 93 n.120  (internal quotations and citations omitted).  Had this case continued to trial, Plaintiffs' maximum damages estimates likely could have been reduced based on matters of proof and the opposition of Defendants' damages experts.

Settlement is well within the range of possible approval.  First, the terms of the proposed Settlement are the product of extensive arm's-length negotiations.  The Action was actively prosecuted for two years.  At the time the parties agreed to settle, the motions to dismiss the Amended Complaint were being briefed, millions of pages of documents had been reviewed, depositions were scheduled, and fact discovery was scheduled to be completed only six weeks later.  Accordingly, there is no evidence here of any collusion between the parties.

Nor is there any evidence that Lead Plaintiff will improperly receive preferential treatment.  To the contrary, Lead Plaintiff will be treated exactly the same as any other Class Member with the single exception of the application that will be made to compensate it for its expenses in representing the class, as expressly provided in the PSLRA.  *See* 15 U.S.C. § 78u-4(a)(4).  Moreover, Lead Counsel has significant experience in securities and other complex class action litigation, and has negotiated hundreds of other substantial class action settlements throughout the country.  Lead Counsel has taken extensive discovery and is thus "well informed as to the operative facts" and "considerable risks" of the Action.  *See Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006).

At this point, the Court need not answer the ultimate question: whether the Settlement is fair, reasonable and adequate.  The Court is only being asked to permit notice of the terms of the Settlement to be sent to the Class, and to schedule a hearing, pursuant to Fed. R. Civ. P. 23(e), to consider any views expressed by Class Members as to the fairness of the Settlement, the Plan of Allocation, and Lead Counsel's request for an award of fees and expenses.  5 James Wm. Moore, *Moore's Federal Practice* 23.85[3], at 23-353 to 23-354 (3d ed. 1999).

As outlined in the Preliminary Approval Order, Lead Plaintiff will notify Class Members of the Settlement by mailing the Notice and Claim Form to Class Members no later than eighteen

(18) days after entry of the Preliminary Approval Order.  The Notice will advise Class Members of the essential terms of the Settlement, of information regarding Lead Counsel's fee application, and of the proposed plan for allocating the Settlement proceeds among Class Members.  It also will set forth the procedure for objecting to the Settlement, Plan of Allocation or the request for an award of attorneys' fees and reimbursement of litigation expenses, or opting out of the Class, and will provide specifics on the date, time and place of the Fairness Hearing.  The proposed Preliminary Approval Order further requires Lead Plaintiff to cause the Summary Notice to be published once in the global edition of *The Wall Street Journal* and in the *Financial Times* within seven (7) days of the mailing of the Notice.  Lead Counsel will also post a copy of the Notice on the firm's website: www.blbglaw.com.  Lead Counsel believes that, because the Notice and Summary Notice fairly apprise Class Members of their rights with respect to the Settlement, they represent the best notice practicable under the circumstances and should be approved.

## V.   THE PROPOSED PLAN OF ALLOCATION  WARRANTS PRELIMINARY APPROVAL

Approval of a plan of allocation in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution must be fair, reasonable, and adequate.  *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002).  Moreover, when formulated by competent and experienced class counsel, an allocation plan need have only a "reasonable, rational basis."  *Id.  See also In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 428-31 (S.D.N.Y. 2001); *In re NASDAQ Market-Makers Antitrust Litig.*, No. 94 Civ. 3996 (RWS), 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000).  In *Maley*, Judge McMahon wrote:  "The proposed Plan of Allocation, which was devised by experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses of the

potential claims of Class members, satisfie[d] the same standards of fairness, reasonableness, and adequacy that apply to the overall settlement."  186 F. Supp. 2d at 367.

The proposed Plan of Allocation was developed by Lead Plaintiff's damages expert working together with Lead Counsel.  *See* Nettesheim Dec. at ¶¶2-12.  The objective of the proposed Plan of Allocation, which is set forth in full in the Notice, is to equitably distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged fraud and negligence, as opposed to losses caused by market and industry factors or Company specific factors not related to the alleged fraud or negligence.  The Plan of Allocation reflects Lead Plaintiff's damages expert's analysis undertaken to that end, including a review of publicly available information regarding Scottish Re and statistical comparisons of the price movements of the Scottish Re Securities with the price performance of relevant market and industry indices during the Class Period (February 17, 2005 – February 20, 2007).  Lead Plaintiff and Lead Counsel, in consultation with Lead Plaintiff's damages expert, have estimated the artificial inflation in Scottish Re Ordinary Shares, Preferred Shares, and HyCU Shares during the Class Period, as reflected in the tables appended to the Notice which fairly and reasonably reflect the relevant risks to recovery from Defendants.

## VI.  SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, the Court must set a final approval hearing date, dates for mailing and publication of the Notice and Summary Notice, and deadlines for submitting claims, for opting out of the Class or for objecting to the Settlement. Lead Plaintiff proposes the following schedule:

| | |
|---|---|
| Notice mailed to Class. | 18 days after entry of the Preliminary Approval Order. |
| Summary Notice published. | 25 days after entry of the Preliminary Approval |

| | |
|---|---|
| | Order. |
| Last day for submitting claims. | 120 days after the Notice is mailed. |
| Last day for Class Members to opt-out or object to Settlement. | 21 days prior to the Fairness Hearing. |
| Lead Plaintiff files its papers in support of final approval. | 7 days prior to the date of the Fairness Hearing. |
| Fairness Hearing. | A date to be set at the Court's convenience, not less than 75 days after entry of the Preliminary Approval Order. |

## VII.   THE PROPOSED CLASS SHOULD BE PRELIMINARILY CERTIFIED UNDER RULES 23(a) AND (b)(3)

In granting preliminary settlement approval, the Court should also preliminarily certify the class for purposes of the Settlement under Rules 23(a) and (b)(3).  At this stage of the process, "[t]he judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."  Manual for Complex Litigation (Fourth) at §21.632.  Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants."  *Prudential Sec. Litig*., 163 F.R.D. at 205.  "Temporary settlement classes have proved to be quite useful in resolving major class action disputes."  *Weinberger v. Kendrich*, 698 F.2d 61, 72 (2d Cir. 1982).  "The law in the Second Circuit favors the liberal construction of Rule 23 . . . and courts may exercise broad discretion when they determine whether to certify a class."  *Aramburu v. Health Fin. Servs.*, No. 02 CV 6535 (ARR), 2005 U.S. Dist. LEXIS 42257, at *5 (E.D.N.Y. Apr. 14, 2005) (citation omitted).

Lead Plaintiff requests preliminary certification of the class pursuant to the numerosity, commonality, typicality and adequacy requirements of Rule 23(a)(1)-(4) and the predominance

and superiority requirements of Rule 23(b)(3).  As demonstrated below, the proposed class has

no obvious defects, and therefore warrants preliminary certification.

### A.    The Class Members Are Too Numerous To Be Joined

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is

impracticable.  *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y.

1993).  The numerosity requirement is satisfied here because when claims involve allegations of

fraud in connection with publicly-traded securities, "common sense dictates the purported

plaintiff class is likely quite numerous."  *IPO Sec. Litig.,* 243 F.R.D. at 90 (citation omitted).

Here, the proposed class includes all purchasers of Scottish Re Ordinary Shares,

Preferred Shares and/or HyCU Shares either in the Offerings pursuant to a Registration

Statement or in the market and were damaged thereby between February 17, 2005 and February

20, 2007.  The proposed Class likely consists of tens of thousands of investors who purchased

Scottish Re Securities during the Class Period.  During the Class Period, there were potentially

48.75 million shares of Scottish Re Securities issued and outstanding which were actively traded

on the New York Stock Exchange.  Thus, the numerosity requirement is satisfied.  *See, e.g.*, *In re

Global Crossing Sec. & ERISA Litig.*,  225 F.R.D. 436, 451 (S.D.N.Y. 2004); *De la Fuente v.

DCI Telecomms., Inc.*, 206 F.R.D. 369, 390 (S.D.N.Y. 2002).

### B.    Common Questions of Law and Fact Exist

Rule 23(a)(2) requires the existence of questions of law or fact common to the class.  *See

Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (commonality inquiry "asks if

the named plaintiffs 'grievances share a common question of law <u>or</u> of fact' with those of the

proposed class . . . .") (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997))

(emphasis added).  "This requirement 'has been applied permissively in securities fraud

litigation' and generally is satisfied 'where putative class members have been injured by similar

material misrepresentations and omissions.'"   *In re Parmalat Sec. Litig.*, 04 Civ. 0030 (LAK), 2008 WL 3895539, at *4 (S.D.N.Y. Aug. 21, 2008) (quoting *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179-80 (S.D.N.Y. 2005)).

In the present Action, there are numerous common legal and factual issues, and the same facts giving rise to the claims of the proposed Class representative also give rise to absent Class Members' claims.   Indeed, absent Class Members would have to prove identical facts, and answer identical questions were they to pursue their claims individually.   *See* Amended Complaint, ¶ 52.  As the court stated in *In re Oxford Health Plans, Inc. Securities Litigation*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000), "[w]here the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." (Citation omitted.)  Thus, the commonality requirement of Rule 23(a)(2) is satisfied by the facts alleged in the present Action.

### C.   Lead Plaintiff's Claims Are Typical Of Those Of The Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a).  Typicality is satisfied if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001) (citation omitted).  The typicality requirement of Rule 23(a)(3) is liberally construed, and "typical" does not mean "identical."   *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 200 (S.D.N.Y. 1992).

The focus of the typicality inquiry is not the Lead Plaintiff's behavior, but rather the Defendants' actions.  *See, e.g.*, *Teachers Ret. Sys. Of Louisiana v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 U.S. Dist. LEXIS 25927, at *12-13 (S.D.N.Y. Dec. 20, 2004).  The critical question is whether the named plaintiff and the class can point to the same "common course of conduct"

to support a claim for relief.  Courts have recognized that typicality is established when "the same [alleged] unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented."  *Global Crossing*, 225 F.R.D. at 452 (quoting *Robidoux v. Celani*, 987 F. 2d 931, 936-37 (2d Cir. 1993)).  A proposed class representative's claims satisfy the typicality requirement if -- as here -- they arise "from the same practice or course of conduct that gives rise to the claims of the proposed class members."  *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007) (citation omitted).

Here, the claims asserted by Lead Plaintiff are typical, if not identical, to the claims of every other Class Member.  The Amended Complaint alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, by making public statements that misrepresented or omitted material facts.  Lead Plaintiff allege that it, like the rest of the Class, paid artificially-inflated prices for Scottish Re Securities as a result of Defendants' alleged material misrepresentations and omissions.  Those claims, and the claims of the absent Class Members, are based upon precisely the same theories, and will be proven by precisely the same evidence.  Similarly, the Amended Complaint alleges that Defendants by including material misstatements of fact and omission in the prospectuses and registration statements pursuant to which Scottish Re Preferred Shares and Ordinary Shares were offered to the public in July and December 2005, respectively violated Sections 11, 12(a)(2) and 15 of the Securities Act.  Thus, the requirements of Rule 23(a)(3) are satisfied.

D.    **Lead Plaintiff and Its Counsel Will Fairly and Adequately Represent The Proposed Class**

Rule 23(a)(4) requires that a representative plaintiff fairly and adequately protect the interests of the class.  The inquiry into adequacy focuses on whether the named plaintiff's interests are antagonistic to the interests of other class members; and whether the counsel

retained by the named plaintiff to represent the class are qualified, experienced, and capable of conducting the litigation. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

As discussed above, Lead Plaintiff's claims arise from the same course of conduct as, and are typical of, the claims of the Class. Lead Plaintiff and all Class Members share an interest in proving the alleged falseness of Defendants representations and obtaining redress. In addition, Lead Plaintiff has retained experienced, capable counsel to represent the Class. Bernstein Litowitz Berger & Grossmann LLP has successfully pursued and resolved a multitude of complex class actions in courts throughout the United States. Furthermore, the proposed $37.5 million Settlement obtained for the Class is further evidence that Lead Plaintiff and its counsel has fairly and adequately protected the interests of the Class, and will continue to do so. Accordingly, the adequacy requirement of Rule 23(a)(4) is met in this Action.

### E.  The Proposed Class Satisfies The Requirements Of Rule 23(b)(3)

In addition to the four requirements of Rule 23(a), a certifiable class must also satisfy one of the three subparts of Rule 23(b). Lead Plaintiff here seeks class certification under Rule 23(b)(3), which requires that:

> the court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). This rule is designed to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

1.      **Common questions of law and fact predominate.**

The predominance inquiry normally focuses "'on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [and] tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.'"    *Cromer,* 205 F.R.D. at 127 (quoting *Amchem*, 521 U.S. at 623) (alteration in *Cromer*).  Predominance "is a test readily met in certain cases alleging consumer or securities fraud . . . ."  *Amchem*, 521 U.S. at 625.  "A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." 2 *Newberg on Class Actions* § 4:25.

In this Action, it is alleged that all Class Members were subjected to, and harmed by, Defendants' uniform course of conduct in issuing materially false and misleading statements with respect to the appropriate amount of DTA on the Company's financial statements and that the Company's internal controls were adequate, as required by the Sarbanes-Oxley Act.

2.      **A class action is superior to other available**
           **methods for resolving this litigation.**

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

> The matters pertinent to these findings include:  (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*  Courts have found that the superiority requirement is satisfied where:

> [t]he potential class members are both significant in number and geographically dispersed[, and t]he interest of the class as a whole in litigating the many common questions substantially outweighs any interest by individual members in bringing and prosecuting separate actions.

*Cromer*, 205 F.R.D. at 133.

Here, the utility of presenting the claims of Class Members through the class action device is substantial, as Class Members who allegedly have been injured by Defendants' conduct number in the thousands, but the vast majority have not been damaged to a degree that would induce them to bring their own suits, nor do they have the resources to conduct litigation of such complexity. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999) ("violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.").

In addition, settlement of this Action on a class basis presents no trial management difficulties. As explained in *Amchem*, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial." 521 U.S. at 620.

Thus, class certification is the superior method for resolving the claims of the Class.

## <u>CONCLUSION</u>

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant preliminary approval of the proposed Settlement; preliminarily certify the proposed Class for settlement purposes; and enter the accompanying proposed Preliminary Approval Order.

Dated:   New York, New York
   September 3, 2008

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

By: /s/ Salvatore J. Graziano
   Max W. Berger (MB-5010)
   Salvatore J. Graziano (SG-6854)
   1285 Avenue of the Americas
   New York, New York 10019
   Telephone:  (212) 554-1400
   Facsimile:  (212) 554-1444

   John R. Climaco, Esq.
   David M. Cuppage, Esq.
   Scott D. Simpkins, Esq.
   CLIMACO, LEFKOWITZ, PECA,
    WILCOX & GAROFOLI CO.,
   55 Public Square, Suite 1950
   Cleveland, Ohio 44113
   Telephone:  (216) 621-8484
   Facsimile:   (216) 771-1632

   *Counsel for Lead Plaintiff and the Class*

#321698.6